# ORIGINAL

(12)
7-13-0
sc

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

KENNETH ALAN SHIFFER,                          :

               Petitioner      :   CIVIL No. 1:00-CV-1829

    v.                                         :

BEN VARNER, et al.,                            :   (Judge Caldwell)

              Respondents    :

**FILED**
HARRISBURG, PA

MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
APPLICATION FOR WRIT OF HABEAS CORPUS
UNDER 28 USC SECTION 2254

JUL 1 2 2001

MARY E. D'ANDREA, CLE[RK]
Deputy Clerk

## STATEMENT OF THE CASE

### Procedural History

Petitioner was arrested and charged with criminal homicide on October 9, 1987 in connection with the death of Lenny Radziak. On November 4, 1987 a preliminary hearing before District Justice Richard Cashman was held, and following the hearing a prima facie case was found and the case was bound over for trial.

On June 1, 1988, a suppression hearing took place before the Honorable Jay W. Myers and after said hearing the court took the matter under advisement. On June 30, 1988, Judge Myers suppressed the photographic identification of Patricia Gardner but denied the suppression of Diane Szklarz and Beverly Lynn. See Exhibit "A".

On November 15, 1988, trial commenced before Honorable

Jay W. Myers and Jury.  The Commonwealth was represented by
Scott W. Naus, Esquire and Richard Knecht, Esquire; Petitioner
was represented by William C. Costopoulos, Esquire and Charles
Rector, Esquire.  After a four day trial, on November 18,
1988, Petitioner was convicted of second-degree murder.

Timely post-trial motion in arrest of judgment and for
a new trial was filed.  On January 9, 1990, Judge Myers denied
post-trial motions.  See Exhibit "B".  On February 12, 1990,
petitioner was sentenced to Life imprisonment.  Timely appeal
was taken to the Superior Court of Pennsylvania, and on October
18, 1990, the Superior Court affirmed the judgment of sentence.
See Exhibit "C".  Allowance of Appeal was taken to the Supreme
Court of Pennsylvania and was denied on June 27, 1991.

On January 6, 1997, petitioner filed his petition under
the Post Conviction Relief Act and was appointed Hugh Summer,
Esquire.  On June 26, 1997 a hearing was held before Honorable
Gailey C. Keller.  On August 5, 1997, the Commonwealth filed
a Motion for Taking Additional Testimony which was opposed
by petitioner.  The Court permitted the Commonwealth to present
additional testimony, and on October 15, 1997 a hearing was
held.  On October 28, 1997, petitioner's petition under the
Post Conviction Relief Act was denied by Judge Keller.  See
Exhibit "E".

Timely Notice of Appeal was taken to the Superior Court
of Pennsylvania, and on February 10, 1999, the Superior Court
Affirmed the Judgment of the trial court.  Pro Se Allowance
of Appeal was taken to the Supreme Court of Pennsylvania,
and on December 3, 1999, was denied.  See Exhibit F & G.

On October 16, 2000, Petitioner filed his present action
with this Court.  Respondents were ordered to file their answer
to the petitioner's petition within twenty (20) days from
February 23, 2001.  After Respondents failed to answer this
court, on April 24, 2001 Ordered the Respondents to show cause

2

to why they failed to file an answer to the petitioner's petition.  Respondents filed a request for extension of time to file their answer, and also their answer to petitioner's petition.  Petitioner filed his response to Respondents filings and requested an extension of time to respond to Respondents answer.  On June 7, 2001, this Court ordered that Respondents extension be granted and a response to petitioner's petition be filed on or before June 26, 2001.  The court also ordered that the petitioner shall have fifteen (15) days of receipt of the Respondents' filing to reply.

Petitioner filed a Clarification of this court's order dated June 7, 2001, to clarify the order.  This court denied the petitioner's request and stated that Respondents will file a response to petitioner's petition on or before June 26, 2001.  To present date, petitioner has not received any response from the Respondents.  To protect the filing of petitioner's writ of habeas corpus, petitioner is presently submitting this present Memorandum of Law in Support of his Habeas Petition filed.

## Factual History

During the early morning hours of May 11, 1987, as Leonard Radziak, the victim, was attempting to enter his room at Hayes Hotel, LaSalle Street, Berwick, Pennsylvania, he was severly beaten.  During the petitioner's trial, Doctor Isidore Mihalikis testified that several of the victim's injuries were caused by a straight or rounded, cylindrical type object. A fellow hotel guest, Lawrence Laubach, known to the victim as "Louie the Kraut", heard someone crying "ou, ou, ou" and a banging sound down a second floor hallway of the Hotel. When he investigated he found the victim lying outside his room, bleeding from a head wound.

The victim was transported to Berwick Hospital, and then

flown to Geisinger Medical Center at Danville, where he died at 9:04 p.m. on May 12, 1987. Doctor Isidore Mihalikis ruled that the cause of death was lack of oxygen to the brain and bacteric in the bloodstream from multiple blunt injuries to the head.

When asked by Assistant Chief Thomas James of the Berwick Police Department, the beating victim said that "Louie the Kraut" did it. See Exhibit "H"  The victim also stated to a lady friend, Marge Sorber, "George -- I had a bad argument with George." See Exhibit "I".

During May of 1987, Diane Szklarz was interviewed by Trooper Confer and Officer McCormick. Ms. Szklarz lives one block from the Hotel, and she saw a man at about 1:00 a.m., on May 11th, with a pipe in his right hand. This man had stopped and looked at her from under a street light for about seven (7) seconds. Ms. Szklarz picked the petitioner from looking through array of photos on July 13, 1987, after looking through her third array of photos, and petitioner was arrested on October 9, 1987 in connection with the death of Lenny Radziak.

Another person, George Sheeler, a sometime drinking buddy of the victim, was also arrested and charged with the murder of the victim. Mr. Sheeler was seen outside of the Hotel on the night of the beating by officer Chief James.

### ISSUES PRESENTED

1. The suppression court erred in not suppressing the eyewitness identification.

2. The evidence presented is insufficient to sustain a verdict.

4

3. Counsel was ineffective for failing to permit petitioner to testify.

4. Counsel was ineffective for failure to object to the charge of reasonable doubt to the jury.

5. Trial counsel was ineffective for withdrawing a pretrial motion for change of venue or venire.

6. Counsel was ineffective for failing to impeach police officer about the money.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act ("AEDPA") which became effective on April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000). Since the Petitioner filed his habeas petition on October 16, 2000, the court would be required to apply the amended standards set forth in the AEDPA to his claims for federal habeas corpus relief. Id. (citing Lindh v. Murphy, 521 U.S. 320, 336 (1997)(presuming that a federal habeas court is to apply the amended standards set forth in the AEDPA when a petition is filed after the effective date of the AEDPA).

The AEDPA increases the deference federal courts must give to the factual findings and legal determinations of the states courts. Id. at 196 (citing Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)). Pursuant to 28 U.S.C. § 2254(d), as amended by the AEDPA, a petition for habeas corpus may only be granted if (1) the state court's adjudication of the claim resulted in a decision contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of United States;"

or if (2) the adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)(2). Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. <u>Werts</u>, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court expounded upon this language in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000). In <u>Williams</u>, the Court explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Hameen v. State of Delaware</u>, 212 F.3d 226, 235 (3d Cir. 2000)(citing <u>Williams</u>, 529 U.S. at 389-390). The Court in <u>Williams</u> further stated that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>. The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id</u>. (citing <u>Williams</u>, 529 U.S. at 388-389). "In further delineating the 'unreasonable application of component, the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." <u>Werts</u>, 228 F.3d at 196 (citing <u>Williams</u>, 529 U.S. at 389); <u>accord Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877 (3d Cir. 1999).

6

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Petitioner's claims of ineffective assistance of counsel are governed by Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court set forth the standard for a petitioner seeking habeas relief on the grounds of ineffective assistance of counsel by stating, "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudice the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. In determining prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice .... that course should be followed." Id.

"It is past question that the rule set forth in Strickland qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Williams, 529 U.S. at 391. Thus, Petitioner is entitled to relief if the

7

Pennsylvania courts' decision rejecting his claims of ineffective assistance of counsel was either "contrary to, or involved an unreasonable application of," that established law. Id. The Pennsylvania Supreme Court has held that the Pennsylvania standard judging ineffectiveness claims is identical to the ineffectiveness standard enunciated by the United States Supreme Court in Strickland. Werts, 228 F.3d at 203 (citing Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987).

<u>ARGUMENT</u>

1.  The suppression court erred in not suppressing the eyewitness identification.

At the suppression hearing, Ms. Diane Szklarz testified that shortly after 1:00 a.m. on May 11, 1987, she observed a man jogging down the street. The man stopped when she yelled for her dog and stood and looked at her for at least six seconds. It was brought out at trial that the distance between the man and Ms. Szklarz measured 80 feet. In two separate police reports, Trooper Confer's and Officer McCormick's notes reflected Ms. Szklarz"s description of the man as having a beard with hair over the ears. However, Ms. Szklarz, denied telling the police that, rather, she said he had "a couple days'" growth on his face.

Based on the information given by Ms. Szklarz on the description of the man, she was shown three photo arrays, and did not identified anyone. Then, on July 13, 1987, two months later, she selected Petitioner's photo.

Petitioner argues that the reliability of the witness photo identification is undermined by the poor conditions she had to view the man she saw. The trial court held that she did have direct face and eye contact with the Petitioner

8

for at least six seconds, under a street light at a distance of approximately eighty feet, the identification was reliable. Reliability is the hitch pin in determining the admissibility of identification testimony and there are several factors to be weighed before reaching a decision based on the totality of the circumstances. Mason v. Brathwaite, 432 U.S. 98 (1977). Convictions based on eye witness identification at trial may be set aside on the grounds that it is unreliable when it gives rise to a very substantial likelihood of irrefutable misidentification. Simmons v. U.S., 390 U.S. 377 (1968).

In Petitioner's motion to suppress, he alleged that the photographic array identification made by Diane Szklarz as well as the preliminary hearing identification should be held inadmissible because the identification procedure was unduly suggestive and the identification of Petitioner was highly unreliable. This identification violated Petitioner's right to due process imparted to him by the United States Constitution.

On a challenge to photographic array identification, the suppression court must determine whether the identification procedure was so suggestive and conducive to irreparable mistaken identity so as to deny the accused due process. Commonwealth v. Thomas, 363 Pa.Super. 348, 526 A.2d 380-1 (1987). Reliability is the primary criterion in assessing the admissibility of a challenged identification. Manson v. Brathwaite, 432 U.S. 98 (1977).

To ascertain the reliability of the identification, the following factors are considered: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the

9

confrontation.  <u>Neil v. Biggers</u>, 409 U.S. 188, 199 (1972).

Given the extreme unreliability of Ms. Szklarz identification and the suggestiveness of the identification procedure, Petitioner's constitutional right of due process under the United States Constitution was abridged by the admissibility of her identification.

2.  The evidence presented is insufficient to sustain a conviction.

The evidence that was adduced at trial against the petitioner is not sufficient to prove his guilt of murder in the second degree.  The eyewitness identification of Diane Szklarz was self-contradictory, inconsistent and fatally flawed.  The jacket that was discussed during trial that contained blood was without evidentiary value because it was of unknown origin.  The dying declaration of the victim should have proven that the petitioner was not guilty of the murder.

When the petitioner was arrested he voluntarily told the police that George Sheeler telephoned him about robbing a person of $400.00, but the petitioner refused to do anything to this person.  Petitioner told police that when the beating took place he was with his girlfriend, and petitioner's girlfriend corroborated this alibi.

There was no evidence presented at trial that the petitioner was at the bar on May 10th.  However, George Sheeler was there with the victim.  Also at the bar were George Sisko, Ernie Knorr, Joan Beaver and Tom McGraw.

While at the bar, the victim flashed the $400.00 he had to Raymond Feustemaker.  Also, he flashed the money at George Sisko, who in turn asked him for a loan.  Ernie Knorr drove the victim back to the Hotel along with McGraw and Beaver,

10

and helped him into the Hotel.

The one person at the bar, George Sisko, said he went to the Slovick Club after leaving the Old Man's Club about 12:30 or 12:45 a.m., however, the Slovick Club closed at midnight. Then, Mr. Sisko informed the police that he got a watch from the man who murdered the victim, but he couldn't remember his name. By August of 1987, Mr. Sisko's memory improved for he remembered that George Sheeler gave him the watch.

As for George Sheeler, he was the initial suspect in this case. Mr. Sheeler maintained that he left the Club at 1:00 a.m. and walked to the R.G. Smith Trailer Park, however, the police stopped him in a different location between 2:00 and 2:15 in the morning.

We go on to Diane Szklarz, the women who could see in the dark and only with a little light, states that it was the petitioner. That on May 13th Ms. Szklarz contacts the police and told them that on May 11th at 1:00 a.m., she saw a man with a pipe jogging past her home. When she yelled for her dog, the man that was jogging stopped under a street light and looked at her. If this person was the petitioner, then it would seem very odd that he would stop right under a light to show someone his face. But, the story becomes even better, as Ms. Szklarz states that the man was carrying a silver pipe in his right hand, three-foot long; hunched over; had on dark pants, not jeans, white sneakers with a black design, and a black Member's Only jacket. To make this story of hers better, she stated, "a shortwaisted jacket with ribbing on the bottom, and ribbing on the cuffs, and two snaplike things on the shoulder. She was able to see all of this within seven seconds and at a distance of 82 feet.

11

To add even more to her story, she stated that the person was white, had dark hair that came over the ear parted in the middle, and was floppy, which means, styled and moussed. Although Ms. Szklarz insisted that the police wrongly wrote down in their reports that she told them the man had a beard, both Trooper Confer and Officer McCormick, in separate reports, clearly noted that she told them he had a beard but no mustache. In the arrays of photos shown to her, it took three arrays until she picked the petitioner, who was clean shaven in the photo.

In search of the petitioner's residence, the police found a Member's Only jacket which had blood on it. When the jacket was sent to the FBI crime laboratory, they could not determine whether the blood was human or animal. Prior to trial, the defense submitted the jacket to a DNA laboratory along with a sample of the victim's blood for testing. The lab was unable to conduct the test despite attempts to do so.

Given the highly speculative nature of the jacket, containing blood that cannot even be said to be of human origin, together with the defense effort to have blood undergo DNA testing, the jacket lacks any evidentiary value in this case, and fails to support Petitioner's conviction.

Petitioner's co-defendant knew that the victim had four $100.00 bills on his person, and the victim was displaying the money to patrons at the club. Also, the victim stated that he had an argument with "George" before he was beaten. George Sisko also needed money that night, in fact he tried to borrow money from the victim at the club. Also, Mr. Sisko received a watch from George Sheeler, the watch that belonged to the victim.

One important area that this court must take note of is the victim's dying declaration to where he stated to Chief

Thomas James, "Louie the Kraut" did it.   See Exhibit "H". This dying declaration in itself should place reasonable doubt to the petitioner's guilt.

For the above reasons, this Court should appoint counsel to the petitioner and hold an hearing on the evidences of this case, and also on the testimony that was given at trial.

3.   Counsel was ineffective for failing to permit the petitioner to testify.

The decision whether to testify on one's own behalf is to be made by the accused after full consultation with counsel. Commonwealth v. Rowles, Pa. 462 A.2d 619 (1983).

In order to support a claim that counsel was ineffective for failing to put the accused on the witness stand, the accused must show that counsel interfered with the accused's freedom to testify or that counsel gave specific advise so unreasonable as to vitiate a knowing and intelligent decision by the accused not to testify.   Commonwealth v. Fowler, Pa.Super., 523 A.2d 784 (1987).

In this present case the testimony presented at hearing does not show evidence of interference by trial counsel. Petitioner's freedom to testify as Petitioner did not persist after being advised by trial counsel.   The testimony does, however, indicate advise by trial counsel was so unreasonable as to vitiate a knowing and intelligent decision by the Petitioner not to testify.

Trial counsel testified at the hearing that the major concern in permitting Petitioner to testify was that the Petitioner was subject to impeachment as a result of a prior conviction the Petitioner had for the crime of aggravated assault.

Pennsylvania Courts have permitted impeachment of witnesses by proof of any felony or misdemeanor conviction if it was in the nature of crime falsi, that is involved dishonesty or false statement. Commonwealth v. Bighum, Pa., 307 A.2d 255 (1973). If a witness is also the Defendant in a criminal trial, additional protectors attach when evidence of prior convictions is offered to impeach. The Courts have recognized the "tendency of a normal juror to accept testimony of prior convictions as a basis for finding a predisposition to commit the crime charged. In this instance the current charge was for an assault that led to murder whereas the prior conviction was for assaultive behavior. Aggravated assault has been held not to constitute a crime of false statement or dishonesty. Commonwealth v. Griman, Pa.Super., 378 A.2d 377 (1977).

Trial counsel's specific advise was: "So I did not tell him not to testify." I told him, "in my opinion, if he testified this assault, this aggravated assault and battery, was coming in. And, if he was asking me what I thought, I thought it was in his best interest not to take the witness stand."

Given the state of the trial counsel's advise not to testify because of the possibility of prior conviction impeachment was totally unreasonable and did in fact vitiate the decision by Petitioner not to testify. Trial counsel also had another avenue to pre-test the impeachment question which he chose not to pursue. Trial counsel testified that he was aware that a Motion in Limine could be filed to get a ruling on the issue outside the presence of the jury but could not explain his failure to file a Motion in Limine. Petitioner testified that he felt the jury had to hear from me that I wasn't involved in the crime. He indicated he would have done so absent the advise concerning impeachment.

Petitioner was obviously prejudiced by the erroneous advise given by his counsel.

4.  Counsel was ineffective for failure to object to the charge of reasonable doubt to the jury.

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. <u>Hopt v. Utah</u>, 120 U.S. 430, 440-441 (1887). As long as the court instructs the jury on the necessity that the defendant's guilt be proven a reasonable doubt, see <u>Jackson v. Virginia</u>, 443 U.S. 307, 320, n.14 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government burden of proof. <u>Taylor v. Kentucky</u>, 436 U.S. 478, 485-486 (1978).

In <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990), the definition of reasonable doubt was given as follows:

> "'[A reasonable doubt] is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. <u>It must be such doubt as would give rise to a grave uncertainty</u>, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. <u>It is an actual substantial doubt</u>. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a <u>moral certainty</u>.'" <u>Id.</u>, at 40. (emphasis added by the Court in Cage).

The court held that the highlighted portions of the instruction rendered it unconstitutional:

> "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Id., at 41.

When reviewing a jury instruction that defines "reasonable doubt," it is necessary to consider the instruction as a whole and to give the words their common and ordinary meaning. It is not sufficient for the jury instruction merely to be susceptible to an interpretation that is technically correct. The important question is whether there is a "reasonable likelihood" that the jury was misled or confused by the instruction, and therefore applied it in a way that violated the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990). Any jury instruction defining "reasonable doubt" that suggest an improperly high degree of doubt for acquittal or an improperly low degree of certainty for conviction, offends due process. Either misstatement of the reasonable doubt standard is prejudicial to the defendant, as it "vitiates all of the jury's findings," and removes the only constitutionally appropriate predicate and the jury's verdict.

The Court, in the petitioner's case, charge to the jury defined reasonable doubt as follows, with no exception from trial counsel:

"As part of that concept is
included the phrase or expression
reasonable doubt. Again we
have a duty to explain the legal
ramification or legal
significance of that phrase
as it applies to that particular
concept. When we say that the
Commonwealth must prove the
guilt of the Defendant beyond
a reasonable doubt, reasonable
doubt does not mean beyond the
shadow of a doubt, nor beyond
the possibility of a doubt,
nor is it a doubt that a juror
might conjure up in his or her
own mind to avoid the performance
of an unpleasant duty. But,
reasonable doubt simply defined
is such a doubt that would cause
a person of ordinary firmness
and prudence to hesitate to
act in important affairs of
his or her own life. Obviously
a doubt to be reasonable <u>arise
from the evidence</u> and must be
such a doubt that would fairly
strike a conscientious mind
and cloud your judgment and
cause you to hesitate to conclude
that this Defendant is guilty"
(emphasis supplied).

Any instruction which allows a finding of guilt based
upon the degree of proof that is less than required by the
due process clause is a violation of that guarantee. Where
a jury instruction of reasonable doubt is constitutionally
deficient, prejudice must be presumed and the deficiency must
be viewed as plain error. <u>U.S. V. Birbal</u>, 62 F.3d 456 (2nd
Cir. 1995).

In the context of the petitioner's case the evidence
consisted of a strongly contested identification of the
Petitioner by an eyewitness and the introduction of a jacket
containing blood which was not capable of being described
as human. The point of the charge was to tell the jury that
the vitally important and all pervasive reasonable doubt

17

standard was limited to the evidence in the case. Failure to instruct the jury that reasonable doubt could arise from the lack of evidence prejudiced the Petitioner in such a way that he was denied a fair verdict.

5. Trial counsel was ineffective for withdrawing a pretrial motion for change of venue or venire.

At the post conviction hearing it was revealed that trial counsel withdrew a Motion for Change of Venue or Venire on the basis that the trial judge would permit him individual voir dire of potential jurors.

The record in this case reveals that trial counsel in support of the Motion for Change of Venue/Venire cited the extensive prejudicial coverage afforded the case in the print, radio and television medias. This case was also one of a series of homicide cases in Berwick for which a special state police task force had been formulated.

In order for pre-trial publicity to be presumptively prejudicial a defendant must prove two (2) points: first either that (a) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual or objective; (b) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; or (c) the publicity is derived from police and prosecuting officer reports; and secondly, that the publicity must be so extensive, sustained, and persuasive without sufficient time between the publication and trial for the prejudice to dissipate, that the community must be deemed to have satured. Commonwealth v. Ruca, Pa. 670 A.2d 1129 (1996).

The newspaper articles submitted as Defendant's Exhibit #1 evidence that Defendant has a prior conviction for

aggravated assault. ( Press-Enterprise article dated October 10, 1987, Press Enterprise article dated November 17, 1988). In one instance, it was inaccurately reported that Defendant had admitted to the killing.   The Times Leader articles dated August 26, 1988 and September 2, 1988 reported that Defendant told police he acted alone in the murder.   Police and prosecuting officer reports were consistently quoted as sources of information by the media.   Press Enterprise May 14, 1987, October 10, 1987, November 4, 1987, November 5, 1987, November 21, 1987, June 2, 1988, June 9, 1988, October 9, 1988, the Petitioner was depicted in a number of photographs handcuffed and in the custody of law enforcement authorities.   Press Enterprise articles dated October 10, 1987, November 5, 1987, June 2, 1988 and November 17, 1988. See Exhibit "J"

In view of the extensive pre-trial publicity as evidenced by the newspaper articles introduced as Petitioner's Exhibit #1, the introduction of Petitioner's prior criminal record into articles, the use of police reports in articles and the photographs depicting Petitioner in custody and in company of law enforcement authorities, the conclusion of the court should be that the publicity was so extensive, substanial and persuasive that the community was indeed saturated.   The publicity should be ruled to have been presumptively prejudicial and the failure of trial counsel to pursue his change of venue motion prejudiced the Petitioner.

6. Counsel was ineffective for failing to impeach police officer about the money.

Petitioner's statement to the police indicated that he had read that the victim was found with $400.00 on his person. Petitioner testified at his post conviction hearing that he informed trial counsel about a Press Enterprise Newspaper article dated May 14, 1987 introduced as exhibit at the hearing.   See Exhibit "K"

The article reports that "at this point, theft has been ruled out as a motive because the victim had $400.00 in his possession, McCormick said." Despite being proffered this information by Petitioner, trial counsel did not cross-examine police officer witnesses about this obvious source of information as to money on the victim.

The importance of the testimony about Petitioner's guilty knowledge cannot be overemphasized Judge Myers' (trial judge) opinion in support of denial of post-trial motions noted that authorities testified that such figures were not published in the newspaper and yet the Petitioner claims to have gathered the information from that source. Trial counsel by utilizing the article would have been able to establish that the Commonwealth had publicly maintained the position that $400.00 was in fact found on the victim and expose the $450.00 for the rouse that it was. Because trial counsel did not confront Trooper Carlson with the inconsistency, he was unable to get to the cross-examination and argument that the $50.00 additional dollars never in fact existed. Raymond Fenstermacher testified that he saw the victim flash four (4) one hundred dollar bills. However, the failure to vigorously pursue this issue left the jury with the belief that the police had information about an additional $50.00 that had never been released to the press. The jury informed that money amount was only known by police.

## CONCLUSION

WHEREFORE, for the reasons within, Petitioner respectfully request that this Honorable Court appoint counsel and order an hearing on the within issues.

Respectfully submitted,

_____

Kenneth Alan Shiffer
#AT-1194
1000 Follies Road
Dallas, Pa.  18612-0286

Exhibit "A"

```
COMMONWEALTH OF PENNSYLVANIA    :    IN THE COURT OF COMMON PLEAS
                                     OF THE 26TH JUDICIAL DISTRICT
                                :          OF PENNSYLVANIA
                                        COLUMBIA COUNTY BRANCH
V.                              :         CRIMINAL DIVISION

KENNETH A. SHIFFER,             :         NO. 294 of 1987

DEFENDANT                       :

                                :
```

SCOTT W. NAUS, ESQUIRE, District Attorney for Commonwealth of
        Pennsylvania

WILLIAM COSTOPOULOS, ESQUIRE, Attorney for Defendant

### O P I N I O N

      The Defendant has been charged with Criminal Homicide,
18 Pa. C.S.A. 2501(a), (b), as a result of an alleged incident
occurring in the Borough of Berwick, Columbia County, PA, on
May 11, 1987.

      Defendant has filed a Motion to Suppress three separate
photographic identifications.  After hearing held, Defendant's
Motion is presently before us for disposition.

      Defendant argues that the identifications were unduly
suggestive and unreliable and therefore violative of his Federal
and Pennsylvania constitutional due process rights.

> "The central concern where any
> identification is offered is whether,
> under the totality of circumstances, the
> identification was reliable.  Manson V.
> Brathwaite, 432 U.S. 98, 97 S.Ct. 2243,
> 53 L.Ed.2d 140 (1977).  A pretrial iden-
> tification will not be set aside unless
> the facts demonstrate that the identi-
> fication procedure 'was so impermissibly
> suggestive as to give rise to a very
> substantial likelihood of irreparable
> mis-identification.'  Simmons V. United
> States, 390 U.S. 377, 384, 88 S.Ct. 967,
> 971, 19 L.Ed.2d 1247, 1253 (1968)."

JUDGE'S CHAMBERS, BLOOMSBURG, PENNA, 717-784-1991

(1)

JUDGE'S CHAMBERS, BLOOMSBURG, PENNA., 717-784-1991

> Commonwealth V. Linder, 284 Pa. Super. 327,
> 337, 425 A.2d 1126, 1131 (1981).
> "[S]uggestiveness ... is only one factor
> to be considered in determining the admis-
> sibility of identification testimony.
> Suggestiveness alone does not warrant ex-
> clusion.  Instead '[i]t is the likeli-
> hood of misidentification which violates
> a defendant's right to due process ... "
> Commonwealth V. Ransome, 485 Pa. 490,
> 495, 401 A.2d 1379, 1382 (1979), quoting
> from Commonwealth V. Sexton, 485 Pa. 17,
> 22, 400 A.2d 1289, 1291 (1979).  Factors
> to be considered in evaluating the like-
> lihood of misidentification in a particu-
> lar instance are:
>> ... the opportunity of the witness to
>> view the criminal at the time of the
>> crime, the witness' degree of attention,
>> the accuracy of his prior description
>> of the criminal, the level of certainty
>> demonstrated at the confrontation, and
>> the time between the crime and the con-
>> frontation.  Against these factors is
>> to be weighed the corrupting effect
>> of the suggestive identification
>> itself.
> Manson V. Brathwaite, supra, 432 U.S.
> at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at
> 154.  See also Neil V. Biggers, 409 U.S.
> 188, 199. 93 S.Ct. 375, 382, 34 L.Ed.2d
> 401, 411 (1972).
>> Although Manson V. Brathwaite, supra,
> involved an allegedly suggestive confron-
> tation, the factors to be considered in
> evaluating an alleged due process denial
> resulting from a photographic identifi-
> cation procedure are the same.  Common-
> wealth V. Fowler, 466 Pa. 198, 207, 352
> A.2d 17, 21 (1976).

Commonwealth V. Johnson, 446 A.2d 1311, 300 Pa.Super. 86

(1982).

The first of the three separate photographic arra

identifications the Defendant seeks to suppress is that of D

Sklarz.  Defendant argues that the lapse of time between the

alleged sighting , to wit, May 11, 1987, and the identificat

July 13, 1987, as well as the lapse of time between the iden

(2)

and the preliminary hearing, November 4, 1987, render Diane S

identification of the Defendant unreasonably suggestive.  Def

also argues that the confrontation was unduly brief and occur

at a distance representing the width of a borough street, thu

rendering the identification unreliable.  Defendant further c

that the preliminary hearing identification was not wholly ind

dent of the photographic array.

However, Sklarz testified at the suppression heari

that she had direct face and eye contact with Defendant for a

least six seconds, under a streetlight at a distance of appro

mately eighty feet.  Sklarz selected the Defendant, with cert

from the third of three arrays.  She was adamant that the Def

was the man she saw on the night in question.  Thus, in our o

Sklarz's identification sufficiently meets the requirements o

liability to permit her testimony at trial.  Accordingly, Def

Motion with respect to Sklarz's identification must be denied

The second identification witness produced by the

Commonwealth was Patricia Gordner.  Defendant argues that the

lapse of time between the alleged sighting, May 12, 1987, and

the photographic identification, July 13, 1987, render the

photographic array process unduly suggestive.  Defendant also

maintains that Gordner's identification was unreliable in tha

confrontation was limited to a few seconds in a dark alley.

At the suppression hearing, Gordner testified that

did not see Defendant's face, but was "pretty certain" that it

was the Defendant she observed on the night in question.  How-

ever, later in her testimony she acknowledged that she did not

(3)

know whether or not the person observed was the Defendant. S
added that the photograph she selected was the only one that
"looked like" the person she saw in the alley. Thus, there i
significant likelihood that her identification is inaccurate
could lead to a misidentification. Therefore, we find the id
tification unduly suggestive and unreliable. Accordingly,
Defendant's Motion to Suppress Gordner's identification must
granted.

The third and final identification witness was Bev
Lynn. Defendant repeats his arguments that the lapse of time
tween the alleged sighting and the photographic identificatio
renders the identification suggestive and therefore the confr
tion was not conducive to a strong identification and thus un
liable.

Lynn testified at the suppression hearing that she
sat across from Defendant at a bar for approximately forty-fi
minutes one evening a couple of weeks prior to the indident.
She quickly and without hesitation selected the Defendant fro
the array. Therefore, we find Lynn's identification sufficie
reliable to warrant her testimony at trial. Accordingly, Def
dant's Motion to Suppress Lynn's identification must be denie

Finally, at the Suppression Hearing, Defendant con
that his photograph in the array was unduly suggestive becaus
it contained the words "Aggravated Assault, Simple Assault"
printed underneath. However, the three witnesses in question
testified that they did not recall the words beneath Defendan
photograph, and that such did not play a part in their identi
cation. Therefore, we find Defendant's argument lacks merit.

(4)

COMMONWEALTH OF PENNSYLVNAIA     :    IN THE COURT OF COMMON PLE
                               OF THE 26TH JUDICIAL DISTR
                             :       OF PENNSYLVANIAA
                                 COLUMBIA COUNTY BRANCH
V.                            :       CRIMINAL DIVISION

KENNETH A. SHIFFER,            :       NO. 294 of 1987

DEFENDANT                     :

                               :

SCOTT W. NAUS, ESQUIRE, District Attorney for Commonwealth of
         Pennsylvania

WILLIAM COSTOPOULOS, ESQUIRE, Attorney for Defendant

### ORDER

      AND NOW, to wit, this 30th day of June, 1988, Defen
dant's Motion to Suppress the photographic identification of
Patricia Gordner is granted. Defendant's remaining Motions to
Suppress are denied.

                  BY THE COURT:

                 _Jay W. Myers_    P.J

JUDGE'S CHAMBERS, BLOOMSBURG, PENNA. 717-784-1991

Exhibit "B"

```
COMMONWEALTH OF PENNSYLVANIA    :   IN THE COURT OF COMMON PLEAS
                                :   OF THE 26TH JUDICIAL DISTRICT
           vs.                  :   COLUMBIA COUNTY BRANCH, PENNA.
                                :        CRIMINAL DIVISION
KENNETH ALLEN SHIFFER,          :
           DEFENDANT            :        NO.  294 of 1987
                                :
```

SCOTT W. NAUS, ESQUIRE, District Attorney for the Commonwealth
       of Pennsylvania

WILLIAM C. COSTOPOULOS, ESQUIRE, Attorney for Defendant


                         O P I N I O N

        The Defendant has been charged with Criminal Homicide,

18 Pa. C.S.A. 2501(a),(b), in the beating death of one Leonard

Radziak, at the Hayes Hotel, Berwick, Columbia County, in the

early morning hours of May 11, 1987.  The Defendant was convicted

by a jury of second degree murder on November 18, 1988.  The

Defendant has filed timely Motions in Arrest of Judgment and for

a New Trial.  Following submission of briefs and oral argument,

Defendant's Motions are presently before us for disposition.

        The Defendant raises two issues in the Motions as

follows:

        I.   Defendant contends that the evidence presented at
             trial, even viewed in a light most favorable to the
             Commonwealth as verdict winner, is insufficient as
             a matter of law to sustain the verdict of second-
             degree murder for the following reasons:  a) that
             the eyewitness identification of Defendant by
             Diane Szklarz was totally inconsistent with his
             physical appearance at the time of the incident
             and otherwise self-contradictory;  b) that the
             blood discovered on Defendant's jacket could not
             be determined to be human or animal;  c) that no
             motive was shown; and  d) no conspiratorial nexus
             was established between Defendant and George Sheeler.

        II.  Following the pre-trial suppression hearing, Defen-
             dant also maintains that the Court erred in refusing
             to suppress the eyewitness identification testimony

                              -1-

of Diane Szklarz which he argues violated his rights under the United States and Pennsylvania Constitutions.

## I

In reviewing Defendant's claim that the Commonwealth's evidence was insufficient to sustain a conviction, the test to be applied is whether, viewing all the evidence in a light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find the existence of every element of the crime beyond a reasonable doubt. Commonwealth v. Jermyn, 516 Pa. 460, 533 A.2d 74 (1987); Commonwealth v. Sneed, 514 Pa. 597, 526 A.2d 749 (1987); Commonwealth v. Holzer, 480 Pa. 93, 389 A.2d 101 (1978); Commonwealth v. Kichline, 468 Pa. 265, 361 A.2d 282 (1976).

In the instant action, the Defendant was found guilty of murder in the second degree for the robbery and beating death of Leonard Radziak. We must review the evidence presented to determine if there was sufficient evidence to warrant finding the Defendant guilty.

The Commonwealth presented the following evidence in an effort to substantiate the finding of guilt. The record revealed that the victim in the instant action was severly beaten. Commonwealth's expert witness, Dr. Isidore Mihalikis, testified that several of the victim's injuries during the course of the beating were caused by a straight, rounded, cylindrical type object. (N.T. 288). The Defendant was spotted jogging, carrying

-2-

a pipe, wearing a black "Members Only" type jacket shortly after
the time frame within which the crime took place. (N.T. 134-137,
150). An individual with the same clothing description, carrying
a long cylindrical object was seen leaving the Hayes Hotel
immediately after the beating. (N.T. 75-77).

    After the Defendant was questioned by the police
regarding his ownership of a "Members Only" type jacket, the
Defendant directed his girlfriend, Joanne Lutz, to turn over a
jacket to the police, (N.T. 213), which jacket did not match
the jacket described by the witness. At that point Defendant
claimed that he did not possess a "Members Only" style jacket.
(N.T. 212). However, the police later discovered a blood-stained
"Members Only" jacket in a darkened area of a second closet in
Defendant's apartment. (N.T. 216). When further questioned
about this second jacket, the Defendant responded that the police
would never be able to prove "that it was Lenny's blood." (N.T.
219).

    In a seperate interview, the Defendant stated to
Pennsylvania State Police Trooper Walter Carlson that it would
be stupid for one to take $50 from an old man and leave $400
on his person. (N.T. 298). The officer then asked the Defendant
where he got those figures. The Defendant paused and then
answered that he "got them from the newspaper." The officer
respondend that such figures were not published in the newspaper
after which Defendant stated he obtained the information from
George Sheeler, who was also charged and later convicted of the

-3-

homicide in question.  After the Trooper questioned the Defendan
about the fifty-dollar discrepency, the Defendant did not answe
direcly but simply claimed that he was at home the entire eveni
of the homicide.  (N.T. 298).

Considering all of the evidence and viewing it in th
light most favorable to the Commonwealth, as well as taking all
reasonable inferences that may be deduced therefrom, one could
fairly conclude beyond a reasonable doubt that the Defendant
is guilty of murder in the second degree.

That evidence includes testimony from an identificat
witness placing the Defendant at the scene of the crime with an
object which caused the death of the victim.  It also includes
Defendant's possession of a blood-stained jacket, which Defenda
earlier denied owning, as well as Defendant's suspicious knowle
of the amount of money in the victim's possession at the time o
the killing.  That monetary information was only otherwise known
by the police.

Granted there is no direct evidence of the crime
committed by the Defendant in this case.  However, the Common-
wealth need not prove the homicide by direct evidence, but is
often required to prove homicide by circumstantial evidence.
Commonwealth v. Smith, Supreme Court of Pennsylvania,slip op.
December 22, 1989.

Accordingly, we conclude that the evidence produced
at trial is sufficient to sustain the conviction of second degr
murder.  Therefore, we find Defendant's first argument to be
without merit.

-4-

## II

Defendant also maintains that the suppression court erred in refusing to suppress the eyewitness identification testimony of Diane Szklarz, which in turn violates Defendant's rights under the United States and Pennsylvania Constitutions. We addressed and decided those issues while denying Defendant's Suppression Motion in an Opinion and Order of Court dated June 30, 1988, which are incorporated herein by reference, and made a part hereof.

Accordingly, we find that Defendant's second argument in his Post-Trial Motions in Arrest of Judgment and for a New Trial is meritless.

For all the above reasons, we deny Defendant's Motions in Arrest of Judgment and for a New Trial.

-5-

```
COMMONWEALTH OF PENNSYLVANIA    :    IN THE COURT OF COMMON PLEAS
                                :    OF THE 26TH JUDICIAL DISTRICT
            vs.                 :    COLUMBIA COUNTY BRANCH, PENN
                                :         CRIMINAL DIVISION
KENNETH ALLEN SHIFFER,          :
            DEFENDANT           :         NO.  294 of 1987
                                :
```

SCOTT W. NAUS, ESQUIRE, District Attorney for the Commonwealth
            of Pennsylvania

WILLIAM C. COSTOPOULOS, ESQUIRE, Attorney for Defendant


## ORDER OF COURT

        AND NOW, to wit, this 9th day of January, 1990,

Defendant's Post-Trial Motions in Arrest of Judgment and for

New Trial are denied.  Defendant shall appear before this Court

February 12, 1990 at 11:30 a.m. for sentencing.

                    BY THE COURT:


                    _Jay W. Myers_    P.J.

-6-

Exhibit "C"

J. S31011/90

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT
                                      :   OF PENNSYLVANIA
              v.               : 
                                        :   NO. 00676 PHILADELPHIA 1990
KENNETH ALAN SHIFFER,         : 
                     Appellant   : 

# JUDGMENT

ON CONSIDERATION WHEREOF, it is now here ordered and adjudged by this Court that the judgment of the Court of Common Pleas of   COLUMBIA   County be, and the same is hereby   AFFIRMED.

BY THE COURT:

*David A. Szergel*

PROTHONOTARY

Dated:   OCTOBER 18, 1990

J. S31011/90

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT |
| v. | OF PENNSYLVANIA |
| | NO. 00676 PHILADELPHIA 1990 |
| KENNETH ALAN SHIFFER, Appellant | |

Appeal from the Judgment of Sentence February 12, 1990
In the Court of Common Pleas of Columbia County,
Criminal Division No. 294-87

Before:  TAMILIA, JOHNSON and CERCONE, JJ.

MEMORANDUM:

**FILED** OCT 18 1990

This is a direct appeal from a judgment of sentence entered after a jury found appellant, Kenneth Allen Shiffer, guilty of murder in the second degree[1] in connection with the beating death of Leonard Radziak in the early morning hours of May 11, 1987.  Appellant's post-trial motions were denied by the lower court and he was sentenced to undergo imprisonment in a state correctional institution for the term of his natural life.  The instant timely appeal followed.  For the reasons set forth below, we affirm.

Appellant has raised two issues for our consideration:

    A. Whether the suppression court erred in not suppressing the eyewitness identification testimony of Diane Szklarz, which violated appellant's rights under the United States and Pennsylvania Constitutions?

    B. Whether the evidence presented at trial, even viewed in a light most favorable to the Commonwealth as verdict winner, is insufficient as a matter of law to sustain the verdict of second-degree murder in that the eyewitness identification of appellant by Diane Szklarz was totally inconsistent with his physical appearance at the time of the incident and otherwise self-contradictory; the blood discovered on

---

[1] 18 Pa. C.S.A. § 2502 (b).

J. S31011/90 -2-

> appellant's jacket could not determine to be
> [sic] human or animal; no motive was shown;
> and no conspiratorial nexus was established
> between appellant and George Sheeler.

We have carefully reviewed the parties' briefs and the record
certified on appeal.  We find that the lower court's discussion
and resolution of appellant's first argument is both clear and
concise.  We affirm on the basis of the lower court's opinion
filed June 30, 1988 with regard to this issue.

Appellant next argues that the evidence adduced against him
at trial was insufficient to sustain a conviction for second
degree murder.  It is well settled that when sufficiency of the
evidence claims are raised, "an appellate court must review the
evidence presented and all reasonable inferences drawn therefrom
in a light most favorable to the verdict winner and determine
whether on the record there is a sufficient basis to support the
challenged conviction."  Commonwealth v. Madison, 501 Pa. 485,
490, 462 A.2d 228, 231 (1983) (citations omitted).  The proper
application of this test requires us to evaluate the entire trial
record and all evidence actually received, in the aggregate and
not as fragments isolated from the totality of the evidence.
Commonwealth v. Harper, 485 Pa. 572, 576, 403 A.2d 536, 538
(1979).  See also Commonwealth v. Griscavage, 512 Pa. 540, 517
A.2d 1256 (1986) (explicating appropriate application of standard
of review set forth in Harper, supra).  This standard means that
we must view the evidence in the light most favorable to the
Commonwealth as the verdict winner, and drawing all proper
inferences favorable to the Commonwealth, determine if the jury

J. S31011/90 -3-

could reasonably have concluded that all of the elements of the crime were established beyond a reasonable doubt. <u>Commonwealth v. Edwards</u>, 521 Pa. 134, 143, 555 A.2d 818, 823 (1989). We note that the trier of fact is free to believe all, part, or none of the evidence presented, <u>Griscavage</u>, <u>supra</u> at 546, 517 A.2d at 1259, and that "the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." <u>Commonwealth v. Harper</u>, <u>supra</u> at 576, 403 A.2d at 538.

In order to sustain a conviction for second degree murder, the Commonwealth is required to prove that a criminal homicide was committed while the defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa. C.S.A. § 2502 (b). Our careful scrutiny of the certified record in the instant case has convinced us that the lower court's comprehensive analysis of the evidence adduced at trial is correct. We therefore affirm on the basis of the lower court opinion filed January 10, 1990 concerning this issue.

Judgment of sentence affirmed.

Exhibit "D"



# Supreme Court of Pennsylvania
## Middle District

CHARLES W. JOHNS, ESQUIRE
PROTHONOTARY

MILDRED E. WILLIAMSON
DEPUTY PROTHONOTARY

434 MAIN CAPITOL BUILDING
P.O. BOX 624
HARRISBURG, PENNSYLVANIA 1710
(717) 787-6181

*June 28, 1991*

William C. Costopoulos, Esq.
831 Market Street
P.O. Box 222
Lemoyne, PA   17043


Re:  **Commonwealth of Pennsylvania**
     **v.   Kenneth Alan Shiffer, Petitioner**
     <u>**No. 1017 E.D. Allocatur Docket 1990**</u>

Dear Mr. Costopoulos:

   This is to advise that the following Order has been entered
for the Petition for Allowance of Appeal filed in the above-
captioned matter:

   "June 27, 1991, Petition denied
            Per Curiam"


Sincerely yours, .

Shirley Bailey,
Chief Clerk

spb
xc:  Hon. Jay W. Myers
     Scott W. Naus, Esq.
     Clerk of Courts - Columbia County
     (No. 294 of 1987)
     Prothonotary's Office - Superior Court
     (No. 676PHL90)

Exhibit "E"

COMMONWEALTH OF PENNSYLVANIA

vs

KENNETH ALAN SHIFFER

           Defendant

IN THE COURT OF COMMON PLEAS
FOR THE 26TH JUDICIAL DISTRICT
COLUMBIA COUNTY BRANCH,
PENNSYLVANIA
CRIMINAL DIVISION

CASE NO:   294 OF 1987
CHARGE:   CRIMINAL HOMICIDE

WILLIAM S. KREISHER, ESQUIRE, Attorney for the Commonwealth
Pennsylvania
HUGH SUMNER, ESQUIRE, Attorney for the Defendant

OPINION

October 28 , 1997, Keller, P.J.

      This matter is before the Court for consideration of

Defendant's Petition for Relief under the Post Conviction

Relief Act, 42 Pa. C.S.A. § 9541 et seq.  We held an

evidentiary hearing at which time the Defendant was represented

by counsel other than prior counsel.[1]  After a careful

consideration of the entire record and the applicable law, we

are convinced that the Defendant's Petition must be denied.

---

[1]
    At the conclusion of the initial hearing and before our decision, the
Commonwealth moved to reopen the record for additional testimony by trial
counsel on the sole issue of why the Defendant did not testify on his own
behalf.  The Defendant opposed the motion, and after hearing argument, we
will grant the same.  The motion is granted in the interest of justice to
make certain that <u>all</u> parties have every opportunity to pursue, as well as
oppose, the Defendant's claims fully.  By granting the motion, we will
consider the additional testimony in our discussion on the merits to
follow.  <u>Commonwealth v. Tharp</u>, 575 A.2d 557,558 (Pa. 1990).

We make the following findings of fact:

1.  The Defendant was arrested on or about October 9, 1987, and charged with Criminal Homicide; 18 Pa.C.S.A. § 2501 (a) (b).

2.  Following a Preliminary Hearing, the Defendant was held for Court, and on December 1, 1987, an Information was filed on this charge.

3.  Defendant's case came on for jury trial before the Honorable Jay W. Myers on November 15, 1988, and Defendant was found guilty by the jury of Murder in the Second Degree.

4.  Motions for a New Trial and in Arrest of Judgment were filed.  After consideration thereof, these Motions were denied.

5.  On February 12, 1990, the Defendant was sentenced to a period of life imprisonment.

6.  The Judgment of sentence was appealed to the Pennsylvania Superior Court who, by its Memorandum Opinion, affirmed the sentence on October 18, 1990.

7.  From the affirmance by the Superior Court, Defendant petitioned for Allowance of Appeal to the Pennsylvania Supreme Court, which was denied, June 27, 1991.

DISCUSSION

In the instant petition, Defendant contends that he is entitled to relief on the basis that trial counsel, William C. Costopoulos, was ineffective as follows:

1.  For failing to permit the Defendant to testify in his own behalf.

2.  For failing to object to the trial Court's charge defining reasonable doubt.

3.  For withdrawing Defendant's Motion for a Change of Venue or Venire.

4.  For failing to impeach the police officer concerning the amount of money on the victim's person after knowledge that the amount appeared in the newspaper when Defendant's admitted knowledge of the amount was used to show his guilty knowledge.

The contention that trial counsel failed to render effective assistance is the most frequent claim of post conviction defendants.  In considering this claim several clear standards exist.  At the outset, counsel is presumed to have acted effectively.  Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987).  The burden is always on the Defendant to prove counsel ineffective; the burden never shifts to the Commonwealth to

prove counsel competent. <u>Commonwealth v. Hudson</u>, 485 A.2d 487 (Pa. Super. 1984).

To rebut the presumption of competency of counsel and to carry his burden, the defendant must prove: (1) that he had some claim of arguable merit which was not raised and (2) that there was no reasonable basis for counsel's actions or inaction. <u>Commonwealth ex rel Washington v. Maroney</u>, 427 Pa. 599 (1967). Once the Defendant has satisfied these two tests, he must show that he was so prejudiced by counsel's actions that the verdict has become unreliable. <u>Commonwealth v. Pierce, supra</u>.

I

Initially, the Defendant submits that trial counsel was ineffective for refusing to permit him to testify on his own behalf. If this were true, Defendant's assertion would have merit, since the ultimate decision in this regard must be made by the client himself. <u>Commonwealth v. Rowles</u>, 462 A.2d 619 (Pa. 1983). However, we are satisfied that counsel did not prevent the Defendant from testifying but, after advising him of the consequences, left the Defendant to make the ultimate decision.

The issue then is whether counsel's advise not to take the stand was so unreasonable as to vitiate a knowing and

intelligent decision by the Defendant.   Commonwealth v. Fowler,
523 A.2d 784 (Pa. Super. 1987).

Counsel's advise not to testify, so as to be
permitted to assert his innocence, was based upon his concern
that to do so would open the door and permit the Commonwealth
to examine him concerning the blood found on the Defendant's
jacket.  Although the Commonwealth was unable to tie the blood
to the crime charged, its presence on Defendant's jacket would
have admittedly required him to testify that it had gotten
there during an aggravated assault for which he had previously
been convicted.

This was the only way that Defendant's prior
conviction would have become known to the jury.  This prior
conviction for aggravated assault was not admissible otherwise
to impeach, since it did not constitute a crime of dishonesty
or false statement.  Commonwealth v. Grimm, 249 Pa. Superior
Ct. 441 (1977).

Counsel's concern about opening the door and
permitting Defendant's prior conviction for assaultive conduct
to be introduced, when coupled with his opinion that the
Commonwealth was unable to sustain its burden to convict, and
his concern about the Defendant's demeanor on the witness
stand, reasonably justified his advise that the Defendant not
take the stand.

We are satisfied beyond all doubt that the Defendant, a man of prior criminal experience, knowingly and intelligently made the decision not to testify.  We will not second-guess both the advice given by counsel nor Defendant's ultimate decision to follow this advice.  The Defendant must bear the burden of his decision not to testify and cannot shift the blame after having received competent advice concerning the matter.  Commonwealth v. Harper, 614 A.2d 1180 (Pa. Super. 1992).

<div align="center">II</div>

The Defendant next contends that trial counsel, by failing to object to the Court's charge on reasonable doubt, was ineffective.  It is Defendant's contention that the Court's charge was defective because it failed to instruct the jury that reasonable doubt could arise from the lack of evidence. In all other respects, Defendant concedes that the charge properly defined reasonable doubt.

It is true that the Suggested Standard Jury Instructions, as well as a number of other jurisdictions, require that the jury should be instructed that "a reasonable doubt may arise not only from the evidence introduced, but from the lack of evidence presented." "Pennsylvania has never required that this form of instruction be included." Commonwealth v. Evancho, 175 Pa. Superior Ct. 225 (1954).

<div align="center">6</div>

Since the trial Court's charge was correct, trial counsel cannot be faulted for failing to object.

### III

The Defendant's third assertion is that trial counsel was ineffective by withdrawing his motion for a change of venue or venire. Counsel justified this decision by explaining that he felt it was the better strategy to withdraw the motion in exchange for the Court's grant of individual voir dire.

Since Pa.R.Crim.P. 1106 (E) does not mandate individual voir dire, except in capital cases, we will not engage in hindsight second-guessing of counsel's strategy in this regard. Commonwealth v. Thomas, 526 A.2d 380 (Pa. Super. 1987).

Nor has the Defendant met his burden of demonstrating that he was prejudiced by counsel's withdrawal of the motion. The murder occurred on May 11, 1987, and the Defendant did not come to trial until November 15, 1988, (seventeen months later). As demonstrated by the relative ease with which the jury was selected, in a matter of about nine hours of individual voir dire, any prejudice which might have been generated by pre-trial publicity had long before trial been dissipated.

IV

Finally, the Defendant contends that counsel was ineffective because he failed to "impeach" the police officer who testified to a statement made to him by the Defendant during which the Defendant told him of the amount of money, which had been in the possession of the victim. This fact as argued by the Commonwealth, demonstrated Defendant's guilty knowledge. On the other hand, the Defendant contended that he became aware of this fact because it was contained in a newspaper account of the murder.

From our review of the trial record, there does not appear to have been any real confusion about how the Defendant obtained knowledge of the money in the victim's possession. The police officer who testified to these facts readily admitted that the Defendant told him, when questioned how he obtained knowledge of the amount, that he had read the newspaper reports and it was for this reason that he had this knowledge.

Once again, we find no quarrel with trial counsel's failure to further pursue this matter. There was no need, as the Defendant suggests, to beat a dead horse. Defendant's mere suggestion falls far short of carrying his burden to overcome the presumption of counsel's competency.

8

Exhibit "F"

J.S75017/98

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KENNETH ALAN SHIFFER, | : | |
| | : | |
| Appellant | : | No. 5050 Philadelphia 1997 |

Appeal from the Order October 28, 1997
In the Court of Common Pleas of Columbia County
Criminal No. 294 of 1987

BEFORE:  POPOVICH, STEVENS, JJ. and CERCONE, P.J.E.

MEMORANDUM:                               ⁞ **FILED**   FEB 1 0 1999

This is an appeal from the denial of Appellant's Post Conviction Relief Act petition entered in the Court of Common Pleas of Columbia County on October 28, 1997, following Appellant's conviction of second degree murder. We affirm.

A review of the record reveals the following procedural and factual history:  Appellant was arrested on October 9, 1987, and charged with criminal homicide.  He was convicted by a jury of second degree murder on November 18, 1988, and, after post-trial motions were filed and denied, he was sentenced to life imprisonment on February 12, 1990.  Appellant filed a direct appeal to this Court, which affirmed the judgment of sentence on October 18, 1990.  Petition for allowance of appeal to the Pennsylvania Supreme Court was denied on June 27, 1991.

J.S75017/98

On January 6, 1997, represented by new counsel, Appellant filed a timely petition for collateral relief pursuant to the Post Conviction Relief Act (PCRA).[1]  A hearing was held before the lower court on June 26, 1997, and, pursuant to the lower court's grant of the Commonwealth's motion for taking additional testimony, a second hearing was held on October 15, 1997. Appellant's PCRA petition was subsequently denied on October 28, 1997.  On November 20, 1997, Appellant appealed the denial of his PCRA petition to this Court, raising the following issues for our review:

1.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO PERMIT DEFENDANT TO TESTIFY IN HIS OWN BEHALF AT TRIAL.

2.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO OBJECT TO A JURY INSTRUCTION WHICH DID NOT ADEQUATELY DEFINE REASONABLE DOUBT.

3.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR WITHDRAWING A PRE-TRIAL MOTION FOR CHANGE OF VENUE OR VENIRE.

4.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO IMPEACH POLICE OFFICER WITNESSES ABOUT THE FACT THAT THE AMOUNT OF MONEY IN POSSESSION OF THE VICTIM WAS DISCLOSED IN A NEWSPAPER ARTICLE WHEN SAID FACT WAS USED TO SHOW GUILTY KNOWLEDGE BY DEFENDANT IN THE CASE.

5.    WHETHER THE PCRA COURT ABUSED ITS DISCRETION IN PERMITTING THE COMMONWEALTH TO REOPEN ITS CASE AND PRESENT ADDITIONAL TESTIMONY FOR THE PURPOSE OF CLARIFYING THE TESTIMONY OF A WITNESS.

Appellant's brief at 3.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

- 2 -

J.S75017/98

We will first address Appellant's fifth claim that the PCRA court abused its discretion in permitting the Commonwealth to reopen its case and present additional testimony for the purpose of clarifying the testimony of Appellant's trial counsel. This issue is tied to Appellant's claim that his trial counsel was ineffective in failing to permit Appellant to testify on his own behalf. Because we may reach a conclusion with regard to this ineffectiveness claim without relying on the testimony at issue, any error on the part of the PCRA court in allowing the testimony was harmless error. *Commonwealth v. Robinson*, __ Pa. __, __, 721 A.2d 344, 350 (1998) ("Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.").

Turning to Appellant's ineffectiveness of counsel claims, we operate under a well-established standard. This Court's review of a post-conviction court's grant or denial of relief is limited to determining whether the court's findings are supported by the record and the court's order is otherwise free of legal error. *Commonwealth v. Yager*, 685 A.2d 1000, 1003 (Pa.Super. 1996) (citations omitted). When claiming that relief is due under the PCRA

J.S75017/98

because of ineffective assistance of counsel, it is the petitioner's burden to plead and prove by a preponderance of the evidence that the sentence in dispute was caused by ineffective assistance of counsel which so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.    42 Pa.C.S.A.  §  9543(a)(2)(ii); **Commonwealth v. Whitney**, 708 A.2d 471 (Pa.Super. 1998).  Additionally, there is a presumption that counsel is effective.    **Commonwealth v. Garnett**, 613 A.2d 569 (Pa.Super. 1992).  To defeat that presumption, a petitioner must prove (1) that the course of action the petitioner alleges counsel was ineffective for failing to pursue had arguable merit; (2) that counsel had no reasonable basis for the action or omission in question; and (3) that the act or omission prejudiced the petitioner to the point that but for the act or omission the outcome of the case would have been different. **Commonwealth v. Appel**, 547 Pa. 171, 689 A.2d 891 (1997); **Commonwealth v. Fowler**, 703 A.2d 1027 (Pa.Super. 1997).

In the case *sub judice*, Appellant initially alleges that his trial counsel was ineffective for failing to permit Appellant to testify on his own behalf. We find this allegation to be without merit.

> The decision whether to testify in ones' own behalf is ultimately to be made by the accused after full consultation with counsel. In order to support a claim that counsel was ineffective for not "putting" the appellant on the witness stand, the appellant must demonstrate either that (1) counsel interfered with his client's freedom to testify, or (2) he gave specific advice so unreasonable as to vitiate a knowing and intelligent decision by the client not to testify on his own behalf.

- 4 -

J.S75017/98

***Commonwealth v. Harper***, 614 A.2d 1180, 1186-1187 (Pa.Super. 1992).
Appellant acknowledges that his trial counsel did not interfere with
Appellant's freedom to testify. Appellant's brief at 8. He asserts, however,
that his trial counsel gave him advice which was so unreasonable as to
vitiate a knowing and intelligent decision not to testify. Appellant's trial
counsel testified on June 26, 1997, that he had expressed his opinion to
Appellant that it was in Appellant's best interest not to take the stand in his
own defense.  N.T. 6/26/97 at 23.  Trial counsel explained that he had
discussed this with Appellant, but that Appellant made the final decision not
to testify.  N.T. 6/26/97 at 23.  Trial counsel gave the following three
reasons for his opinion that Appellant should not testify:

> My basis for that is [Appellant] had a prior criminal
> conviction of aggravated assault and battery. And . . . I believe
> the Commonwealth had made an efforts [sic] to get that prior
> conviction into the record. And, we were successful in keeping it
> out of the record.  I didn't want this Jury to know that
> [Appellant] had this assault in his past.
> , . .
> I knew that if I called him to the witness stand I was
> opening the door for what I had kept out . . .

N.T. 6/26/97 at 22.  In addition, trial counsel indicated that Appellant's
anticipated testimony that he had been home with his wife at the time of the
killing was cumulative of testimony given by Appellant's wife that Appellant
had been home with her, and also cumulative of the testimony state
troopers called as Commonwealth witnesses who testified that Appellant told
them he had been home with his wife and was innocent of the crime

- 5 -

J.S75017/98

charged.   N.T. 6/26/97 at 24.   Finally, trial counsel testified that after spending a significant amount of time in Appellant's presence, he was convinced that because of Appellant's "persona," Appellant's testimony would not be well-received by the jury and he might falter under cross-examination and damage his case.  N.T. 6/26/97 at 24-25.

Without addressing whether trial counsel was correct in his belief that Appellant's testimony would put his prior conviction before the jury, we are satisfied that in light of the testimony of Appellant's wife and the state trooper's, as well as trial counsel' opinion with regard to how Appellant would be perceived by the jury and what Appellant might say, trial counsel's advice was not "so unreasonable as to vitiate a knowing and intelligent decision by the client not to testify on his own behalf." **Harper**, 614 A.2d at 1186-1187.  As such, Appellant's claim with regard to this issue is without merit, and we conclude that trial counsel was not ineffective for expressing opinion to Appellant that it was not in Appellant's best interest to testify on his own behalf.

Appellant next alleges that his trial counsel was ineffective for failing to object to a jury instruction which did not adequately define reasonable doubt because it failed to instruct the jury that reasonable doubt could arise from the lack of evidence.  This argument is without merit.

Whether a jury instruction on reasonable doubt must include a statement regarding lack of evidence was addressed by a panel of this Court

J.S75017/98

in **Commonwealth v. Evancho**, 103 A.2d 289 (Pa.Super. 1954).  In that

case, the trial judge's charge on reasonable doubt included, among other

things, a statement that "[a] reasonable doubt is a doubt that would grow

out of the evidence produced in this case...," but did not include a mention

of the significance of a lack of evidence.  In finding this instruction sufficient,

the Court noted that:

> In a number of jurisdictions it has been held that the jury should
> be instructed that "a reasonable doubt may arise not only from
> the evidence introduced, but from lack of evidence."  It has
> frequently been held that instructions are not erroneous merely
> for failure to state in express terms that reasonable doubt may
> arise from lack of evidence.  Pennsylvania has never required
> this form of charge.

**Evancho**, 103 A.2d at 291 (citations omitted).  The Court further found

that:

> [t]here is very little difference between saying, "if the evidence
> produced on the part of the Commonwealth does not of itself
> convince the jury that the defendants are guilty beyond a
> reasonable doubt they should acquit," . . . and saying, "A
> reasonable doubt may arise not only from the evidence but it
> may arise from a want of evidence or a failure to produce
> evidence that the prosecution could produce," . . . If the jury is
> not convinced beyond a reasonable doubt from the evidence
> produced does this reasonable doubt not arise from the want of
> sufficient credible evidence?

**Evancho**, 103 A.2d at 292 (citations omitted).  Because we find that the

lower court's jury instruction adequately and accurately reflected the law, it

was not ineffective for Appellant's trial counsel to choose not to object to it.

**Commonwealth v. Henry**, 550 Pa. 346, 381, 706 A.2d 313, 330 (1997)

J.S75017/98

("Counsel will never be deemed ineffective for failing to raise a meritless claim.")

Appellant's third ineffectiveness claim centers around his allegation that in light of the extensive and prejudicial media coverage of his case, trial counsel erred in withdrawing a motion for change of venue or venire. A review of the record shows that trial counsel withdrew the motion in question in exchange for the right to conduct individual *voir dire* of the prospective jurors. At the June 26, 1997 hearing on Appellant's PCRA petition, his trial counsel testified that he chose this course of action because it was his judgment that individual *voir dire* and liberal questioning of the prospective jurors offered by the lower court was much more beneficial than pursuing the motion for change of venue or venire. As such, even if we were to assume that this claim is of arguable merit in that Appellant could show that a change of venue or venire was warranted, we find that Appellant's failed to show that there was no reasonable basis for his trial counsel's tactics, or that he was actually prejudiced by those tactics. ***Commonwealth v. Birdsong***, 538 Pa. 587, 650 A.2d 26 (1994); ***Commonwealth v. Weakland***, 417 A.2d 690 (Pa.Super. 1979). This claim of ineffectiveness must fail.

Appellant also alleges that his trial counsel was ineffective for failing to "impeach police officer witnesses about the fact that the amount of money in possession of the victim was disclosed in a newspaper article when said fact

- 8 -

J.S75017/98

was used to show guilty knowledge by defendant in the case." Appellant's

brief at 14. Because Appellant's convoluted argument on this issue does not

lend itself to paraphrasing, we must state it in its entirety:

> Defendant's statement to the police indicated that he had read that the victim was found with $400.00 on his person. Defendant testified at post-conviction hearing that he informed trial counsel about a Press Enterprise Article dated May 14, 1997 introduced as exhibit at post-conviction hearing and attached hereto.[2]    Notes of testimony Post Conviction Hearing Act Hearing, June 26, 1997, at page 7. The article reports that "at this point, theft has been ruled out as a motive because the victim had $400.00 in his possession, McCormick said." Despite being proffered this information by Defendant, trial counsel did not cross-examine police officer witnesses about this obvious source of information as to money on the victim.
>
> The importance of the testimony about Defendant's guilty knowledge cannot be overemphasized. Judge Meyers' opinion in support of denial of post-trial motions[3] noted that the authorities testified that such figures were not published in the newspaper and yet the Defendant claims to have gathered the information from that source. Opinion and Order of Judge Myers dated January 09,1990 at page 3. Trial counsel, by utilizing the article would have been able to establish that the Commonwealth had publicly maintained the position that $400.00 was in fact found on the victim and expose the $450.00 for the rouse that it was. Because trial counsel did not confront Trooper Carlson with the inconsistency, he was unable to get to the cross-examination and argument that the $50.00 additional dollars never in fact existed. Raymond Fenstermacker testified that he saw the victimflash [sic] four (4) one hundred dollar bills. Notes of testimony, Jury Trial, November 14, 15, 16, 17, 18, 1998. Notes of testimony at page 54. However, the failure

---

[2] Appellant has failed to attach the article. Although the article may have been admitted as an exhibit during the June 26, 1997 PCRA hearing, a review of the record reveals that the article is not included. Appellant's trial counsel testified at that hearing that the newspaper reported that the victim had four hundred dollars ($400.00) in his possession. N.T. 6/26/97 at 29-30.

[3] The certified record transmitted to this Court does not contain the opinion referenced by Appellant.

- 9 -

J.S75017/98

> to vigorously pursue this issue left the jury with the belief that
> the police had information about an additional $500.00 that had
> never been released to the press.
>     Given the circumstantial nature of the case against
> Defendant, it was incumbent upon trial counsel to have reviewed
> the article and used it in vigorous cross examination of its [sic]
> police witness. His failure to do so had prejudiced the Defendant
> in such a way that the truth determining process was
> undermined.

Appellant's brief at 14-15.

We cannot agree that Appellant has presented a viable ineffectiveness of counsel claim on this issue. Appellant attempts to show that "trial counsel, by utilizing the article, would have been able to establish that the Commonwealth had publicly maintained the position that $400.00 was in fact found on the victim and expose the $450.00 for the rouse that it was." He has simply not provided this Court with the information necessary to draw such a conclusion, and, as such, we are unable to conclude that this claim is of arguable merit, that his counsel tactics with regard to his cross-examination of Trooper Carlson were not reasonable and aimed at protecting Appellant's best interest, or that Appellant was actually prejudiced in this regard.

For the reasons discussed *supra*, the order of the PCRA court is affirmed.

Affirmed.

Exhibit "G"

9:09 P.M.

**Appeal Docket Sheet**

**Superior Court of Pennsylvan**

**Docket Number:**     5050 PHL 1997

**Page 4 of 4**

**August 29, 2000**

### SESSION INFORMATION

Journal Number:     J-S75017-98
Consideration Type:   Submitted on Briefs-Panel
Date Listed/Submitted: October 26, 1998
**Panel Composition:**

The Honorable Zoran Popovich, Judge

The Honorable Correale F. Stevens, Judge

The Honorable William F. Cercone, Judge

### DISPOSITION INFORMATION

| | | | |
|---|---|---|---|
| Related Journal Number: | J-S75017-98 | Judgment Date: | 2/10/99 |
| Disposition Category: | Decided | Disposition Author: | Per Curiam |
| Disposition: | Affirmed  (Decided) | Disposition Date: | 2/10/99 |

Dispositional Comments:

| | | | |
|---|---|---|---|
| Dispositional Filing: | Memorandum Opinion | Author: | Per Curiam |
| Filed Date: | 2/10/99 | | |
| Judge: | | Vote: | |

### SUPREME COURT INFORMATION

Appeal Type:              Pet. for Allowance of App
PAA Filed Date            March 10, 1999
Allocatur Docket No.:       296 MAL 1999
Allocatur Disposition Date:   Friday, December 3, 1999
Allocatur Disposition        Order Denying Petition for Allowance of Appeal
Appeal Docket No.:
Date Record Sent to Supreme Court:
Date of Supreme Court Disposition:
Supreme Court Disposition:

Exhibit "H"

1           (Whereupon Mr. Naus began his opening stat

2    to the Jury at 3:32 o'clock p.m. and concluded at 3:46

3    o'clock p.m., at which time Mr. Costopoulos began his

4    opening statement to the Jury and concluded at 4:07 o'c.

5           MR. NAUS:   Our first witness will be handle

6    Mr. Knecht.   We call Lawrence Laubach.

7           LAWRENCE H. LAUBACH, Called, sworn accordi
     law, and examined by Mr. Knecht.

8

9                       DIRECT EXAMINATION

10   BY MR. KNECHT:

11        Q     Would you state your name for the record,

12        A     Lawrence H. Laubach.

13        Q     Mr. Laubach, where do you live?

14        A     I reside at Hayes Hotel, Room number three.

15        Q     Is that in Berwick?

16        A     Berwick.

17        Q     How long have you lived at Hayes Hotel?

18        A     It will be four years this March.

19        Q     Do you work?

20        A     No, retired.

21        Q     Where did you retire from?

22        A     Berwick Public Schools, Berwick Area School

23   District.

24        Q     You say you have lived at Hayes Hotel

25   Approximately four years?

                            (8)

1      A      It will be four years in March.

2      Q      Will you describe your living quarters at

3 Hayes Hotel?

4      A      It is just, more or less--I got a bureau in

5 there and cot.

6      Q      Is it one room?

7      A      One room, yes.

8      Q      No one else lives in that room with you?

9      A      No, it's just a single room.

10      Q      Do you know how many other rooms are in Haye

11 Hotel?

12      A      There are six other ones for rent.  There a

13 some upstairs, but they don't rent them out no more.

14      Q      When you say "upstairs," how many floors are

15 there in the Hayes Hotel?

16      A      There is a basement, then a bar and dining

17 room on the first floor, then the rooms they rent is on

18 the second floor and the third floor, attic rooms, they

19 don't rent them out no more.

20      Q      Would it be fair to say that the rooms you

21 spoke of as being for rent are on the second floor?

22      A      Second floor, yes.

23      Q      No one lives on the third floor:

24      A      No.

25      Q      The first floor would be the dining room and

(9)

1    the bar?

2         A       That's right.

3         Q       Did you know Leonard Radziak?

4         A       Yes, I did.

5         Q       Where did you come to know him?

6         A       Well, when I out the Hotel, that is the fir

7    I met him.  He was in charge of the rooms upstairs.  So,

8    that is how I met him.

9         Q       Did he live there before you did?

10        A       Yes, he did.

11        Q       You siad he had charge of the rooms, what d

12   that mean?

13        A       His duties was to get us clean clothes.  Th

14   is a laundromat.  He would come every Tuesday and Wednes

15   If you had a complaint, you were supposed to take it to

16   and he would see the owner.

17        Q       What was your relationship with Leonard?

18        A       Lenny?  We were good friends, after I moved

19   there and we got to know one another, we were good friend

20        Q       I understand he had a nick-name for you?

21        A       The first day I went there he said, "What's

22   your name?" I said, "Lawrence Laubach", he said, "I'm

23   going to call you Lou" he says, "for short."  Then he

24   started calling me Lou and everyone else around there.

25   That's how they nickname you.

1    Q      They nicknamed you Louie?

2    A      Lou.  I used to call him Lenny the Pollock

3  he used to call me Louie the Kraut, that's how that star

4    Q      He called you "Louie the Kraut"?

5    A      We would kid one another.  I used to call h

6  "Lenny the Pollock" and he would call me "Louie the Krau

7    Q      I would take you back to Mother's Day of 19

8  I think we have already established that you were living

9  there at that time?

10    A      Yes, I was.

11    Q      Was Lenny living there also?

12    A      Yes he was.

13    Q      That afternoon, did you have occasion to se

14  Lenny at all?

15    A      Let's see, that was on Sunday.  Him and one

16  of the other fellows went out.  That was on the 11th.

17    Q      This was on Mother's Day, on Sunday?  I

18  believe it was May 10th?

19    A      Anyhow him and one of the other fellows wen

20  out to the club and they come home, I would say about

21  four o'clock.

22    Q      Do you know what time he left?

23    A      No, I couldn't tell you what time he left.

24    Q      When you say "one of the other fellows,"

25  who was that?

(11)

```
 1         A        Gary Heimbach.

 2         Q        When you say "one of the other fellows", do

 3  Gary lived there also?

 4         A        Yes he does.

 5         Q        Do you know where they went?

 6         A        They went up to that club on Freas Avenue,

 7  then they come home about four o'clock.  I heard them com

 8  home.

 9         Q        Did both of them come home?

10         A        Yes, they both come home.  I didn't talk to

11  them, but I heard them.

12         Q        When you say you "heard them," how is it you

13  can know by hearing that it is them?

14         A        Lenny's got a loud, shrill voice.  It's not

15  hard to hear him, you know what I mean.

16         Q        Have you heard that voice before?

17         A        Oh, yes.

18         Q        So it was approximately around four o'clock

19  when they came back?

20         A        I would say it was around four o'clock they

21  came back.

22         Q        Did you see or hear Lenny any time after tha

23         A        No, well I heard--

24         Q        See or hear?

25         A        I didn't see him, no, but I heard him leave
```

(12)

1  that evening.

2      Q      What time, if you remember, did you hear h

3  leave that evening?

4      A      It was between 9:00 and 9:30.  He was with

5  another person.  I couldn't--I don't know who it was.

6      Q      How do you know that it was Lenny leaving

7  around that time?

8      A      I could tell his voice.

9      Q      Did you hear his voice?

10     A      Yes.

11     Q      Did you recognize that as Lenny's voice?

12     A      Yes, I can tell his voice because he had a

13  loud voice.

14     Q      Incidentally, are you familiar with Gary's

15  voice also?

16     A      Gary's, yes.

17     Q      Gary would have a distinctive voice, wouldn

18     A      Yes, he would.

19     Q      Was it Gary that he left with then around 9

20  or 9:30?

21     A      I could tell Gary's voice.

22     Q      Did you hear another voice?

23     A      Yes.  The other voice was very tough, very

24     Q      Did you recognize that as  anybody whose vo

25  you recognized that lived there?

(13)

1       A      I couldn't recognize the voice, but whoever

2 was, talked very low.

3       Q      They talked very low?

4       A      Very low.

5       Q      Let me clarify that.  Did they have a low

6 voice, or do you mean they were talking quietly?

7       A      They talked, I'd say, very quietly.

8       Q      Did you happen to hear any of the conversat

9       A      Yes, I did.  I heard them come out, we had

10 little puppy, so the little puppy came out, and then the

11 said--Lenny said, "Get back in there, you can't go with

12 So he put the puppy back in.  There is a vacant room rig

13 next to Lenny's.  They stopped there momentarily and the

14 were discussing something, but I couldn't get what they

15 were discussing, and then they went a little further, th

16 Lenny said, "I'd like to get paint and paint this hall t

17 summer."  Whoever it was said "What color would you like

18 paint it?"  And then he said he didn't know.  They said,

19 "that would be nice."  From there they went on out.  And

20 that was between 9:00 and 9:30.

21       Q      That would have been Mother's Day evening?

22       A      Yes, it would.

23       Q      What did you do the rest of the night?

24       A      I went to bed around 11:00 o'clock.  It was

25 about quarter of 1:00 a strange noise woke me.

(14)

1    Q        What did the strange noise sound--

2    A        "Ou, ou, ou." So I put my ear up to the doo

3    coming out of a sleep, and I tried to tell what the hell

4    it was that went on for so long. Then I heard a bang,

5    bang, bang, bang, bang. Consecutive blows.

6    Q        Well, bang, bang, bang, bang, bang can mean

7    many things. Do you have any idea what type of banging

8    that was?

9    A        Well, it was against the wall. I couldn't

10   tell, but, I was wondering what the banging was, but it

11   sounded like when you hit a wall, and it echoed.

12   Q        What did you do?

13   A        I didn't do--I just put my ear up to the doo

14   I just like, more or less, froze. I didn't know what was

15   you know, going on. I just put my ear up to the door

16   and tried to listen as much as possible. Then, I was

17   just about ready to go out and, I thought I better not

18   because I didn't know what was out there, you know.

19   Q        Can I ask you, how old are you?

20   A        Seventy-four, I will be seventy-four in Marc

21   Q        You heard those noises. You had your ear

22   against the door.

23   A        Yes, against the door.

24   Q        What happened next?

25   A        Well, finally that noise ended. It was a co

(15)

minutes later, Albert Farver come up.  He is another roo[...]
there.  He come up the steps, he had to turn the lights [...]
he said because they were out and he went up to his roo[...]
and he happened to look back at Lenny's room, the hallwa[...]
there, and he happened to see Lenny laying there.  So he[...]
came over and hollered, "Gary you better call the police[...]
and the ambulance, Lenny's been hit."  So we all came ou[...]
in the hallway, congregated above the steps, right in th[...]
hall that goes back by Lenny's room.  Then they called t[...]
911 emergency number.  Frank  Gitori  and Gary.  Pretty [...]
soon the chief came and the ambulance came.

Q        If in the--

A        The paramedics came and they asked Lenny, "[...]
day is this Lenny?"  They started giving first aid.  Len[...]
said, "Saturday."  It was really early Monday morning, yo[...]
know.

Q        Let me interrupt you.  Is there any way you[...]
can estimate how long it was from when you first heard t[...]
noises, both the "Ou, ou--

A        You mean, "Ou, ou--

Q        Right, to the point where you actually went[...]
out into the hall, when you heard the noises stop.

A        I'd say at least ten minutes.  Coming out o[...]
a sleep, you know you don't--

Q        Had you been asleep?

(16)

1    A        Yes, I was asleep, and it woke me up, and I

2    pretty surpised, you know, "Ou, ou, ou."

3    Q        Then the people that you saw when you did

4    come out into the hall would have been just Gary Heimbach

5    and Mr. Farver? Would that have been?

6    A        No, it was Gary Heimbach--

7    Q        I'm sorry, actual hotel occupants.

8    A        Well, Gary Heimbach was over in his room

9    calling, and Frank Gitori went over to help him call the

10   emergency number. Then there is John Torres, John the

11   Puertirican, he came out, and then me. Then Bob Farver

12   up the steps and he said he saw that guy, got a glimpse

13   of that guy and he was going back down to see if he could

14   find out which way he went, trace him. He left, he was

15   gone a short while, he came back and said he couldn't fin

16   him nowhere. And then--

17   Q        Incidentally, are you aware that Lenny named

18   you as the person who had beat him? Are you aware that

19   Lenny named you as the person who had beat him?

20   A        Oh, yes. I think he repeated twice while he

21   was laying, after we congregated out there, you know. Af

22   we had called the ambulance and the police, I think he sa

23   it twice.

24   Q        Said what?

25   A        "Louie did it, Louie did it." I think he sa

(17)

1    it twice.  So, the other guys--

2        Q      Do you know why he would have named you?

3        A      We had an argument.  It was that Sunday mor

4        Q      You and Lenny had an argument?

5        A      Yes, it was just a verbal argument.  He lik

6    to argue quite a bit, you know.

7        Q      What was the argument about?

8        A      A can of Ajax.  He went in the bathroom and

9    there wasn't any powder in the Ajax can and he got mad,

10    then I got mad.  It was just a little heated argument.

11    happened--so it was over.  But I'll tell you that we nev

12    had no other arguments.

13        MR. KNECHT:  Thank you.  Cross examine.

14        MR. COSTOPOULOS:  No questions.

15        MR. KNECHT:  That's all.  Thank you.  The

16    Commonwealth would next call Don Hellenthal.

17        DON HELLENTHAL, Called, sworn according to

  and examined by Mr. Knecht.

18

19           DIRECT EXAMINATION

20    BY MR. KNECHT:

21        Q      Your name for the record?

22        A      Donald Hellenthal.

23        Q      Mr. Hellenthal, the next quesitons is where

24    do you live?

25        A      1029 Dickson Street in Berwick.

Exhibit "I"

1     A      Definitely said "they didn't get my money."

2     Q      Did you ask him who had done this?

3     A      Yes, I did. I said "Who--were you arguing

4 anyone?" He said "yes, Louie." Louie is a tenant that l

5 up there. He said "George--I had a bad argument with Geo

6 I said "George, who's George? Do I know him?" He said "

7 don't think so. He came to rent a room and I wasn't able

8 rent him a room. After some argument, I promised to take

9 walk down the block." He said "that's why I went back to

10 club, because I didn't want him in my room. It would cau

11 me problems with the landlord."

12           MR. KNECHT:  Cross examine.

13             CROSS EXAMINATION

14 BY MR. COSTOPOULOS:

15     Q      Mrs. Sorber, you say you have been going wi

16 friend's of Lenny Radziak for how many years?

17     A      Sixteen.

18     Q      When you were talking to him that morning,

19 he was at least coherent enough to know that they didn't g

20 his money?

21     A      Definitely.

22     Q      No question in your mind about that?

23     A      No question whatsoever.

24     Q      And you, of course, caring for him and lovi

25 him, wanted to know who did this?

Exhibit "J"

**6G**   The Times Leader, Wilkes-Barre, PA, Sunday, August 28, 1988

# EDITORIAL P

...Os state law

## The Times Leader

**DALE DUNCAN** *President and Publisher*

**ALLISON WALZER** *Editor*          **CLIFF SCHECHTMAN** *Managing Editor*
**BILL GRIFFITH** *Associate Editor*      **MARITA LOWMAN** *City Editor*
**NEIL SHEEHAN** *Sunday Editor*

Those named above are members of our editorial board. The board also
includes editorial writers Ray Blockus and Tom Bigler.

...e families — one of which is from Scranton, another from Carbon-

Kosik noted that the Scranton and Carbondale school districts require the

tutor to be a certified teacher in Pennsylvania, while others only require a college education or a high school diploma.

Among the families directly affected by the order are the Jeffery's of Jefferson Avenue in Scranton. John Jeffery, 40, and his wife, 43, first sent their children to private Christian schools. But in the last four years, Jeffery said, they have been teaching them at home.

Jeffery, who has a college degree, and his wife a high-school diploma, are nursing and child-care requirements, hailed Wednesday's ruling as "about time for home schoolers in this country."

But "we haven't hit at home, we're only on third base," he said, adding that the superintendents will appeal the decision or the legislature...

# Berwick man faces murder charge

**By TRACY JORDAN**
*Times Leader Staff Writer*

BERWICK — Police arrested a Berwick man Thursday in connection with a one-year-old murder.

George Sheeler, 40, was charged with criminal homicide, criminal conspiracy and aggravated assault in connection with the beating death of 51-year-old Leonard Radziak on May 11, 1987.

Radziak was found beaten outside his room at the Hayes Hotel, Lasalle Street. Police said he was beaten with a hammer, which was found in the hallway. Radziak died the next day in the Geisinger Medical Center in Danville.

Sheeler is the second person arrested in connection with the death. Police arrested Kenneth Shiffer, 27, of West Front Street, on Oct. 8, 1987.

When Shiffer was arrested, however, he told police he acted alone in the murder.

Shiffer is in the Columbia County Jail awaiting his trial. He has been in the prison since his preliminary hearing last November.

Sheeler was arraigned before District Justice Delbert Pennypacker in Millville and committed to the Columbia County Jail, Bloomsburg, without bail.

A magistrate cannot set bail in a homicide arraignment.

A preliminary hearing is set for Sept. 1 at 10:30 a.m. before District Justice Richard Cashman in Berwick.

Sheeler was arrested at home Thursday morning by Berwick Assistant Police Chief Thomas James. He was assisted by the Bloomsburg State Police and Columbia County District Attorney Scott Naus.

# Dry season proves hard on migrants

**By GARY MURACA**
*Times Leader Staff Writer*

WILKES-BARRE — They come from far off places like Mexico, Guatemala and El Salvador.

They arrive via bus and car, toil in the fields of Northeastern Pennsylvania for several weeks and then leave for greener pastures.

They are the migrant workers and, like the farmers they work...



TIMES LEADER/GARY MURACA

...two grandchildren; one great-grandchild.

Funeral services will be Saturday at 1:30 p.m. from the Metcalfe and Shaver Funeral Home, 504 Wyoming Ave., Wyoming with Rev. Robb Henderson, Orange United Methodist Church, officiating.

Interment will be in the Eaton Cemetery, Orange. Friends may call today from 2 to 4 and 7 to 9 p.m. Memorial contributions may be made to the Orange United Methodist Church, P.O. Box 227, R.D. #3, Dallas, 18612.

## in Ostrum

...nton ...sday ...ger-...nter.

...he ...f the ...Os-

Surviving are his wife, the former Cecelia Januszewska; children, Mrs. Robert (Patricia) Zawada and Mrs. Donald (Debra) Harris, both of Wilkes-Barre; Calvin C. Jr., Lampac, Calif.; brother, William F., Shavertown; sister, Betty Ostrum, Wilkes-Barre; four grandchildren.

...High ...kes ...the

...elsh ...rre. ...can ...U.S.

Funeral services will be Monday at 10:30 a.m. from the Luther Kniffen Funeral Home, 465 S. Main St., Wilkes-Barre with Rev. Donald P. Hartshorne, officiating.

Interment will be in Maple Hill Cemetery, Hanover Township. Friends may call Sunday, from 2 to 4 and 7 to 9 p.m.

## Hrivnak

...ino-...sday ...Nan-...ortly

...n of ...late ...ak. ...uate ...had ...zin ...nion

...946, ...ears ...Rub-...ntal ...He ...em-

...St. ...the ...913, ...Post

He was a naval veteran of World War II, serving as an aviation machinist mate First Class in the U.S. Navy-Air Force.

Surviving are his wife, the former Josephine Hudak; son, Airman First Class Gregory, Lowery Air Force Base, Colorado; daughter, Mrs. Daria Rowland, Pottstown; brothers, Michael, Veterans Administration Hospital, Lebanon, PA.; Daniel, Mt. Pocono; sisters, Mrs. Mary Bennetski, Lower Askam; Mrs. Celia Rominski, Nanticoke; Mrs. Ann Kadtke, Wilkes-Barre; two grandchildren.

A military funeral will be conducted Monday at 10 a.m. by American Legion Post #350, Nanticoke from the Grontkowski Funeral Home, 51-53 W. Green St., Nanticoke with a Mass of Christian Burial in St. Joseph's Church at 10:30.

Interment will be in the parish cemetery, Nanticoke. Friends may call Sunday, 2 to 4 and 7 to 9 p.m.

## ...yne Neely

...ash-...died ...tercy

...as a ...Anna

...loyed ...ware ...er of ...odist ...ghlin ...Barre

A veteran of World War II, Mr. Neely served in the U.S. Army Pacific Theater of Operations. He was also a member of the American Legion Post #558, Plains.

Surviving is his wife, the former Ruth Sprow; several nieces and nephews.

Funeral services will be at the convenience of the family with interment in Oak Lawn Cemetery.

Arrangements by the Frederick

---

ginning Saturday at 7 p.m. and after 2 p.m. on Sunday.

Interment will be in Cathedral Cemetery, Scranton.

## John Schmid

John A. Schmid, 82, of Slocum, died Thursday morning, Sept. 1, 1988 at his home.

Born in Patterson, N.J., he was a son of the late John and Elizabeth Schmid.

He had resided in the Slocum area since 1944, and prior to that in Wilkes-Barre. Before living in Wilkes-Barre, he resided in Patterson, N.J., from 1916 to 1934.

Prior to retiring in 1968, Mr. Schmid was employed as a machine operator by Hazard Wire Rope, Wilkes-Barre. He was a member of St. Mary's of Our Lady Help of Christians Church, Dorrance.

He and his wife, the former Catherine B. Reiner, celebrated their 62nd wedding anniversary in January.

Surviving in addition to his wife are sons, John P., Milwaukee, Wisc.; Andrew M., Berwick; Joseph R., Slocum; Robert J., Deptford, N.J.; daughters, Mrs. Robert (Rosemary) Petty, Rockaway, N.J.; Mrs. Edward (Betty) Strzelecki, Wapwallopen; brother, Joseph, Patterson, N.J.; sister, Mrs. Edward (Rose) Mikaionis, Wayne, N.J.; 25 grandchildren; 11 great-grandchildren.

Prayer services will be Monday at 9 a.m. from the Ralph H. Cragle Funeral Home. Hobbie followed by a Mass of Christian Burial at 9:30 in St. Mary's of Our Lady Help of Christians Church. Rev. Robert N. Shilala, pastor, will officiate.

Interment will be in the parish cemetery, Dorrance. Friends may call Sunday, 2 to 4 and 7 to 9 p.m. Rosary will be recited Sunday at 7:30 p.m.

## Morris Kemmerer Jr.

Morris Kemmerer, Jr., 81, of Watkins Guest Home, Orange, died Wednesday evening, Aug. 31, 1988 in Mercy Hospital.

A life resident of Mountaintop, he was born in Nuangola, Feb. 10, 1987, a son of the late Morris J. and Jenny McGovern Kemmerer.

He was active in the Civil Air Defense during World War II and was a member of the Wright Township Fire Co.; the township auxiliary police; the Black Diamond CB CLub, Wilkes-Barre.

Surviving are nieces and nephews.

Funeral services will be Saturday at 9:30 a.m. from the Graham-McCune Funeral Home, 80 S. Mountain Blvd., Mountaintop with a Mass of Christian Burial at 10 in St. Jude's Church.

Private interment will be in CalvaryCemetery, Butler Township.

---

...ing.

Friends may call today, from 2 to 4 and 7 to 9 p.m.

## Berwick man arrested in year old murder case

BERWICK — Police arrested a Berwick man Aug. 25 in connection with a one-year-old murder.

George Sheeler, 40, was charged with criminal homicide, criminal conspiracy and aggravated assault in connection with the beating death of 51-year-old Leonard Radziak on May 11, 1987.

Radziak was found beaten outside his room at the Hayes Hotel, Lasalle Street. Police said he was beaten with a hammer, which was found in the hallway. Radziak died the next day in the Geisinger Medical Center in Danville.

Sheeler is the second person arrested in connection with the death. Police arrested Kenneth Shiffer, 27, of West Front Street, on Oct. 8, 1987.

In arresting Shiffer, police said he acted alone in the Radziak murder. The newspaper incorrectly reported Aug. 26 that Shiffer told police he acted alone in the murder.

Shiffer is in the Columbia County Jail awaiting his trial.

Sheeler was arraigned before District Justice Delbert Pennypacker in Millville and committed to the Columbia County Jail, Bloomsburg, without bail.

A magistrate cannot set bail in a homicide arraignment.

A preliminary hearing set for Thursday was continued upon the request of his attorney, Frank Kepner Jr.

The new date is Sept. 16 at 1 p.m. before District Justice Richard Cashman in Berwick.

## Church to hold ice cream social

The Bloomingdale United Methodist Church will hold an ice cream social at 4 p.m. Saturday, Sept. 10, at the church.

The menu will include barbecue, hot dogs, bean soup, deviled eggs, potato salad, beans, assorted pies and tarts, and ice...

October 8, 1988 **Weekend Edition/50¢**

# NTERPRISE

e Susquehanna Valley

PHONE: 717-784-2121
TOLL FREE: 1-800-422-1164



Press-Enterprise/Bill Hughes

N. Myers refused to hear their reasons why
ed to her father. The Lutskys' flight with the

# Murder witness tells story

**By LEON BOGDAN**
Press-Enterprise staff

BERWICK — An elderly eyewitness has surfaced who can positively identify the killers of Leonard Radziak, a policeman testified Friday.

The revelation came during a preliminary hearing for 40-year-old George Sheeler, one of two suspects in the brutal beating death.

The witness claims he saw Sheeler and the second suspect, Kenneth Shiffer, "pacing" a darkened hallway at the Hayes Hotel in Berwick.

He then listened as Sheeler and Shiffer beat to death the elderly Radziak, a hotel tenant, the policeman said.

The statement was given to authorities only on Wednesday by 68-year-old Juan Garcia, a former hotel resident now confined to a nursing home.

It is the first eyewitness account of the assault, although police admitted Garcia had "nothing" important to tell them 17 months ago when first questioned about the crime.

"As I recall, I wasn't too impressed with his interview at the time because he said he was asleep
Please see **MURDER** page 14

Please see **MURDER** page 14

# Frustrated flagwoman stops truck

Case 1:00-cv-01829-WYC-PT    Document 12    Filed 07/12/2001    Page 82 of 120

# Murder

and didn't hear too much," Berwick assistant police chief Thomas James said.

"I was actually elated," police Tpr. Charles Confer said of this week's interview with Garcia at a local nursing home. "He identified both of my suspects."

"Sounds strange to me," said Sheeler's lawyer, Frank Kepner Jr.

"Today was the first I heard of it," Sheeler, at the conclusion Friday of nine hours of testimony over two days, was ordered to trial on murder charges in Columbia County Court by District Justice Richard Cashman. Cashman refused to consider a second request for bail. The defense was arrested, 27-year-old Shifer, was arrested the May 11, 1987, death.

The men are being held in separate prisons, officials said. Police attempt to rob him.

Although Garcia, said to be sickly and confined to a wheelchair, was not present at yesterday's hearing, he will be available to testify, police said.

Garcia says he saw "two men, late at night" pacing in the hall one a big man, pacing in the hall late at night . . . one was George, the other Kenny," Confer testified, adding that Garcia noticed one man reach up and unscrew a bulb from a ceiling light. "Garcia said he then heard a thumping, then the thumping noise of the victim being beaten — and cries of moaning," Confer said. Garcia then saw the men flee.

Neither officer, when questioned by Kepner, could explain the discrepancy in Garcia's two stories.

i didn't ask him," Confer replied. "it was possible he had seen them and tried to hide something from me."

His account wasn't the only new evidence offered by police Friday.

More information implicating Sheeler, a Mifflin Township native, was also revealed by Radziak's girlfriend, Marjorie Sorber.

The woman testified Radziak told her on his deathbed about "a furious argument" he had with Sheeler shortly before he was beaten.

Sheeler had asked Radziak to get him a room at the hotel, and got angry when Radziak said he couldn't help him, the Sorber testified.

The two argued, and Radziak offered to take Sheeler to a nearby bar "for a drink."

"He said George borrowed $5 from him," Sorber said. "He knew exactly how much money he was carrying."

Attorney Kepner said Sorber's recollection of her bedside conversations with the victim were different from what the previously heard.

District Attorney Scott Naus said later, "it's not a total surprise to me."

"It's just that we didn't reveal it before," Naus said of the latest testimony. "It should show how our investigations continue even after arrest."

Sorber, who broke down in tears as she recalled speaking with Radziak at the Berwick Hospital Center two hours after the assault, said she asked him, "Hon, who could have done this to you?

"And he said he had an argument with Louie . . . and an argu-

"Louie," she learned, referred to "Louie the Kraut," an elderly hotel tenant with whom Radziak often argued, Sorber said.

Radziak "never fought. He would argue. He loved to argue," she said.

"He said, 'They didn't get my money,'" Sorber recalled of nearly $400 found on the victim. "He thought that possibly George did it."

She said Radziak, who was in intense pain, said it was "all dark" in his room while he returned to and saw "a silver bat come at him."

Tpr. Confer said a 34-inch pipe was reported stolen by a neighbor near the hotel the following day. That pipe, believed to have been the murder weapon, was never recovered, he said.

At least two other witnesses have claimed they saw a man fitting Shifer's description carrying the pipe away from the hotel early that morning.

When questioned by police about Sheeler knew of Radziak's beating, Sheeler admitted he had "a couple beers" but left him at the social club, but let by himself less than a half hour before Radziak did, Confer testified.

He told police he walked directly to a former girlfriend's home to spend that night, then the trooper said.

Bartenders at the "Old Man's Club," formally known as the American Ukrainian Citizens Club on Fries Avenue, said Confer entered her bar with Radziak that night about 9:30.



GEORGE SHEELER
. . . at previous hearing

Please Enterprise file photo

der Don Hellenthal.

Sheeler, he said was more "low-key" and a "loner . . . he didn't run with anybody," Radziak said.

"He laid a wad of money on the bar" that evening, Hellenthal said, and "his tone never changed. Lenny is a loud patron."

Sheeler used the bar telephone at "least" four or five times, Hellen-thal recalled, "to call friends, as "least" four or five times, Hellen police Sheeler has told Shifer, of Berwick, has told robbing "a guy with $400..."

Last Friday, two bar patrons

Enterprise staff

BLOOMSBURG — A state welfare review team that was waved off the Beatrice Bird case by District Attorney Scott Naus in December will meet in the county Children and Youth Services office, Commissioner George ... said Thursday.

least three days reviewing files and interviewing agency workers to unravel its handling of Beatrice Bird, who starved to death under agency supervision in March.

The team, which includes Bloomsburg University Sociology Chairman Sue Jackson, also will identify overall problems at the agency.

erly.

But Naus said the team would interfere with his probe and indicated recently that his investigation is drawing to a close.

Department official Pete Rollason informed Gensemer of the team's

Please see **BIRD** page 14



Press-Enterprise/Keith Haupt

**CHANGE —** Juan Garcia rebuts police story.

# 'Eyewitness' denies seeing Berwick killing

### By FRANK SELLERS/ Press-Enterprise staff

ORANGEVILLE — The prosecution's only eyewitness against murder suspect George Sheeler now says he remembers little about the night a man was fatally beaten outside his hotel room.

Juan Garcia, 65, claimed to have heard a "thumping" noise in the hallway when Leonard Radziak was beaten, according to a police officer's testimony at a preliminary hearing in October.

But when asked this week about the murder, Garcia said, "I said I saw nobody . . . didn't see anything."

A county prosecutor, however, said he'll press the case against Sheeler with or without Garcia's testimony, building a case on circumstantial evidence.

Garcia, a native of Puerto Rico, was a Hayes Hotel tenant on May 11, 1987, when Radziak returned home sometime after midnight. Today, Garcia is confined to a semi-private room at

Please see **KILLING** page 14

Eight jurors seated in murder case/**Page 3**

Columbia won't hold county vote/**Page 4**

Danville fills empty stores/**Page 6**

Markets needed for newsprint/**Page 7**

Budget boss quacks up senate/**Page 8**



UPFRONT
Spotlight shines on the front lines in Sunday's Super Bowl contest.
**Story, page 15**

name ... as did attorney Frank Wenzel to

## Killing

Bloomsburg.

Keller said he got the word yesterday morning in a telephone call from the governor's office.

"I still have to wait for confirmation," he cautioned, but personally felt confident of becoming "a good judge."

"I'd make a good one. You got to be fair, be decisive," he said. When asked if he assessed any Senate opposition, he expected any Senate opposition.

Char-Mund Nursing Home, Orangeville.

Speaking with a thick Spanish accent, he insists he heard and saw nothing when Radziak was killed.

All he remembers the night of the murder is the police waking him up in the early morning, he said. They showed him Radziak's body and asked him if he knew anything about what happened, he said. He told them he knew nothing.

Shown a photo of Sheeler during an interview on Wednesday, he said Sheeler looked like someone with whom he worked in a Berwick lamp factory, but that was "a long, long, long time ago."

He could also not identify a photo of Ken Shiffer, who has been convicted of second-degree murder in the death. Prosecutors claim Shiffer and Sheeler acted together.

A state police officer, however, painted a different picture of Garcia during a preliminary hearing that resulted in homicide charges being sent to Columbia County Court.

State police Tpr. Charles

Confer told District Magistrate Richard Cashman what Garcia had told him during an interrogation after the murder.

Confer testified on Garcia's behalf because the witness was too ill to attend the hearing.

Garcia said he saw "two men, one a big man, pacing in the hall late at night . . . one was George, the other Kenny." Confer testified, adding Garcia noticed one man reach up and unscrew a bulb from a ceiling light.

"Garcia said he then heard a thumping, the thumping noise of the victim being beaten," and his cries of moaning," Confer said. Garcia then saw the men flee.

On Wednesday, asked about Confer's remarks, Garcia said he hasn't told police anything about Radziak's murder.

"I don't say nothing," he said.

Defense attorney Frank Kepner feels Garcia's inconsistency is reason enough to ask Columbia County Court to dismiss the case. He said Garcia is the only link and his testimony is unreliable.

Kepner said no one at the preliminary hearing linked Sheeler to the crime.

said she doesn't recall seeing him there," he said.

But Assistant District Attorney Richard Knecht downplayed the significance of Garcia's testimony.

"Frank Kepner would like to pigeonhole it," Knecht said Wednesday.

He said the district attorney's office has presented "strong evidence," albeit all circumstantial, to have the case bound over to court with or without Garcia's testimony.

"He may be frightened," Knecht said as to why Garcia is now denying any knowledge of the crime. "Maybe in a week or two, he'll remember and tell somebody what he told us," Knecht said.

Knecht said the district attorney would have to wait until sometime closer to the trial date, if the case isn't thrown out, to determine whether Garcia's testimony will be used.

"I think we'll be able to proceed with him or without him. There are lots of other circumstantial witnesses," Knecht said.

## Costs

design is nearly complete. Jessick said the designs must pass a state board which must OK how it looks. "I can't look like an add-on," or it won't be approved, she said.

Jessick gave the following breakdown for the actual building costs:

High school — new construction, $1,029,510; alterations $1,987,613. Total, $3,480,000. Plus architect's fees and cost of bond issue, $3,430,000.

Elementary school — new construction, $665,330; alterations, $728,625. Total, $1,593,955. Plus architect's fees and cost of bond issue, $1,830,000.

The overall cost of the project is $5,260,000.

Jessick said the state would reimburse $1,461,866 on the high school portion and $676,551 on the elementary school. That leaves the total local share of $3,121,583, she said.

Hoagland asked why the state would cover three-fourths of the high school costs, but only half the elementary costs. Jessick said the state reimbursement percentage is lower for new construction than for renovation.

# PRESS-ENTERPRISE

Serving the heart of the Susquehanna Valley

November 15, 1988 TUESDAY/35¢

PHONE: 717-784-2121
TOLL FREE: 1-800-422-1164

# Jurors selected for the first of three Berwick murder trials

**By LEON BOGDAN**
Press-Enterprise staff

BLOOMSBURG — A sister of a murdered Berwick man fainted in the courtroom Monday as trial opened for one of two suspects charged in the 1987 beating death of Leonard Radziak.

It is the first of three Berwick murders last year to reach trial in Columbia County court, with the accused, 27-year-old Kenneth A. Shiffer of the 500 block of West Front Street, maintaining his innocence.

District Attorney Scott Naus, while seeking a first-degree murder conviction against Shiffer, told the court he would not ask for the death penalty if a conviction is returned.

A life sentence would be the maximum possible punishment if the defendant is found guilty.

Testimony is expected to start this afternoon after a full jury is impaneled. Trial, which could

include two extended court sessions into Wednesday and Thursday evenings, is expected to last all week.

On Monday, seven women and two men were selected during a painstaking screening of 42 potential jurors inside the chambers of Judge Jay W. Myers.

Another 55 remained in a jury pool to be questioned. All selected jurors are being sequestered under strict supervision at a local hotel until the end of the trial to avoid outside publicity.

Shiffer, who has spent 13 months in jail waiting for his day in court, has pleaded not guilty.

He is claiming an alibi that he was home with his live-in girlfriend and their infant child on the night of May 11, 1987, when 51-year-old Radziak was found brutally beaten during an apparent robbery attempt outside his Hayes Hotel room on LaSalle Street.

A second suspect, George Sheeler, 40, of Mifflin
Please see **BERWICK** page 16

KENNETH A. SHIFFER
*. . . on trial in murder*

Case 1:00-cv-01829-WWC-PT    Document 13    Filed 07/12/2001    Page 85 of 120

## Attack

the heart.

"It is one of the most major breakthroughs in history," Kresock said of the drug's affect on heart attack patients.

And for Davis, who was in stable condition Monday night, it is a treatment that may have been introduced just in time at the local hospital.

According to Kresock, the drug had been used experimentally for about three years and had been put into widespread circulation in the spring. At the Bloomsburg Hospital, he said in-service procedures that must be

fulfilled before a new drug is used had been completed by Thursday, two days before Davis' attack.

Kresock, the hospital's only cardiologist and the physician who examined Davis, said she was a prime candidate for TPA because she was treated only hours after first experiencing chest pains. The drug seems to be most effective within six hours of a heart attack, he added.

Kresock also said the drug works quickly and allowed him to notice improvement on Davis' electrocardiogram

(EKG) within 10 minutes after she was injected.

Another hospital physician, internist Richard Nesbit, said he examined Davis' EKG on Sunday and found it to be "remarkably better."

But the drug is expensive and costs up to $2,500 for 100 milligrams, the dosage needed for one patient, Kresock said.

"That's $8,000 more per ounce than gold," he added.

But it seems to be worth the price because it has been 70-80 percent effective in saving heart attack patients, he said. Because the drug dissolves

blood clots, it's not recommended for patients who have had recent surgery, a stroke, bleeding ulcers or who are pregnant, Kresock said.

The human body naturally produces small amounts of TPA, but not in large enough quantities to reverse a heart attack, Kresock said.

TPA is a product of the new recombinant DNA technology, he said. Bacteria are clinically programmed to make this enzyme.

Kresock, 32, studied medicine at Penn State University Hershey Medical Center.

## Berwick

Township, is awaiting a separate trial on homicide charges. He was arrested in the case a month ago.

As Shiffer's jury selection progressed, one of the victim's sisters who sat waiting in the courtroom with other family members suddenly collapsed unconscious.

A Bloomsburg ambulance team was summoned and worked to revive the woman on the floor of the courtroom before a waiting crowd of some 60 potential jurors.

The woman, who was not immediately identified by name, apparently was overcome by a combination of heat and emotions and reportedly did not require further treatment.

It did cause defense attorneys some concern, however, with the defendant's chief counsel, William C. Costopoulos of Lemoyne, asking the courtroom to be cleared of any potential witnesses or family members to avoid possible prejudicial effects on the waiting jury pool.

Costopoulos said he is "absolutely certain" that a fair and impartial jury could be found in Columbia County, despite local news coverage of the murder.

While the homicide was widely reported in the local media when it occurred, and again

months later with arrests, only four of 42 potential jurors questioned yesterday said they recalled the case, and only vaguely.

In fact, one juror who was selected, Carol Samuel, a 30-year-old secretary from Catawissa, told the court she thought Shiffer was an attorney when he was pointed out to her.

The defendant, dressed in a suit jacket and slacks, sat directly in front of each potential juror as they were brought before the court for private questioning on what they might have heard of the homicide.

"I read a little bit," Samuel confided. "I know there were three in a row up in Berwick and everyone was hysterical."

Another questioned, 43-year-old Mary Bailey of Main Township, said she "probably" read of the Radziak murder, but added, "There's so many going on in Berwick you just can't keep track of them."

She was promptly excused by prosecutors.

One Bloomsburg resident who also was excused, Austin George, a 50-year-old maintenance worker, told lawyers when asked if he knew Radziak, "All's I read in the paper is sports, and if I don't know who he is, I never heard of him."

Besides Mrs. Samuel, other jurors selected

throughout the day included Robert Kehl, 42, a bricklayer from Berwick; Charles Creasy, 45, a PennDOT truck driver; Virginia Barnes, 49, a housewife from Berwick R.D.2.

Also, Janice Longenberger, 37, a secretary from Bloomsburg; Mildred Fetterman, 65, a retired bank teller from Catawissa; Thelma Hughes, 38, a Berwick homemaker; Edna Lynn, 63, a retired nurse from Catawissa R.D.3; and Eleanor Fedder, 64, a Bloomsburg housewife.

Another 11 potential jurors were excused by the court for various health or hearing problems, while one elderly man who lives alone was excused because he had no one to tend his coal stove at home, and a woman said she had no way of finding a babysitter for her three young children.

Yet another excused juror, 41-year-old Charles Case of Millville, a manager at Kawneer Co. Inc. in Bloomsburg, had a unique problem with serving jury duty this week.

His company, he told the judge, had recently been robbed at one of its service centers in Boston, and he was on his way there to do an inventory this week.

Tyson's flight

John Tyson, suspected of strangling his ex-fiancé, Georgia Naylor, in Nescopeck, killed himself halfway across the nation to Osawatomie, Kan., where he was captured, stabbed and appears to have suffered a restraint.

Tyson's body, according to police, took him to Georgetown, Ky., where he allegedly left the car at a hotel. He abandoned his car. He had lost his luggage in Des Moines, Iowa.

Local police, according to Kansas, where Tyson will be charged with auto theft and questioned about the murder.

Press-Enterprise art/Brenda Martin

# death

# Lawyer at trial: Police arrested the wrong man

By LEON BOGDAN
Press-Enterprise staff

BLOOMSBURG — A defense lawyer charged here Tuesday that police have yet to find the real killer of Leonard Radziak, while the man they arrested on trial is a victim of "mistaken identity" by a lone key witness.

"We are here, ladies and gentlemen of the jury, because we don't know what happened," asserted chief defense counsel William C. Costopoulos during opening arguments in the Columbia County murder trial.

Eyewitnesses can't link the defendant, 27-year-old Kenneth Shiffer, to the murder scene because he doesn't fit their descriptions then or now, Costopoulos asserted.

Costopoulos told jurors that after hearing all evidence, "You're going to see why the

lawyers — and the police — don't have any idea who killed Lenny Radziak at the Hayes Hotel on May 11, 1987."

Columbia County District Attorney Scott Naus, while acknowledging no one actually saw the fatal attack take place, argued that eyewitnesses certain, she saw Shiffer fleeing the hotel moments later.

A man dressed in a dark jacket trying to cover his face was seen leaving the building's front door, hurrying toward Front Street. Minutes later, Naus said, a second witness saw someone "jogging" by dressed in identical dark clothing as he passed under a streetlight.

"She says it's him," Naus said. "She says it's Ken Shiffer."

Radziak, 51, was described by witnesses Tuesday as a loudmouthed, intoxicated bar patron who was "flashing" money
Please see TRIAL page 10

# GMC head: We're



**1988. There are 45 days**

holdin' her
.om her face
like smoke."

## Trial

around a crowded tavern shortly
before he was found brutally
beaten outside his hotel room.

He died about 20 hours later at
Geisinger Medical Center, author-
ities said.

A later pathology report identi-
fied two distinct types of marks
on the body — circular ones
about the size that a hammer
might inflict, and long, straight
blunted marks, Naus said.

"beaten and left in a bloody heap
on the floor."

"I want you to understand
Lenny was real," Naus told the
jury in his opening statement,
then Lenny died.

"And I want you to understand
the Commonwealth believes it
knows who did that," he said.
"That man," seated there, Ken-
neth Shiffer.

Costopoulos, however, said
the police investigation, "their
problem with the case, ladies and
gentlemen, is big time."

## Beatrice

He said the maker's inline

---

"Any number of people are
suspects in this murder, and
George Sheeler is one of them,"
Costopoulos said of another sus-
pect charged one month ago in
the case. Sheeler, 40, of Mifflin-
ville, is now awaiting trial as a
co-defendant.

Sheeler is accused of telephon-
ing Shiffer from the American
Ukrainian Club on Freas Avenue
"about robbing a guy" with $400
after drinking with the victim
earlier that night.

Initial eyewitness accounts
given to police by one woman,
Diane Sklarz of Berwick, por-
trayed a slender, bearded man
with hair down over the ears
hurrying away from the hotel
around the time of the beating.

A composite drawing of a sus-
pect later published in area
newspapers were based on such a
description, Costopoulos argued,
but Shiffer was and remains
clean-shaven and has short hair.
Shiffer was arrested last Sep-
tember — four months after the

---

fatal assault — when Sklarz iden-
tified him out of a set of photo-
graphs shown her by police.

"We have one lady who has
made a mistaken identity," Cos-
topoulos said. "As a result of that
mistake, Ken Shiffer's arrested."

Shiffer, he went on, spent the
night of the attack with his girl-
friend, JoAnn Lutz, and their
infant child, after leaving his
parents' home earlier that eve-
ning, which was Mother's Day.

"He never left the house," the
defender said, doubting the police
accounts and adding, "If that is
believed, then this case is over."

In animated style, Costopoulos
walked briskly over to where his
client sat and told the jury that
Shiffer's infant child just turned
22-months-old yesterday.

Just prior to the start of testi-
mony, Judge Jay W. Myers

---

down like a hound and John
would come and get me.

"He just kept thinking and
different points knocking me
feet," and breaking his nose. He
said he wants the law to deal
harshly with his son.

---

## down like a hound and John

John W. Bird, who he claims
assaulted him several times at
different points knocking out his
teeth, and breaking his nose. He
said he wants the law to deal
harshly with his son.

---

that good planning can enable an
organization to thrive in an
uncertain environment.

"In recent years there has been
a great deal of restructuring and
change in the health care indus-
try," Hood said.

"We are not just wandering
aimlessly. And we have not just
used consultants," he said.

Consultants breed amidst the
uncertainty that afflicts busi-

leadership every few years.
In the health care industry, he
said, "there are consultants
everywhere and you can buy 'em
by the pound."

But their findings and advice
— which also come "by the
pound," Hood cracked — are of
little value, because no one in the
business has been involved in
their preparation. "No one has
poured any sweat into them,"
Hood said.

Always looking ahead is criti-

---

consultants' reports on the shelf,
and says, "We didn't order that
study anyway. The last guys
did."

Hood, who is only the third
chief executive in Geisinger's 73-
year history, said his organiza-
tion is different thanks to man-
agement continuity and reliance
on planning that is done totally
in-house.

The defense objected, however,
saying available photographs and
diagrams were sufficient while
nighttime conditions when wit-
nesses say they spotted a suspect
could not be duplicated.

The judge agreed, denying the
jury's visit to Berwick because of
a "great deal of difficulty"
recreating conditions of the
early morning attack, which
police theorize happened between
1:10 and 1:18 a.m.

"At last we've arrived," were
the district attorney's opening
words to the jury, made up of
seven women and five men who
will remain sequestered until
trial's end.

"This is not a game," the chief
defender countered. "If you con-
vict an innocent man . . .
everybody loses."

---

denied a prosecution request to
take the jury to the Hayes Hotel
for a personal look at the crime
scene and its relation to a nearby
.

"People are always saying to
me, 'You know, Henry, you ought
to run that thing like a business.'
And I say, 'Yes, but which busi-
ness?'"

"Still, Hood said with a smile, he
still gets his share of outside
advice.

now behind him and Columbia
County is "too far" to travel to
testify against him and daughter
.

State police said Bird, never
made statements about being

[redacted]

Press-Enterprise/[illegible]

**Need a hug**
Friendly Tavern owner Art Zimmerman placed this sign atop his business recently in support of Benton English teacher Susan Depoe.

Story, page 29

By LEON BOGDAN
Press-Enterprise staff

The state must pay the salaries of all workers in the county court system, the state Supreme Court has ruled in a decision that could save counties plenty while putting an undetermined burden on the state budget.

Columbia County could save about $144,000 in salaries for court employees, and Montour, $31,000, officials said, and the numbers would go higher if the ruling includes county sheriffs and prothonotaries.

"It's good news, no matter how much it is. It's going to save us money," said Montour County Chief Clerk Sue Kauwell.

But the 4-2 court decision handed down late Monday in Pittsburgh would cost Pennsylvania several hundred million dollars a year after the Legislature acts on the high court's instructions.

"Nobody really has an estimate of the costs involved, but it's going to be mind-boggling when you consider the costs of court employees for each county," said state Rep. Ted Stuban, D-Berwick.

The court delayed enforcement of its ruling until the Legislature can pass a revised appropriation bill.

"Nobody knows where the money's going to come

Please see COURT page 10

# Murder trials could leave taxpayers with hefty bill

By MICHAEL J. DILLON
Press-Enterprise staff

BLOOMSBURG — Usually the three commissioners decide how much tax Columbia County residents pay — but this year that decision may rest with four accused murderers.

If the four suspects in this year's murders in Berwick exercise their rights to a trial by jury, there is an "even chance" that Columbia County — which will adopt a two-mill tax hike on Thursday — will have to petition the court to raise taxes again, according to county Chief Clerk Harry Faux.

And if estimates of the costs of those trials are accurate, the additional hike could amount to two more mills. A mill of tax equals about $90,000.

County officials originally estimated and budgeted $150,000 to prosecute the four suspects.

Another $40,000 was set aside to pay for special prosecutors next year because newly elected District Attorney Scott Naus faces potential conflicts of interest. Naus, a former public defender, will be unable to prosecute suspects he formerly defended.

County officials, however, cut the $150,000 legal fund from the final draft of the budget and are gambling that the suspects won't go to trial, Faux said.

"If they go to trial and we are faced with a financial dilemma, there is an even chance we will instruct our solicitor to petition the court to raise the taxing cap," Faux said.

A two-mill tax hike would push the county to 25 mills. State law forbids raising taxes beyond that figure, but if a county can show dire need or "unforeseen" expense, the court can grant the right to tax beyond the cap, Faux said.

"These three murder trials are certainly foreseen, but we can certainly argue that the expenses are unforeseen," he said.

"There's no telling exactly how much it

Please see TRIALS page 10

## Single mother faces holiday income crunch; needs clothing for winter

Mrs. L. is trying to better herself. She's working her way through Bloomsburg University in a work-study program that enables her to earn some money and attend classes.

But it's not easy for her, and it's even tougher for her 5-year-old daughter.

The father departed soon after the little girl was born and hasn't been of any help since. But Mrs. L. pays her bills, including her rent and all her utilities.

December, ironically, is their most difficult month. Because the university will close for the holidays, Mrs. L.'s employment and income this month will be limited.

She's learned how to get by in difficult times and she'll make it through the holidays. But she says her little girl is badly in need of winter boots and a winter coat and there is no money.

Mrs. L. asked nothing for herself, but the social worker who met with her said she also needs a winter coat.

Amount needed: $100.

This story is a true account of a case on file with a local social service agency.

To help make Christmas brighter for this family and others in our area, fill out the coupon found on page 30 and send it with your check to:

Brighter Christmas Fund
Press-Enterprise
3185 Lackawanna Ave.
Bloomsburg, PA 17815

Contributions, which are tax-deductible, can also be dropped off at any Press-Enterprise [illegible]

All money received [illegible]. There are no administrative co[illegible] the work of those overseeing the appeal is [illegible].

If you need help [illegible] request in writing and mail it [illegible] Christmas Fund in care of the [illegible]. Make sure to include your phone number and list any current benefits received from service agencies.

Brighter Christmas Fund 1987

## Yorks hopes to block tax increase in county

By MICHAEL J. DILLON
Press-Enterprise staff

BLOOMSBURG — Columbia County Commissioner-elect Wayne Yorks says he will try to find a way to block or repeal a proposed two-mill tax hike when he takes office in January.

Yorks vowed during his election campaign that he would oppose county tax hikes under any circumstances.

"When a new board comes in we have 30 days to open the budget and look it over again" before a tax increase takes affect, said Yorks, a Republican, when asked for his reaction to the proposed increase.

"You can bet I'm going to be looking. I don't know what can be cut, or where we can cut, but I'll bet something can be cut," he said.

"If I was on the board now I wouldn't vote for it," he added.

Yorks was the only successful commissioner candidate who committed himself when questioned about taxes at an Oct. 14 election forum.

He vowed then that nothing could compel him to support a tax increase, saying, "I'm as conservative as the devil."

At that time, incumbents George Gensemer and Lucille Whitmire hedged when asked about taxes.

The announcement of the tentative hike came less than one month after the election, but the first ominous warnings that taxes might be raised were issued by Whitmire

Please see YORKS page 10



PRESS-ENTERPRISE/Wednesday, December 9, 1987

## FAMILY CIRCUS/ Bil Keane

"God gift-wrapped the world!"

## TODAY/ Dec. 9, 1987

Today is the 343rd day of 1987. There are 22 days left in the year.

TODAY'S HIGHLIGHT IN HISTORY:

# Court

from," Stuban said, but added, "it's going to be a godsend to county government."

"Oh my God, imagine what it would amount to," said Columbia County Chief Clerk Harry Faux, who said a tentative county budget for 1988 balanced recently only with a tax increase and cuts in programs.

Columbia County now pays $80,117 for court staff alone, plus $8,640 for jury commissioners. Salaries for the probation department, another branch of the county judicial system, account for another $55,500.

In Montour County, the court decision could lead to savings of up to $31,000, based on salaries the county pays a court administrator, bailiff,

clerk of courts and deputy prothonotary.

Savings to both counties could be much higher if the Supreme Court decision is interpreted to include sheriff's deputies who supply courtroom security and elected judicial officials, such as prothonotary and sheriff.

According to Associated Press reports, Supreme Court Justice John Flaherty, writing for the majority, said state funding is required under the state constitution's mandate for a unified court system.

The system, he wrote, cannot be unified if each county hires and sets salaries separately.

The ruling was made in a lawsuit filed in Allegheny County. Home of all four justices in the Supreme Court majority: Flaherty, Nicholas Papadakos, Rolf Larsen and Stephen Zappala.

"This constitutes tax reform at its very best," said Allegheny County Solicitor James Dodaro. "It's a great victory for Allegheny County and every county in the state."

Writing in dissenting minority opinion, Chief Justice Robert N.C. Nix Jr. agreed with Commonwealth Court, which had dismissed the suit, saying the courts had no power to rule on the issue.

Under the system overturned by

Monday's ruling, each county hires and pays Common Pleas Court secretaries, administrators and other courtroom personnel according to each county's pay scale, said Nancy Sobolevitch, state court administrator.

The state already pays the salaries of county court judges, district justices and various appeals judges.

The tab this year is estimated at $130 million. The figure could rise to $70 million if all county court employees are included, not counting any added expenses for shifting the salaries, Sobolevitch estimated.

The state has a budget of $10.2 billion.

# Trials

could cost."

Faux, asked if the county was tipped by the district attorney's office that the suspects have been offered or agreed to plea bargains, said "No.

"But suppose they do cop a plea?" he said.

"Then, of course, we don't need the money.

"It looks like one guy is going to trial for sure," he said. "That guy (accused) in the LaSalle Street killing has hired a lawyer and there is every evidence that he's going to trial."

That man is Kenneth Shiffer, who is accused of murdering Lenny Radziak at the Hayes Hotel on May 11. Shiffer has hired William Costopoulos, a high-powered Philadelphia lawyer who was recently portrayed in a television movie.

The other murder suspects are Myron Leighow Jr. and Tracey Creasy, who are accused of murdering Tracey's husband, Lee Creasy, on July 16; and Robert Luccak, who is accused of beating James Harmon to death on Aug. 19.

If no trials take place, more bad tax news will be waiting for county residents on the horizon.

The county will probably find itself in court asking for a tax increase next year because the county can't keep up with rising state-mandated sources, according to County Commissioner Albert D. Fairre and Commissioner-elect Kay Shellhamer.

"You soon can't pay a couple of more mills, usually inflation takes care of that," Shellhamer

said in explaining why a 1988 tax hike won't be enough to carry the county through 1989.

"Last year we went through a terrible time and raised taxes one more mill, this year it's two mills," he said. "I don't think anyone realizes how expensive it is to run a county."

"We politicians can write our hands, but the bottom line is that somebody is going to pay the piper — and that somebody is the poor taxpayer," he said.

Next year, he said, the commissioners will "probably go to court and ask for additional money beyond the cap. It's something no one likes to do, but it will probably be necessary."

"Expenses certainly aren't going to go down, and we can't cut services anymore."

Shellhamer, who won't have to help make that unpopular decision because he is stepping down to run for Edward Helfrick's state senate seat, said that even the tattered promise of tax reform can't help the county out of the bind it's in now.

"Tax reform would probably give us great relief, but it wouldn't kick in until 1989 and (state Rep.) Ted Stuban told me the prospects that it will pass aren't very encouraging," he said.

Numerous attempts to reach Commissioners Bairre and Lanny Fred and Gov. Casey's office Tuesday

Commissioner-elect Wayne Yorks has vowed to try to repeal the 1988 tax hike. He has said he

would oppose any tax hike, but could not be reached to comment specifically on the possibility of a tax increase to prosecute the murder trials.

Whitmire bore bleak news right after the November election, when the county faced a $450,000 deficit. Taxpayers were warned to earmark themselves for a cut in services or a tax hike. They got the tax hike.

The deficit was real and the county has had to trim and sacrifice to balance the budget, Faux said Wednesday, but the $450,000 figure represented a "Christmas list," he said.

Some of that deficit was easy to cut, because all county departments ask the commissioners for everything they need or want, "and of course those things have to be removed first," Faux said.

But after the extras were slashed, a sizable lump of necessary expenses remained, he said. The county was very reluctant to part with the $150,000 legal fund, he said.

The budget is now balanced, as required by law, and will be adopted Thursday, but a big year for murder trials or some other unexpected calamity could send the commissioners begging in the courts because Faux said they have absolutely no other source of revenue that we could possibly draw upon to help us."

# 'Dawgs do it again

■ Berwick, 28, Mt. Carmel, 7
■ Danville, 55, Tamaqua, 0
■ N. Schuylkill, 33, C. Columbia, 6
■ W. Chester, 24, Bloom U., 9

# PRESS-ENTERPRISE

October 1, 1988 Weekend Edition/50¢

Serving the heart of the Susquehanna Valley

PHONE 717-784-2121
TOLL FREE 1-800-422-1164

# Witnesses fail to ID suspect

## Radziak seen 'flaunting' cash night of killing

By LEON BOGDAN
and HUGH LESSIG
Press-Enterprise staff

BERWICK — Two witnesses Friday were unable to identify one suspect in the killing of Leonard Radziak, who was found brutally beaten here after being seen "flaunting" a roll of money in a social club.

Police believe 40-year-old George Sheeler had called a second suspect, Kenneth Shiffer, for about robbing Radziak after Sheeler allegedly spent the night drinking with the victim and learned he was carrying $400 in cash.

But at a preliminary hearing yesterday, Sheeler was not identified by either of two patrons of the "Old Man's Club" who pre-

viously told police a man named "George" tried to discourage them from giving Radziak a ride home.

"This is a 360-degree turn-around from what I heard three, four days later when their minds were fresh," state police investigator Charles Conter said of their testimony later.

Radziak was found badly beaten outside his room at Hayes Hotel in the early morning of May 11, 1987. He died of his injuries several hours later at Geisinger Medical Center.

Sheeler's fingerprints were found on a beer bottle later recovered near the Hayes Hotel, police testified.

Man's Club" as tall and weighing about 200 pounds and wearing a flannel shirt.

Another club patron who socialized with Radziak that night, Joan Beaver, 27, said a man with a "big nose" and blond hair, wearing a polo shirt and jeans, had told her "not to give Lenny a ride home."

Sheeler, who is of average height and slender build, has dark hair combed to the back. Beaver, who said Radziak was "flaunting" a roll of 20s and 50s "around the bar that night," said the man who approached her had blond "bangs" combed to the front.

Neither witness, called to the stand by Columbia County District Attorney Scott Naus, were able to identify Sheeler although he sat directly in front of them in District Justice Richard Cashman's hearing room.

The hearing, adjourned by Cashman after hearing testimony from eight prosecution witnesses, including three police officers, will resume on Friday.

Prosecutors expect to call all six or more witnesses. But those two key witnesses called Friday, who had been expected to place Sheeler with the victim that night, offered contradictory descriptions of the "George" they spoke with.

"A fellow came up to me," Beaver recalled, "and said not to give Lenny a ride home because he had walked down from Hayes with him.

"He said Lenny was drunk," she continued, "and I wouldn't be able to get him out of my car."

She said she left the "Old Man's Club" on

Please see SUSPECT page 14




Press-Enterprise/Mark Haun

AT HEARING — George Sheeler, ..., left, with Eugene Golla.

Kremlin shake up

# Bil Keane

1988

FROM PAGE ONE

## Suspect

Freas Avenue with two men she knew only as "Tom and Ernie," who drove Radziak to the Hayes Hotel between 12:30 and 1 a.m.

While waiting in the car, Beaver said the two men helped Radziak into the hotel "because he was drunk" but then "came running out like the hotel was on fire."

"They seemed funny," she said, "like they seen something."

Radziak was discovered beaten outside the hotel's second-floor room between 1:10 a.m. and 1:30 a.m., according to police.

Fenstemaker said Radziak "didn't seem drunk at all" when he spoke with him at the club about an hour earlier. He offered to buy Radziak a drink, who declined saying, "I probably have more money than you do."

"He went into his pocket and pulled out four hundred-dollar bills," Fenstemaker said.

Berwick Assistant Police Chief Tom James testified to seeing a man near the Hayes Hotel shortly after finding a bloodied Radziak on his hands and knees near his second-floor apartment.

James said the man seemed to walk "at a fast gait ... to get away from where I was." His last glimpse of the man was near the Catholic War Veterans social club, James said.

After returning to the hotel, James said he briefly questioned Radziak before an ambulance arrived and the victim mentioned the name, "Louie The Kraut," when asked who beat him.

James later identified that man as an elderly hotel tenant named Clarence Laubach, who was ruled out as a suspect.

According to James, Laubach argued with the victim on the morning prior to the incident. "The way it sounded, they had these types of arguments before," James said.

The officer said he found Radziak "really beat . . . he was in more of a heap than crouched on the floor."

"I was surprised he was still living when I saw him," James said.

State police Tpr. Richard Sachs and Berwick police Sgt. Robert McCormick testified about Sheeler's fingerprints matching those found on one of two beer bottles found near the hotel.

Shiffer, 27, of Berwick is awaiting trial for murder in Columbia County court. The hearing for Sheeler, a Mifflinville native, is to determine if enough evidence exists to hold him for trial on charges of murder, assault and conspiracy to commit murder.

## Guesser

is something even she doesn't know, having lost 20 pounds this summer.

She's a dark-featured woman with friendly brown eyes and an easy, toothy smile.

She said she hasn't gotten much better at guessing ages in all the years she's been doing it.

"You either have it or you don't," she said.

She believes her ability to guess an age is akin to telepathy.

"I look in their eyes. If they're thinking about it, I'll guess it. If they aren't, I won't," she said.

To coax them into thinking about their ages, the Guesser asks would-be foolers, "Are you thinking about your age?"

Even when they say they aren't, just asking them about it often gets them to picture it in their minds, Freeborn said.

She's not one to adamantly defend her theory of mental powers being the key to successful guessing, though.

"If you believe in it, I guess it is. I do," she said.

On a good day Freeborn can correctly guess up to 80 percent of her foolers. If she's out of sorts or has a headache, "I can't hit at all."

Of 33 guesses made while being interviewed, Freeborn did just better than even, hitting 17 and missing 16.

She can pull in 800-900 customers a day on a weekend, she said.

She guesses weight within three pounds and age, length of marriage or other numbers with two.

Guessing weight is a little more observational than age.

Freeborn has them take off their jackets and turn around "just like they do in the Miss America contest" so she can get a good look.

She looks most closely at the shoulders and hips, she said.

Extremely tall, thin people give her the most trouble in guessing weights, while the toughest age group to catch is the 40- to 55-year-old set.

But in the end, it's not whether you win or lose that draws a crowd — it's how entertainingly you play the game.

"That's really three-fourths of it," she said. "You have to put on a show for people or they won't stand around and watch you."

And the longer they stand around, the more they're tempted to try and fool the Guesser.

## Games

a midway raid at 10 p.m., hitting two game booths.



Case 1:00-cv-01898-VSB-PT Document 12 Filed 07/12/2001 Page 91 of 120

# Second suspect arrested in 1987 Berwick murder

### By LEON BOGDAN
Press-Enterprise staff

BERWICK — A man whose fingerprints police say matched those found on a beer bottle at a murder scene last spring was charged Thursday as a second suspect in the 15-month-old robbery slaying.

George Sheeler, 40, an unemployed Mifflinville native, was booked and jailed on murder charges as an accomplice in the brutal beating of 51-year-old Leonard Radziak at the Hayes Hotel.

Sheeler was first questioned by police last fall about the murder, "and has been a "target" of the investigation since that time," authorities confirmed.

Sheeler, a thin, disheveled-looking man with heavy moustache and sideburns, was awakened in bed at 9 a.m. at a West Front Street apartment yesterday by a team of five police officers and immediately placed under arrest.

"What can I say? I was in bed. I was shook up," the suspect said to a reporter shortly before being taken to Columbia County Prison. He is being held without bail on homicide and related charges and has a preliminary hearing next Thursday at 10:30 a.m.

Police believe Sheeler had been drinking "all night" with the victim at a local club here and knew Radziak was carrying $400 cash when the fatal assault took place outside Radziak's Hayes Hotel apartment on May 11, 1987.

Sheeler, according to arrest papers, telephoned 27-year-old Kenneth Shiffer that night and asked him "if he wanted to rob a guy" who he knew who had $400 on

Shiffer was charged in the murder last Oct. 9 and is waiting to be tried in Columbia County court. Police said yesterday's arrest of Sheeler does not alter their prosecution of Shiffer in any way.

Shiffer plans an alibi defense, with his lawyers claiming he spent the night of the crime with his girlfriend and their infant child.

Police said they had been keeping track of Sheeler's whereabouts until they felt confident of having enough evidence to make an arrest.

"We knew where he was when we needed him," mentioned Sgt. Walter Carlson, a lead investigator in a state police task force assigned to aid Berwick police in this and two other slayings here last summer.

"An arrest was made when we felt there was sufficient evidence to take him into court," Carlson added.

"I don't think he expected any visit," Sgt. Carlson noted of the unexpected warrant arrest yesterday morning. Police said Sheeler offered no resistance.

When asked if he personally knew the victim, Sheeler, shielding his face from television cameras on being led away, replied, "Yeah, I knew him."

Asked if he had any comment about the accusations, he answered, "Not at this time, no."

He was taken to Bloomsburg state police barracks for processing and later arraigned on murder, aggravated assault and robbery conspiracy charges before on-duty District Justice Delbert Pennypacker in Millville. Berwick's magistrate, Richard Cashman, who will preside over next week's hearing, is on vacation.



**MURDER SUSPECT** — George Sheeler, 40, hides his face while led from a hearing at which he was charged

<span style="font-size:small">Press-Enterprise/Bill Hughes</span>

# Young Wales leader visits U.S. on U.S. tour, hasn't been told of strike

### By HUGH LESSIG
Press-Enterprise staff

BERWICK — The son of Solidarity Union leader Lech Walesa sat in a hospital lobby here last night, oblivious to the tension currently paralyzing his homeland country of Poland.

For the past two months, the 20-year-old Slawek Walesa toured the United States for "AmeriCares," a group which aids overseas countries. But he hasn't been told about the state of strikes in Poland which his father — as of late Thursday night — was helping to mediate.

The idea, said AmeriCares representative Jan Wydro, is to keep him from upsetting the young Walesa during his stay. But when, in an interview, he requested a reporter refrain from any "political" questions about the strikes which began two weeks ago.

The strategy seems to worked.

During a brief visit to Berwick Hospital Center, Slawek Walesa could have passed for a typical, laid-back American s...

Bill Keane

# FROM PAGE ONE

## Murder

Assistant county district attorney Richard Knecht, called on to supervise Sheeler's arrest and arraignment, described the suspect as "somewhat of a transient."

"I understand he's made 'no statements at all,'" Knecht said of Sheeler's questioning by police yesterday.

Sheeler had moved into an apartment at 435 W. Front St. since last being questioned about the crime in November, police said. His previous address was a post office box in Mifflinville, where Sheeler said his parents still reside.

Sheeler, already in jail on homicide charges, was the first arrested in Radziak's murder although police said at the time that their investigation "was continuing."

Sheeler's name was mentioned during Shiffer's preliminary hearing last fall, but police declined to comment on whether further arrests were imminent at the time.

Shiffer was to stand trial in Columbia County court next month, but yesterday's developments now

appear to make that court proceeding uncertain. Separate murder trials, however, for each suspect would likely be sought, said assistant D.A. Knecht.

Contacted about Thursday's additional arrest in the Radziak killing, one of Shiffer's lawyers, Charles Rector of Lemoyne, said he still anticipates starting their trial the week of Sept. 19-23.

"We're coming up there to try this thing in September," Rector said. "And everything we know is consistent with that."

Arrest papers pointed to scientific analysis of two Budweiser beer bottles recovered at the Hayes Hotel the night of the crime, along with incriminating statements by several eyewitnesses, as pointing to Sheeler's involvement in the fatal beating.

Latent fingerprints recovered on one of the beer bottles, found sitting on an electric meter at the side of the hotel, matched that of Sheeler. Another bottle was found in a row of hedges behind the hotel.

Police also received information from two patrons at the "Old Mans Club" where the victim was last seen alive that a man named "George" had told them to refuse Radziak a ride home because "they were going to leave together."

Those patrons are identified in arrest documents as Raymond Penstamaker and Joan Beaver. The man in question was wearing clothing identical to that worn by Sheeler that night — a blue shirt and blue pants.

Sheeler, when questioned by state police, confirmed he had been drinking with Radziak at the club that night but told them he left before the victim had departed.

Berwick assistant police chief Thomas James, one of the first officers arriving to at the hotel to investigate the beating, stated he also saw a person in similar clothing lingering by the corner of LaSalle and Sycamore streets that night, a block from the hotel.

The person walked off "at a fast rate" as the officer approached,

according to arrest papers.

Radziak was found bloodied and beaten by a blunt instrument in a hallway outside his second-floor hotel room. Police say the attack occurred sometime between 1 and 1:30 a.m.

Radziak died about 20 hours later at Geisinger Medical Center.

Sheeler, who was not represented by a lawyer during his arraignment, told District Justice Pennypacker he expected to be defended by Berwick attorney Frank Kepner Jr.

But Kepner, contacted later in the day, said he had not yet decided whether to take on the case, although Sheeler had asked to be represented.

He confirmed that Sheeler had "come in to see me a while ago on a related matter" but did not know at the time that he was going to be arrested. Kepner said he could not make a decision on whether to represent him until speaking with Sheeler at the jail.

## Benefield

Advertisements for the restaurant used the nickname "The Jolly Fat Man," to describe Benefield.

"Obviously I've gained weight since I came to Bloomsburg and I try to be jolly. I enjoy my work and I enjoy people. I think the only true happiness comes from serving other people," he told the Press-Enterprise when his retirement was announced.

During his years at the Magee

the hotel was the site of a popular and widely known smorgasbord, scaled back to holidays only in recent years as a health-conscious public tried to eat less.

The newest addition at the hotel was Harry's, a bar and restaurant.

In a press release, Garban said the school welcomed Benefield's expertise in evaluating a food service which serves thousands each day in residence dining halls, the conference center, Kehr Union and

and the Hetzel Union Building.

He also will oversee operation of the Inn, a 140-room Colonial style hotel on campus.

An active Rotarian, Benefield is also Columbia County's Republican State Committeeman and a State System of Higher Education trustee.

He was named Distinguished Alumnus in 1983 by Penn State, while he directed the hotel

earned membership in the World Famous Restaurants International.

He was elected to the Hospitality Hall of Fame in 1976, was awarded the Lawson A. Odde Award of the American Hotel and Motel Association in 1977 and the Pennsylvania Award for Travel Excellence in 1978. He is a past president of Pennsylvania Hotel-Motel Inn Association and founder, past president and director of the Penn State Hotel and Restaurant Society.



## 'Shopper's club' owner waives charges to court

By KERRY O'ROURKE / Press-Enterprise staff

BLOOMSBURG — A man facing bad check and deceptive business counts as a result of a 'shopper's club' he operated waived a preliminary hearing Friday, making arrangements to pay on one of those checks which involved an unresolved personal payment of $88 to a former employee on no papers filed.

Joseph Barnhart, 43, Danville R.D.7, is also expected to appeal his admitted Friday three violations on Monday, his public defender, Deanna Pealer-Wenzel, indicated to District Justice Donna Coombe.

Coombe had previously found Barnhart guilty of passing six bad checks to former employees when he failed to appear at a preliminary hearing.

Pealer-Wenzel said the checks which involved an unresolved personal payment of $88 to a former employee on no papers filed.

Hearings were to be held Friday on 11 other bad check charges and one count of deceptive business practices, but all were waived by the defendant.

## Lady luck breaks election tie

By KERRY O'ROURKE / Press-Enterprise staff

BLOOMSBURG — Robert W. Pursel proved Friday it doesn't always take a lot of effort or money to win an election. All he had going for him was one vote and a little bit of luck.

Pursel, 24 Ivey Drive, Bloomsburg, and three other candidates were tied for the position of Hemlock Township auditor after the Nov. 3 election. Each had received one write-in vote.

Friday, the candidates were summoned to the Columbia County Courthouse to break the tie.

Only two came — Pursel and Margaret Hunsinger, 229 Drinker St.

After some ceremony, a small jug filled with plastic "pills" numbered 1 to 16, Chief Clerk Harry Faux instructed Pursel and Hunsinger to draw a pill. The candidate with the lowest-numbered pill would win.

Short and simple, Hunsinger didn't even bother to take her coat off.

She drew first, after shaking the jug herself, but concealed the pill in her clasped hand until Pursel drew. She opened her hand to reveal a 6, not a bad draw. But Pursel held a 2.

Faux declared him the winner, but was reminded that pills needed to be drawn for the two candidates who weren't there — Jack McElwee and Howard Brochyus.

Kathy Lupini, Faux's administrative assistant, drew for McElwee — a 5. County Commissioner Jacolyn Whitmire drew for Brochyus — a 10.

Pursel was still the winner.

Pretty easy way to win, huh? "Yea, it was," Pursel, 44, said. "I'm usually not lucky like that."

Faux said tie races are broken this way because it would be too costly to conduct another election.

The winner was satisfied with the method.

"It's a fair way," he said.

Pursel said he didn't know who gave him the lone vote in the election, but said he had been thinking about getting into politics.

The position of assessor opened when Harold Swartz, who had held the job for years, did not seek re-election.

Lupini said she asked the four candidates to call her if they were not interested in the position, but no one did.

Brochyus, 93 Buckhorn Road, Bloomsburg, did not attend because he was working in Williamsport.

## Radziak suspect leaves area

By HUGH LESSIG / Press-Enterprise staff

BERWICK — A suspect in the Leonard Radziak murder case apparently left the area last weekend and authorities are attempting to locate him, a state police investigator said Friday.

George Sheeler, 39, did not keep an appointment with state police last Saturday and investigators learned sometime thereafter he had left the area, Trp. Charles Confer confirmed the police have not checked since then, he added.

Confer said the public should not be alarmed that Sheeler's whereabouts are unknown. Sheeler did nothing illegal by leaving, he said.

"He's not a fugitive, as of yet," he said.

"Once, or if he is shown to be involved (in the Radziak murder), then the public should be alarmed."

Confer added that police can do nothing to keep Sheeler from leaving. "We have no control over him. That's his right," he explained.

Sheeler's name surfaced unexpectedly during a Nov. 4 preliminary hearing for Kenneth Shifter, who is the only man charged so far in the beating death of Radziak.

According to testimony, Sheeler told police he had allegedly came from Sheeler, beaten. That call allegedly came from Sheeler, who asked Shifter's help in robbing a man who had $400.

Radziak was found beaten in the Hayes Hotel on LaSalle Street with $400 in his wallet. At the time, Shifter's attorney William Costopoulos said it was "ironic" the caller indicated the target had $400 and the victim had $400.

Shifter was later ordered to stand trial for Radziak's murder.

Sheeler is still considered a suspect, and police set up the Saturday interview because they wanted to talk with him further, Confer said.

"He's just like any of the other people who have been suspects in the case," he said.

While police have not determined his whereabouts, and relatives don't know where he is, "the people we talked to tell that he was going to return," Confer said.

## Tire cleanup motion denied

By HUGH LESSIG

clear, the need for relief must be

---

Rough seas and an approaching storm have slowed U.S. Coast Guard efforts to find a fishing boat missing at sea since last week.

A storm passed through Friday said efforts to find the boat, which was carrying a former Berwick resident, probably will resume Sunday.

All day and into the night Thursday, Coast Guard officials used an underwater camera to try to get pictures of what could be the object, but Friday, where the fishing boat was last known to be, said Lt. Paul Wolf.

The camera "got excellent pictures of the ocean floor," but the object, which officials believe may be a vessel on its side in 200 feet of water, he said.

A storm moving up the coast Friday caused the boat to suspend its efforts to photograph the object, he said. The storm "prevented us from staying out there any longer," he said.

Timothy M. Jones, 24, a former Berwick resident who had moved to Newport, R.I., was a crewman on the boat, fishing boat. Coast Guard and four other crewmen are considered missing and not presumed dead, Wolf said.

Lady Sunday, a fishing boat assisting the Coast Guard in its search for the Reliance caught its nets on an object on the ocean floor. After analyzing sonar readings, officials determined it looked like a vessel on the Reliance.

The spot where the object was found was marked, but the markers were carried away on a strong current, making it more difficult for officials to locate the object, Wolf said Friday. With latitude and longitude figures, however, the Coast Guard was able to determine the general position within 30 yards of it, he said.

Officials were near the object when they got word of the approaching storm, he said.

The Coast Guard boat with the camera aboard, the Point Bonita, returned to port in Woods Hole, Mass., at 6 a.m. Friday.

If the underwater camera, officials will be able to determine if the object actually is a vessel, and if so, if it is the Reliance.

The boat's owner received the last call from the crew Tuesday night, but did not notify the Coast Guard until Saturday morning. Between then, there were two heavy snowstorms, Wolf said.

Jones, son of Mr. and Mrs. Wayne Jones, 152 Park Blvd., was married and was a regular fisherman on the boat.

## Royal Safari III Portable Typewriter

Some Of The
Features Included

Segment Shift For Perfectly Aligned Capitals
Full Size 88-Character Keyboard
Repeat Spacer bar Saves Valuable Time
Full and Half Space For Neat Corrections
2-Position Impression Control
Ribbon-Color Selector
Touch-Set Margins
Line Spacing 0, 1, 1½, 2, 2½

SALE $7988
PRICE

WALKER'S
Jewelers

## CAWLEY          ZAR...

Public Administration D... Graduate School of ... Sciences. The program ... problem solving, ma... organization behavior, utilization, communicatio... relations, communicatio... and theory, research and findings related to t... justice field.

Captain Frank Anzel... Director, has stated the ... rounded program is desi... the varied needs of all ... the criminal justice syst... counterparts in the sec... and is directly applicabl... ment and operations".

For further informati... upcoming seminar or ... Graduate Criminal Jus... call the Continuing Ed... at (717) 348-6237.

Conducting the seminar will be Patrolman Harold P. Cawley, of the Wilkes-Barre City Police Department; Chester Zaremba, Criminal Investigation Supervisor at Troop P, Wyoming Barracks, Pennsylvania State Police; and Attorney Dan Pillets, Assistant District Attorney, Luzerne County. Both Patrolman Cawley and Mr. Zaremba have had extensive experience in the investigation of cases involving satanic cults. Attorney Pillets is specializing in the prosecution of cults.

The Criminal Justice Program at Marywood College offers a Masters Degree and is a component of the

---

**TOUR CAPITOL** — Representative Stanley Jarolin hosted visiting French students and their host families at the capitol building in Harrisburg. Jarolin said the students are part of an international cultural exchange which affords these students an opportunity to view first-hand the American way. Jarolin said he arranged a "V.I.P. Tour" for the students; he presented each with a memento of their visit from Governor Robert P. Casey. The students, and their hosts, include from left: Fabrice Petit, Audrey Egenski, Céline Gelmann, Jean Kuneiga, Jarolin, Renaud Fatras and Gene Hudak.

---

## Berwick Man Accused Of Murder in May

Kenneth A. Shiffer, 26, of West Front Street, Berwick, was arrested by state and local police Friday and charged with the beating death of Leonard Radziak, Berwick, last May.

After being arraigned before District Magistrate Richard Cashman, Berwick, Shiffer was committed to Columbia County Jail without bail to await preliminary hearing.

The arrest was made following a probe by the State Police task force assigned to investigate three Berwick area murders in three months.

Shiffer, police charge, beat Radziak in a hallway of the Hayes Hotel, LaSalle Street, May 11. The victim passed away the following day in Geisinger Medical Center, Danville, ... medical ... of the beating.

---

## Girardville Man Arrested in Shooti...

A 25-year-old Girardville man was lodged in the Schuylkill County Prison early yesterday after allegedly shooting another man who died several hours later at the Geisinger Medical Center, Danville.

Girardville Borough Police apprehended Richard Blackwell at his ...

Hospital. He was lat... Geisinger where he d... morning.

## GNA Ban...

---

### (Continued from Page 1, Section 3)

GOP primary for that seat, an event, however, which will not occur until 1992. Specter, suggests the activist, could have real trouble in such a confrontation.

On the other side, the Democrats would doubtless welcome a Specter defeat in a primary election, since ...

---

### ...ttings

...current board majority ...t only by chang... ...rict and only by the impor...

---

According to ...
...Commi...
...in the area of ...
...with the ...
...Personnel ...
...with Chief Reese of the Kingston Borough Police Department are looking into further in-service training programs and grants." in this regard Sabol noted that the Kingston Township Police Department will sponsor a second in-service training program on October 21, 1987 entitled "Law Enforcement and the Civil Liability Crisis." This training program has also been funded totally by a $1,500 grant from the Municipal Police Officer's Training Commission. The course is open to area law enforcement personnel. The one day session will be presented by four instructors from the Indiana State University at the Kingston Township Municipal Building.

Officers who participated in the drivers proficiency course included Walter Davis, Gary Beisel, Michael Moravec and Charles Rauschkolb of Kingston Township; Donald Smith, Alan Bogdan, Arnold Berman, Sgt. William Barrett and Benedict Victor of Wilkes-Barre; Donald Hunter, Jay Berthelson, David Shope and Timothy Berkey, Mahoning Township Police in Montour County; James Myee, Williamsport Police; Michael Flanagan, Exeter Borough; Robert Jolley, James Martin and John Flower, Dallas Borough; Keith Keiper, Joseph Quinn and John Yenchak, Municipality of Kingston.

# Lab tests on bloody jacket delay Shiffer murder trial

**By LEON BOGDAN**
Press-Enterprise staff

BLOOMSBURG — Sophisticated laboratory analysis of a blood-stained jacket owned by murder suspect Kenneth Shiffer of Berwick will prove his innocence, defense attorneys asserted Friday.

Ongoing tests at a private laboratory in New York to identify the exact blood type of the jacket stains by isolating its DNA molecules will delay Shiffer's trial until September, authorities confirmed yesterday.

Jury selection for Shiffer, accused in the fatal beating of 51-year-old Leonard Radziak at the Hayes Hotel on May 11, 1987, was to have begun Tuesday morning in Columbia County court.

It is one of three Berwick murders that occurred last summer now waiting to be tried in the courts. A pool of 225 prospective jurors was called to undergo individual screening to pick a dozen regular jurors and four alternates.

On Friday, however, chief defense counsel William Costopoulos of Lemoyne asked for a trial continuance so defense analysis of the blood samples can be completed. District Attorney Scott Naus did not object.

Analysis of the bloodied jacket, recovered by police from Shiffer's closet shortly after his arrest in the homicide case last fall, is seen as a key piece of defense evidence in seeking an acquittal, his lawyers said.

Please see **MURDER** page 12



Press-Enterprise/Don Hughes

CHARLIE 'KID' RARIG
...with Mountain Monster

# Monster truck proves a monster responsibility

**By LISA A. CELLINI**
Press-Enterprise staff

BLOOMSBURG — Owning one of the world's largest monster trucks is, well, a monster responsibility.

There's a lot more to it than buying oversize tires. There's an image to be upheld, a business to be run.

"Godzilla," the car crusher, one of the monster trucks appearing this weekend at the KENCO 4 Wheel & Off Road Jamboree Summer Nationals at the Bloomsburg Fairgrounds, sports the slogans, "Ocean State Monster," "Kings of the Monsters" and "Pride of Rhode Island," alongside paintings of the overgrown movie reptile from whom it got its name.

five cars lined in a row.

But Godzilla won't be crushing cars in Bloomsburg this weekend.

"We're not running in competitions," said Godzilla driver and owner Alvin L. Thurber III.

"(This) Jamboree won't pay monster trucks for traveling expenses," he said, adding that the truck will only enter the "Show 'n' Shine" competition, which offers a cash prize.

So why is the truck at the first summer nationals?

Thurber's father, also part owner, said the family's monster business is for sale — everything from the truck's registered name to at least 22 appearances contracted for next year. Showing the truck around while advertising it for sale in popular off-road magazines doesn't hurt, he said.

Please see **MONSTER** page 3



Press-Enterprise/Dave Maialetti

...etary Boyd Wolff, in front of a corn field at the Danville operation would close.

# ...oney-losing farm

**■ LOST JOBS:** Eight state employees, farmers will be out of work/**Page 17**

chief of farm operations.

Dunn said that if the state operation did not cease, the farm would drain the program's coffers so much that within a year and a half the General Assembly would either have to allocate extra funds or sell the farms.

"It's hard for me to justify spending money when we're losing almost $500 a day here," Wolff said.

The farm has 229 cattle that will be auctioned off Sept. 15. Some of the farm's equipment will be sent to the Farm Show Complex in Harrisburg while the rest will be offered to other state agencies. Wolff said.

Please see **FARM** page 2

$2.6 million, ASCS Montour County spokesman Lewis Humphrey said.

If weather forecasts predicting a chance of rain Monday or Tuesday turn out to be correct and if it rains continue regularly until harvest, the loss might be held to 50 percent, Hubbard said. "But if it doesn't turn around we could be looking at a $14,285,000 total," he said.

Humphrey said Montour farm profits can be expected to nosedive fast without rain. "Probably in the next week you can add 15 to 20 percent (to the 50 percent loss) if we don't get rain," he said.

area economy, Hubbard said crop losses are only the tip of the iceberg. Banks that loaned farmers money worry about repayment. Farmers strapped for cash to buy feed can't invest in new equipment. Sometimes they can't even repair the old, he said.

"With the size of this drought you're talking about impact that goes all the way to John Deere's national headquarters," Hubbard said.

Area farmers were weeks ahead of the general public in realizing the drought potential. They had cut back water use before the state on

of his farms are watered from a spring which began watering in a dry spell. "You have to allocate it. They'll drain it dry in the afternoon and it fills back up overnight," Wolff said. So far, the ground water in the spring is holding its own, he said.

Corn crops are at a critical stage. "We need rain for the later corn," Wolff said. Without success there and with a third or fourth cutting of hay to store, dairy feed will be "really, really high," Wolff said.

"Five hundred fifty head of cattle is a lot of hungry mouths to feed

"There's no question about it if it just doesn't rain in the next month there's not going to be a corn crop," he said.

For a farmer like Yule who doesn't raise any of his own feed, it's hard to stay afloat when corn, hay and soybeans prices rise, but he's paid the same for the milk.

Too many aspects are beyond his control, he said. "Three years ago our price was $13 a 100 pounds of mulk, now it's $10. Yet the price of milk to consumers is as high as it's ever been and continues to elevate," he said.

## Murder

"Our argument is there's blood on the thing but not the victim's blood, because our man had nothing to do with the victim's blood," said defense co-counsel Charles Rector.

"The Commonwealth is going to want to include that jacket and say the blood is of human origin. We're not satisfied with that," Rector said. "All we're saying is they got to do better than that."

Radziak, an unemployed hotel resident who lived alone, was found outside his room brutally beaten about the head. He died a day later at Geisinger Medical Center.

Several eyewitnesses identified Shiffer from police photographs as a man they saw near the hotel that night wearing a dark jacket and carrying what appeared to be a silver pipe.

An alibi defense will be introduced at trial that Shiffer spent the evening with his live-in girlfriend and infant child when Radziak was beaten.

Attorney Rector said that Shiffer, 26, jailed without bail since his arrest last Oct. 9, is

willing to wait for the laboratory results in the hopes it will help clear him.

The consensus among the defense team and also Ken is that if we can just prove it's not the victim's blood, it's well worth two more months of Ken's time behind bars," said Rector.

"Before we even agreed to continue trial we had to consult with Ken," he explained. "After all, that's another two months he's going to be in the can."

The laboratory procedure, by which DNA molecules of a blood sample are isolated in a chemical culture and identified, is a relatively new technology comparable to a type of "scientific fingerprinting" of blood, Rector said.

A New York laboratory firm called Lifecodes, regarded as the leading serologist testing firm in the country, is performing the tests.

Blood samples of the victim have also been obtained under court order to match those that contained on the jacket, Rector said.

Defense attorneys do not expect any preliminary results until Monday, and that information will only show whether the blood stains on the jacket are sufficient for DNA testing at all.

If tests cannot be completed, Costopoulos will "just go to trial" and "roll with the punches," his associate said.

"What we're trying to do is determine for sure that the blood on the jacket found in Ken's closet is not the victim's," Rector said.

"We're told it's very much as accurate as fingerprints, since the DNA structure is unique to each individual," Rector said. "But we won't know till Monday if they can even do it."

If the blood analysis can be completed and matched for DNA identification, it will take four to six weeks to compile results.

Both sides felt the case will be ready for trial by September, which is the next criminal court term here.

Rector said that even if attempts to analyze the blood stains fail, the defense is prepared to prove that the jacket was bloodied under different circumstances.

He declined to specify for now what those circumstances may have been.

"We're prepared to identify where it came from and whose it is, even if we can't get results from the laboratory," he said.

## Farm

The department will try to find other state jobs for the eight employees working at the farm.

Those jobs will most likely be in state transportation work.

Republican State Sen. Ed Helfrick had opposed ending state operation, saying the farm should be made a model of farming practices in the state.

Democratic State Rep. Ted

tion with Penn State.

He said he felt protocol was breeched because his office was not notified until an hour before Wolff's announcement that the press concerns would taken care of.

taken steps in the past to make it profitable.

Dunn estimated the state will bring in about $16,800 rent from the 475 acres when it is leased.

He estimated the land is worth

heart of the Susquehanna Valley                              TOLL FREE: 1-800-422-1

# 'Nosy' neighbor IDs murder defendant

**By LEON BOGDAN**
Press-Enterprise staff

BLOOMSBURG — A "nosy" neighbor swears she saw murder defendant Kenneth A. Shiffer running with a metal pipe near the Hayes Hotel the night a resident there was bludgeoned, but no physical evidence links him to the crime, according to trial testimony Wednesday.

Shiffer is accused in the brutal beating of 51-year-old Leonard Radziak outside his hotel room shortly after 1 a.m. on May 11, 1987.

Diane Szklarz, a former Monroe Street resident, pointed the finger to Shiffer yesterday as the man she saw running with a metal pipe moments before Radziak's body was discovered by police.

"We were nosy and went to see what was going on," she said of alerting police to her sighting at the hotel later.

But police admit that while fingerprints of a second suspect, 19-year-old George Sheeler of Mifflin Township, were found on a beer bottle found at the hotel, they found no physical evidence to link Shiffer.

"Are we going to hear any testimony in this courtroom that Ken Shiffer's prints were found on any bottle?" asked chief defense counsel William C. Costopolous of Lemoyne.

"No," answered state police investigator Charles Confer.

"Were found on any instrument of crime?" the lawyer asked.

"No," the state trooper said.

"At the Hayes Hotel?"

"No."

"Isn't it a fact," Costopoulos went on, "that Ken Shiffer told you to 'go have a bottle, then you dust it because my prints aren't on there?' And do what you have to do?"

"Something to that effect," Confer replied.

Confer also testified, however,

Please see NEIGHBOR page 18

## Detective failed to shave sketch



MURDER SUSPECT
*police composite*



KENNETH SHIFFER
*at previous hearing*

**By LEON BOGDAN**
Press-Enterprise staff

BLOOMSBURG — A sketch widely circulated last summer of a bearded suspect in the Leonard Radziak murder was wrong because "not all of the pieces" were available in a Berwick police kit used to make the drawing, a witness testified Wednesday.

There was no beard on the person, Szklarz testified, 42-year-old Diane Szklarz, who told police that a sketch did not resemble the man she saw running from the Hayes Hotel.

"That was the closest we could get with what we had," she said of the drawing.

Szklarz yesterday pointed to defendant Kenneth A. Shiffer in the courtroom as the person she positively spotted

beneath a street light near her former Monroe Street home, located one block from the hotel.

Shiffer, 27, facing a possible life sentence if convicted, is clean-shaven and did not wear a beard when the murder happened in May 1987, according to a photograph produced by his lawyer.

Szklarz said she went to police after reading of the murder in the newspaper and offered to help complete a composite sketch of the suspect.

But the sketch came out with a distinct beard, as did a description of the suspect to accompany the composite sketch, while the person she saw looked like he needed a shave, but had no beard.

But, Sgt. Robert McCormick, who worked more than hour on

Please see SKETCH page 18

## Gay activist who

## WEATHER

### TODAY

CASr/Breezy, mild.
TEMPERATURE/55
SOURCE OF PAGE/A2006

### EXTENDED

**Saturday though Monday**

Fair Saturday. Chance of rain Sunday and Sunday night. Gradual clearing Monday. Afternoon high temperatures mainly in the 40s all three days Morning low temperatures in the mid 20s to low 30s Saturday upper 20s to mid 30s Sunday, mid 30s to around 40 on Monday.



NATIONAL FORECAST FOR THIS AFTERNOON

---

story is worth reading.

...the attitude toward life Shiffer's home could not be positively identified, despite FBI and sophisticated genetic analysis.

But defense attorney Costopoulos claimed outside the courtroom Wednesday that those blood stains resulted from an earlier assault by Shiffer — on a middle-aged man who was beaten up by the defendant a year before the murder.

Jurors hearing the case have not been informed of Shiffer's conviction in that earlier assault, in which George Petrishin was found lying bloodied on a sidewalk near Shiffer's Front Street...

Blood stains later found on a jacket recovered by police from Shiffer's home could not be positively identified...

---

"the drain," moments after reporter when asked about the bloodied dark nylon jacket that fit the description of that worn by woman the night of Radziak's death.

The defense adamantly denies Shiffer had anything to do with last year's murder, however, saying that while he was invited by Sheeler to "take a man down who had $400 on him," he refused and stayed home.

Costopoulos admitted it could be damaging to his client, but no clear legal ruling has been made even by the court on whether it can even be referred to at this trial by prosecutors because of its prejudicial impact.

Shiffer told police he beat and kicked Petrishin over off-color remarks made to his girlfriend, JoAnn Lutz, in that assault. He was found guilty, but sentencing in that case was postponed when he was charged last fall in the Radziak murder.

Yesterday, state police investi-

---

home in January 1986.

Costopoulos told a murder and helped link their case to Shiffer.

Sheeler, however, was arrested on homicide charges only one month ago.

Through the investigation, it was learned that Sheeler telephoned Shiffer from the American Ukrainian Club sometime before the fatal assault. Sheeler had been drinking with Radziak and learned he was carrying a large sum of cash.

Sheeler told other tavern patrons not to give Radziak, who was intoxicated to the point of staggering, a ride home when he asked, Confer said.

"It was unusual for Lenny to return to the club at night after drinking in the afternoon," Confer said, adding that Shiffer and Radziak arrived at the club together about 9 p.m.

One patron, 30-year-old Ernest Knorr, testified that he and friends, Tom McCrain and Joan Beaver, eventually drove Radziak home and helped him to the door

---

gator Confer testified that Sheeler "He was pretty well drunk. Knorr told the court. He admitted being one of the last known people to see Radziak alive although he denied helping him victim inside or seeing anything unusual.

They left Radziak near a door leading to rooms upstairs, h said. "We asked him if he was going to be OK, and he sa 'Yeah, I'll be OK. And we left, Knorr testified.

Another witness, Ray Fenster maker, 23, said he was at the ba and saw Radziak "flashing" $100 bills, telling him, "I have more money than you do," when he offered to buy him a drink.

Berwick assistant police chie Thomas James, who was the firs to find Radziak lying in the hotel hallway after being alerted to a assault there, said he briefly fol lowed a man fitting Sheeler description who hurried down a darkened LaSalle Street befo ducking around a building.

Testimony resumes in Colum bia County Court this morning

# an arrested in beating death

## Charges ...ed in third Berwick murder

**By HUGH LESSIG**
Press-Enterprise staff

BERWICK — A borough man was arrested Friday and charged with the murder of 71-year-old Leonard Radziak, who was beaten to death at the Hayes Hotel on May 11 and died on May 31.

Kenneth Alan Shiffer, 26, of Salem, near Miller, was arraigned Friday on one count of criminal homicide and committed to Columbia County Prison without bail.

Police yesterday refused to discuss "a little" about Shiffer's motive, but said they didn't want to discuss it further and not rule out the possibility of another arrest.

Shiffer was picked from a 15-photo lineup by a woman who saw someone leaving the murder scene, according to an arrest warrant affidavit filed with District Justice Richard Cashman.

The woman's name, as well as a man who supplied information to police, was deleted from copies of the affidavit given to reporters.

The woman said she had let her dog outside between 1-1:30 a.m. on May 11. When the dog began barking, she went to the front door.

She said she saw a man jogging across the street, carrying a pipe in his right hand, the affidavit states. The dog began to follow the man, and the woman called after the dog.

When she called, the man stopped under a street light and turned to face the woman, then turned and jogged through a neighbor's yard toward Tuzzi's Bakery.

Another area resident told police he had seen someone walking out the front door of the Hayes Hotel between 1:15 and 1:30 a.m. As the man approached, "I'd appeared that he was trying to hide (a) pipe alongside his leg and was trying to hide his face," the affidavit states.

As the man passed, he said, "How are you doing?" and continued to walk up LaSalle Street toward Front Street.

The resident continued walking into the hotel, and noticed there was no light in the upstairs hallway.

He heard someone moaning, turned the corner and saw Radziak lying in a pool of blood, the affidavit states. The resident later identified the man as about six feet tall, 180 pounds, solid build and medium-length hair.

Police later issued a composite description of a suspect. The sketch looks similar to Shiffer, except that the sketch depicts a man with a beard while Shiffer was clean-shaven on Friday.

Shiffer appeared at the arraignment in a pale blue T-shirt and blue jeans. He reportedly was arrested at Datacom, where he worked.

When Cashman asked if he wished to contact relatives about his arrest, he said "yes, I do," and was taken into another room.

The arrest climaxed a busy day for state and local police, who earlier sat through a preliminary hearing for Robert J. Luczak, who is charged in the beating/slashing death of James Hartman.

An arrest warrant for Shiffer was issued around the time of the 11 a.m. hearing, and police announced the arrest shortly after 2 p.m.

## Victim's family relieved an arrest made

**By MIKE FEELEY**
Press Enterprise staff

BERWICK — Leonard Radziak's family and girlfriend say they were kept in the dark about the investigation into Radziak's murder until an arrest was made.

Police yesterday arrested and charged Kenneth Alan Shiffer, 26, over Miller, in the beating death at the Hayes Hotel on LaSalle Street.

Edward Radziak, Leonard's brother, said the family did not know what to think about the investigation because they had not heard from

police.

"We thought maybe it was going to go unsolved," said 72-year-old Edward Radziak of Glenolden. "Then the family thought of taking up toward among ourselves."

He said his sister, Mary Rudawski, was contacted by the homicide task force in Berwick and was told to "get it (the idea of a reward)

"Rudawski could not be reached last night.

"You expect people to die," Radziak paused, "of natural causes. But this happens, it strikes you up inside."

Another brother, Paul of Philadelphia, said the arrest gives him a feeling of relief, but "I would still like to see my brother."

He said he was not in contact with police, but his sister told him an arrest would come soon.

"When you hear things you are up in the air. You are wondering. But when you get there too. But we are good Christians, and we believe the truth will always come out," Paul Radziak said.

Leonard Radziak's girlfriend, Marge Sorber, said she had not received any information from police during the investigation, but knew they were working on the murder.

Please see FAMILY page 7

# Luczak confession recounted

## Suspect so high on cocaine

# an says attack
## ...es declaration

AWAY — Kenneth Shiffer is taken from his arraignment charges of beating Leonard Radziak to death with a pipe.

Press-Enterprise/Keith Haupt

PRESS-ENTERPRISE/Saturday, October 10, 1987    7

# BERWICK MURDER: Arrest made in third homicide

# Residents glad arrests made

## Suspects held in all 3 cases

### By MIKE FEELEY
Press-Enterprise Staff

BERWICK — After living through three murders in three months, borough residents interviewed Friday said they were glad arrests have been made.

"I was never too worried about a murderer, because I thought the murders were directed at specific people," said Mary Lawton, Berwick.

Lawton said she was not afraid someone was walking the streets waiting to kill. She also was not concerned about letting her children walk the streets.

She pointed out, however, that

people arrested in the cases are not out until found guilty, and may not be the actual killers.

Three people were murdered in the borough. Leonard Radziak was attacked May 11 at the Hayes Hotel, where he worked. Lee Creasy was found in the back while entering his home July 16 and on Aug. 9 James Harman was found murdered behind a shed in his backyard.

A homicide task force, made up of Berwick and state police have made arrests in all cases.

Myron Leighow surrendered to police on Sept. 12 and Tracey Creasy was arrested on Sept. 15 in

connection with the Lee Creasy murder.

Robert Luczak was arrested Sept. 15 and charged with the Harman murder and yesterday police arrested Kenneth Alan Shiffer for the murder of Radziak.

"I believe the police did a reasonably good job in solving the murders," said Linda Mazzitti, Berwick, who said the killings were "scary" when they were happening, because they were in her town.

Chris Mazzitti said he was glad Berwick police could work with the state police to solve the murders. He said it shows the two groups can

work together in the future.

Jim Lawton said he keeps a shotgun next to his bed and is not worried about people entering his house.

"It is nice to know the police are keeping law and order in the town, though," he said.

As mayor, Lou Biacchi said as he is more than pleased with the performance of the task force. As a resident, he said it is a relief there have been arrests

"There hasn't been too much said about the task force. I had a lot of confidence with our police force prior to the time, but it gave us the extra manpower and expertise," Biacchi said

Lou Biacchi said. I am grateful to all the people on the task force."

## Family

Continued from page 1

"Because of the articles in the newspaper, I was sure they hadn't let it rest," Sorber said.

Sorber, of the Harveys Lake area, said police did not contact her after her mother's death.

"This has been such an awful summer," she said. "It is a relief they arrested somebody, if he is the one who did it."

Paul Radziak's wife, Dorothy, said it is a relief knowing an arrest has been made, but said the grief is not over.

Shiffer, 548 W. Front St., Berwick, was arrested Friday at 2 p.m. He was arraigned before District Justice Richard Cashman in Benton on a single count of criminal homicide. He was committed to Columbia County

Prison without bail.

Shiffer was picked from a 15-photo lineup by a woman who saw someone leaving the murder scene, according to an arrest warrant affidavit filed with Cashman.

He was reportedly arrested at Danville, where he worked. Shiffer will have a preliminary hearing on Oct. 19.

Edward Radziak said it will not be tough for him to sit in court.

"I will be there, the family will come out," said Edward Radziak.

"I will think it over and make some kind of approach. I would like to talk to him."

He said there are a lot of things he would like to say to Shiffer but probably would ask, "Why on earth did you do that to my brother?"



YOU OUGHT TO SEE

Serving the heart of the Susquehanna Valley

# murder suspect named in court

PHONE: 717-784-2121
TOLL FREE 1-800-422-1164



Press-Enterprise/Bill Hughes

Ken Shiffer is escorted by Berwick Police Chief Gene Golla.

## wyer for Radziak efendant portrayed n recent TV series

By the Press-Enterprise staff

BERWICK — Attorney William Costopoulos was in the borough defending a murder suspect Wednesday, but earlier this week it was revealed he played a TV part.

"Echoes in the Darkness," a mini-series based on the murder of Upper Merion High School English teacher Susan Reinert and her two children, featured actor Chuck Shamata in the part of Costopoulos. The lawyer, whose office is in Lemoyne, defended one of the suspects convicted of murder in the Reinert case.

The program aired on CBS Sunday and Monday nights.

Costopoulos is now the attorney for Kenneth Shiffer, accused of the May 11 beating of Leonard Radziak in Berwick. Radziak, 92, died May 12 at the Geisinger Medical Center, Danville.

The mini-series was taken from a novel by Joseph Wambaugh, the author of "The Blue Knight" and "The Choir Boys."

Ken Shiffer's lawyer William Costopoulos was portrayed in CBS mini-series this week.

## By HUGH LESSIG
Press-Enterprise staff

BERWICK — The name of a second murder suspect surfaced Wednesday during a preliminary hearing for the accused killer of Leonard Radziak.

In a surprising twist, a state trooper testified under cross-examination that they have questioned a man named George Sheeler, and still consider him a suspect in the May 11 beating which led to Radziak's death.

Telephoned for comment, Sheeler denied any involvement in Radziak's death, but confirmed he was a suspect. He said he knew Radziak, but would not discuss their relationship further.

"I've been questioned several times," said Sheeler, 39, of Mifflinville.

Kenneth Shiffer, the only man accused so far in the case, was ordered to stand trial in Columbia County Court after the two-hour hearing before District Justice Richard Cashman.

Defense attorney William Costopoulos managed to uncover Sheeler's name after repeated questioning of state Tpr. Charles Confer, who helped Berwick police investigate the murder. District Attorney Elwood Harding did not object to the line of questioning until after Confer disclosed Sheeler's name.

According to Confer's testimony, Shiffer told police during a telephone call before Radziak was beaten. The call came from Sheeler, who asked Shiffer's help in robbing a woman who had $400, his testimony said.

Radziak was found beaten in the Hayes Hotel on LaSalle Street with

$400 in his wallet. Confer said an undetermined amount of cash could have been taken from Radziak's pants pocket.

"It's ironic the caller indicated the target had $400 and the victim had $400," Costopoulos commented after the hearing.

Tpr. Confer said afterwards that Sheeler "is only a suspect." Sheeler denied he telephoned Shiffer prior to the murder.

The name surfaced as Costopoulos began asking questions about mug-shots shown to a Radziak neighbor, Dianne Szklarz. The woman, who testified she saw Shiffer on the night of the beating, was shown several photographs throughout the course of the investigation.

Police said on July 13 she selected Shiffer's photograph from a group. They had not included Shiffer's photo in previous groupings.

Asked what triggered the inclusion of Shiffer, Confer said police were trying to find someone who had been associated "with another man." When Costopoulos asked who the man was, Confer blurted out George Sheeler.

As Costopoulos pressed further, District Attorney Harding objected to the line of questioning. Cashman sustained his objection.

However, Confer later testified police have evidence linking Shiffer to the murder scene. They discovered a beer bottle with Sheeler's fingerprints outside the Hayes Hotel, Confer testified.

Confer also testified police dusted the beer bottle for fingerprints, saying according to Costopoulos, "Look, why don't you dust it prints?" I didn't do it and I

see MURDER Page 16

## Gill still stunned by wife   love made to kill 3 percent pay

ember 5, 1987

Bil Keane

## Witnesses saw man near Hayes Hotel after murder

**By HUGH LESSIG**
Press-Enterprise staff

BERWICK — A woman testified Wednesday she saw Kenneth Shiffer near the Hayes Hotel on the night Leonard Radziak was fatally beaten, holding what appeared to be a silver pipe.

Radziak was found minutes later, kneeling in a second floor hallway of the hotel, his head brutally beaten. The 51-year-old died one day later at Geisinger Medical Center. Shiffer, his accused killer, was ordered to stand trial in Columbia County Court after Wednesday's preliminary hearing.

Dianne Szklarz, 514 Monroe St., testified she was brewing coffee at about 1 a.m. on May 11 when she heard her dog barking outside. When she opened the door, the dog ran after a man who was walking across the street. Szklarz said she yelled for the dog, and the man turned around to face her. He was standing "almost directly under the streetlight," she said.

When asked by District Attorney Elwood Harding if she recognized the man, she pointed to Shiffer sitting in the courtroom and said, "The gentleman with the blue plaid shirt."

Questioned closely by defense attorney William Costopoulos, she said Shiffer's face was visible for between five and seven seconds.

rushed by Szklarz's house and stopped at the Hayes Hotel. When she discovered what happened, she told her story to police.

She said Shiffer "had what looked like a silver pipe in his right hand," about three feet long. He was wearing dark clothing.

Another witness, Robert Farver, testified he was walking toward the Hayes Hotel shortly after 1 a.m. when he saw a man wearing dark clothing. The man passed Farver on the sidewalk, but Farver said he couldn't identify him.

"I couldn't get a look at his face," he said. "He appeared to be trying to hide it, be seen from the side, more or less."

He added, "In his right hand, he had a long, brown object" about three feet long.

Farver then entered the hotel, and discovered a hallway light was not working. He reached up, and found the light bulb was loose.

He discovered Radziak in the second floor hallway.

"I went up the steps and I heard moaning and talking, and I looked around the corner and I saw Lenny on his hands and knees," Farver said.

He told another hotel resident to call for help.

Farver said he noticed the walls were "blood-spattered and marked up like someone was beating on the wall."

Pathologist Dr. Isidore Mihalkis testified the wounds on Radziak's body could be consistent with a hammer, but he did not rule out the possibility of a pipe.



**COMFORTED** — Karen Fenstermacher, left, comforts JoAnn Lutz, Ken Shiffer's girlfriend, as the two leave his preliminary hearing Wednesday. The two women left the courtroom as testimony turned to Radziak's injuries.

Murder

1987

56 days left in the
gress elected John
ing him the "title of
ongress. Assembled
signed because of ill
ead."

City Editor

Parver said he noticed the... was were "blood-spattered and marked up... someone was beating on the w...

Questioned closely by defense attorney William Costopoulos, she said Shiffer's face was visible for between five and seven seconds.

"He stopped and turned and stood there, and off he went," she said.

Then he turned and jogged away, between two houses.

Minutes later, an ambulance

Press-Enterprise/Bill Hughes

**COMFORTED** — Karen Fenstermacher, left, comforts JoAnn Lutz, Ken Shiffer's girlfriend, as the two leave his murder hearing Wednesday. The two women are former foster sisters.

## Murder

ing Sheeler prior to getting any information from Shiffer.

Shiffer, dressed in a blue plaid shirt and blue jeans, sat quietly throughout the hearing. Asked for comment afterwards, he pointed to Costopoulos and said "He's my lawyer."

During the hearing, the names of two other former suspects also surfaced but police said they are no longer being considered in the case.

A man named Allen Shaw and another known only as "Louie The Kraut" were mentioned during testimony on Wednesday. While Costopoulos was questioning Confer, he asked if a man named Allen Shaw ever confessed to the murder.

Confer said Shaw hadn't confessed. He said Shaw was considered a suspect "in the beginning" but has since been ruled out.

Reached by telephone Wednesday

night, Shaw said he had no commitment.

Radziak twice mentioned the name of "Louie The Kraut" before he died, according to testimony from Berwick Assistant Police Chief Thomas James.

The first mention came when Radziak was on his hands and knees in the hallway of the Hayes Hotel. When James asked who beat him, Radziak replied "Louie The Kraut." He repeated the name when he was at the hospital.

"That's all he would say, 'Louie The Kraut,'" James said.

However, James said they ruled out this individual as a suspect. He turned out to be a resident of the hotel who was about 80 years old and "very cooperative."

After questioning by Costopoulos, James admitted police did not obtain a search warrant.

Pathologist Dr. Isidore Mihalikis testified the wounds on Radziak's scalp could be consistent with a hammer, but he did not rule out the possibility of a pipe.

## Composite sketch scrutinized

BERWICK — A composite sketch released after the Leonard Radziak murder showed a man with a beard, but the woman who provided information for the sketch testified Wednesday the man she saw did not have a full beard.

Dianne Szklarz testified she saw a man in the area of the Hayes Hotel on the night Radziak was beaten. At one point, the man stopped under a streetlight and turned toward her. Asked to identify the man, she pointed to Shiffer.

Shortly after the murder, Szklarz gave police a description of the man. The sketch released to the public depicted a man with a full beard, but Szklarz said the man had only a stubble of beard, perhaps three or four days' growth.

A police composite sketch is

developed with a series of plastic overlays. Apparently, police did not have an overlay which depicted a beard stubble instead of a full growth.

Another key piece of evidence coming under scrutiny was a bloodstained jacket owned by Shiffer.

Szklarz testified she saw Shiffer under the streetlight wearing what appeared to be a jacket manufactured by "Members Only." Szklarz said her husband owns several Members Only jackets, and they have distinctive shoulder straps.

State police Trp. Charles Confer testified he found a Members Only jacket during a search of Shiffer's residence.

☐ By Hugh Lessig

## Centralia

"party wall" house will run to $63,000 — about equal to the average amount spent to buy new homes for those who fled the 25-year-old mine fire that officials say "threatens the town," according to Columbia County Redevelopment Authority Director Bill Klink.

"It will probably cost as much as it would cost to move them somewhere else, and that's the way the money should have been spent — to send them somewhere else," Klink said.

Now... the mines... will from... too... to build the 21 party wall homes... town... the residents... other... homes...

ment accepted for the party wall project.

By comparison, in other recent contracts that deal exclusively with demolition, Brdaric has been paid from $3,000 to $3,500 for each house he has destroyed.

Still said tearing down houses that do not adjoin inhabited homes is easy; heavy machinery is used and the job takes about one day.

But workers must work slowly and carefully to tear down empty houses that do adjoin inhabited homes to avoid damaging those

braces on the exterior of buildings — were considered to shore up the skinny homes. Despite the lower cost, however, they were rejected as too ugly.

The cost of the reconstruction project adds up to about 3 percent of the total $42 million of tax money allotted for the relocation project.

Klink said he fears that eventually the expensively reconstructed homes will be torn down and the people moved anyway.

What happens, after all this money is spent, if Centralia doesn't make it and they have to be an... after reconstruction...

over the worth of the project.

Redevelopment officials had argued it was "ridiculous" to spend tens of thousands to reconstruct houses for the stayers. The agency then disassociated itself from that phase of the project.

Those who wish to stay argued that because the relocation effort is voluntary, the government had a legal and moral obligation to leave their homes in good, inhabitable condition.

The state Department of Community Affairs has undertaken the administration of the reconstruction.

## Bugging out

Patrick Chillot, a Bloomsburg University graduate student, spent Wednesday afternoon collecting bugs for his entomology class in a field behind the university.

Press-Enterprise/Dave Maialetti

---

# Murder suspect claims alibi

## Shiffer was with live-in girlfriend and infant son during killing, lawyer says

By LEON BOGDAN
Press-Enterprise staff

BLOOMSBURG — Trial in the first of three 1987 Berwick murders will begin July 12 with an alibi defense for Kenneth A. Shiffer that claims he spent the evening of the crime with his live-in girlfriend and infant child, his defense lawyer said Wednesday.

"I feel the jury will come in with the appropriate verdict," said

criminal defender William Costopoulos of Lemoyne. "He's maintaining his innocence on that."

In surprise legal moves yesterday, Costopoulos also withdrew prior requests that the trial be moved out of Columbia County and that Shiffer be allowed to make bail until a trial date.

Shiffer, 26, is accused of homicide in the fatal beating of 51-year-old Leonard Radziak, who was found lying bloodied in a hallway near his room at Hayes Hotel on

May 11, 1987.

Explaining afterward that he felt news coverage of the crime was "accurate" and would not prejudice a trial, Costopoulos told the court, "We're satisfied the members of this community can fairly try this case.

"I've been in this business for 15 years," said the defender later, who has published a book on criminal defense work. "I've come to rely on my instincts. Sometimes

Please see **MURDER** page 16

KENNETH A. SHIFFER
Press-Enterprise file photo

---

# Showers was primary's big spender

By TOM SINK
Press-Enterprise staff

LEWISBURG — State Rep. John Showers out spent his opponent, by $53,000 to win the Democratic nomination for a state Senate seat in the April 2 primary, according to expense reports filed in the Union County Courthouse.

Showers' strong financial backing was not and manufacturing political action committee in Harrisburg.

Charles R. Gerow, PEG president, said his group also endorsed incumbent Republican Sen. Ed Helfrick whom Showers will oppose in the November election. "Gerow said PEG supported Showers, although the support was not

988

are 212 days

...ueen Elizabeth ... four months ...one upon the

...te to enact a

...l game to be ...lace, in Fort

...and married ...mony. (Cleve- ... marry in the

...zenship to all

... Gehrig, died ..., amyotrophic

... abolished in

...or One landed ...etailed photo-

...feller said his ...d pattern of ...ce Agency. ... in his native ... a Communist

...huck Barris is ...r Stacy Keach ... 47. Composer ...ners is 40. ...omance that is ...t believed." -- ... 797).

...nobile at Christ ...a, today from ... the Red Cross

Nancy Reagan and Raisa Gorbachev engaged in a feisty competition for the press' attention with Mrs. Reagan cutting in at one point while Mrs. Gorbachev was talking. Said the first lady, "I want to say something; I want to say something, OK?" Mrs. Gorbachev fell silent.

Mrs. Reagan characterized their relationship as "a Mexican standoff" — a tie.

A satisfied Gorbachev held a 110-minute news conference — his first ever on Soviet soil — and called the summit "a blow to the foundations of the Cold War."

For his part, Reagan said again that his characterization of the Soviet Union as "the evil empire" no longer applies.

The Reagans and Gorbachevs got

A great deal is due to the ...eral ...retary," the president ...of ...remarkably softer tone ...ard the Kremlin. The statement ...ed eyebrows among several ...seniks, including Tanya Zieman ...o has been waiting 11 years to ...n an exit visa.

Gorbachev, at his own news con...ence, said the two leaders, in ...at will be their final summit ...less the remaining arms ...passes are bridged by negotia...tors in Geneva, "have freed them...selves from all sorts of propaganda gambits."

In fact, Reagan said, "I'm going to do everything I can to persuade my successor to follow up and continue" the policy of reconciliation.

...most noticeable ad...ion visable from Route 11 is a ...ering structure that will house a hydrostat, or sterilizer, Pelletier said.

After the pet food has been canned, the cans will go to the hydrostat where a heat process will kill bacteria, he said.

...was unavailable ... comment on how the company plans to hire the additional workers.

The Recipe plant was purchased from Campbell Soup Company in August 1987, by California-based Star-Kist, a subsidiary of H.J. Heinz.

## Refuseniks claim visas near

MOSCOW (AP) — Soviet Jewish leaders said Wednesday 28 refusenik cases had been resolved in meetings between U.S. and Soviet officials, but a Western diplomatic source said later no cases had been settled.

The source, speaking on condition of anonymity, said the Jewish leaders had misunderstood the situation and that the 28 cases had not been cleared for emigration.

The confusion arose over a meeting between Assistant Secretary of State Richard Schifter and a group of six refuseniks Wednesday morning.

# Murder

I've been wrong."

"I'm convinced Ken Shiffer's going to get his day in the courtroom," Costopoulos continued. "Let's try this darn case and get the verdict in."

The defense, Costopoulos informed the court, plans to present Shiffer's former live-in girlfriend, JoAnn Lutz, in testifying that he spent "all relevant hours" with her and the couple's 15-month-old child at their East Front Street home.

Costopoulos, aided by three associates from his Cumberland County law firm, also attacked the credibility of eyewitnesses used by police to identify Shiffer as a suspect from more than three dozen police photographs of prior offenders.

Two of those witnesses pinpointed Shiffer as a "hunched over" man who appeared in a hurry near the Hayes Hotel shortly before Radziak was found.

Radziak, who lived alone, died of his injuries a day later. Shiffer, who had lived in the neighborhood for a time, was arrested five months later.

The defense, arguing that such photographic identification was "unreliable" and unduly suggestive, is seeking to withhold that evidence at trial.

Shiffer's photograph, a classic police "mug shot" or line-up picture, had been shown to the witnesses with past criminal arrests for assault typed below in large print, the defense said.

Shiffer was to be sentenced yesterday for aggravated assault in a January 1986 beating of a middle-aged Berwick area man, George Petrishin. At the request of lawyers, that sentencing, unrelated to the murder charges, will not take place until after his murder trial.

One of the witnesses called to testify about her identification of Shiffer's picture, Patricia Gordner of Berwick, conceded he looked "like" the man wearing a lowered baseball cap and flannel shirt seen near the rear of the hotel, but couldn't be positive.

Another, Dianne Szklarz, who has since moved from Berwick to New Jersey, said she was "positive" she saw Shiffer running away from the hotel that night carrying what appeared to be a silver pipe, but wearing a dark jacket.

"That's the person I saw," she replied to attorneys' questions. "Like I'm looking at you. I saw him."

However, state police Tpr. Charles Confer said three different composite drawings were made based on Szklarz' description of her sighting, made at a distance of about 80 feet that night.

One showed a man with a beard, another with a few days' beard growth and a third clean-shaven. All three were brought into court Wednesday. A published composite sketch released by police at the time showed a bearded suspect.

Shiffer, who appeared in court chained by both ankles and wrists, had neither beard nor moustache.

Szklarz testified she saw a man who "looked like he needed a shave," but did not have heavy beard growth.

Confer, in handwritten investigation notes examined carefully by defense lawyers yesterday, noted "beard" initially during his interview with Szklarz, then went back and added "slight beard" to his notes.

A third witness, Beverly Lynn, said she identified Shiffer as a man she saw about two weeks before the murder drinking at a local social club. She said Shiffer was in the company of a second man she knew as George Sheeler, whom police had identified previously as a possible suspect.

Costopoulos inferred her testimony had nothing to do with the crime itself.

The defense also sought access to a jacket confiscated by police from Shiffer's home on which chemical analysis turned up traces of human blood.

Costopoulos told the court the defense needed to have the jacket analyzed by its own chemical expert to prove the blood could not be positively identified as that of Radziak's blood type.

Columbia County District Attorney Scott Naus did not object, as long as the jacket remained in police custody while the test was conducted.

# PRESS-ENTERPR

November 1

Serving the heart of the Susquehanna Valley

© 1988

## Jury split on Shiffer verdict

## Deliberations resume this morning in murder case

BY [ON] BOGDAN
Enterprise staff

[BLO]OMSBURG — An indeci[sive] murder jury worked six [...] into Thursday night before [retir]ing to sequestered hotel [rooms], apparently split on a ver[dict] in the weeklong trial of [Kenne]th A. Shiffer.

[Shif]fer, 27, is accused of inflict[ing th]e mortal blows that led to [the de]ath of 51-year-old Leonard [Zezz]ak at the Hayes Hotel in

Berwick on May 11, 1987.

Jurors were led back into Columbia County court at 10:55 p.m. by jury foreman William Hine Jr., with the 36-year-old postal clerk confirming to Judge Jay W. Myers that no verdict was near.

Myers then dismissed all 12 for a night's rest, telling them to resume their deliberations this morning.

"We're very nervous," conceded chief defense counsel William C. Costopoulos, who earlier felt so confident of acquittal that

he decided not to allow Shiffer to testify on his own behalf.

"This is the hour of decision, and each minute that goes by is agony for Ken," Costopoulos said.

"When that telephone rings with a verdict, that means his freedom, his life, is at stake."

"The jury is doing its work," District Attorney Scott Naus said.

"I don't think anyone can say at this point what the outcome may be."

Testimony wrapped up yesterday morning with the last of four

state witnesses, followed by only brief recitations by five defense witnesses as to the defendant's appearance when the murder occurred.

A key issue is a suspect's identification near the hotel that night, with one resident saying she saw Shiffer, but noted he appeared to "need a shave."

Shiffer family members, including his parents and girlfriend, say he was clean-shaven and had a photograph to prove it, taken at a friend's wedding that weekend.

Shiffer's live-in girlfriend, JoAnn Lutz, claimed he was with her the entire evening in question.

"I'll go to my grave knowing that it was Ken Shiffer I saw that night," remarked 35-year-old Dianne Szklarz, a former Monroe Street resident who identified the suspect running away from the hotel carrying a metal pipe.

In remarkably contrasting styles, the lawyers closed their cases with lengthy appeals for Please see, **JURY** page 16

## Tyson [
## murder

BY MIKE FEELEY
[...]

## Dinner helpers



[su]pporters
[d]efend

[...]an Quayle

other role.

So far, Quayle has been no other duties by Bush, who is busy working on Cabinet and White House appointments, apparently without him. Quayle has held no press conferences or granted any interviews as aides say that he is learning the ropes of his new job.

And through it all he has been the butt of outrageous jokes.

"Vice presidents have traditionally been the subject of some pretty mean jokes," observed Jeff Nesbit, Quayle's press secretary. "They really can't defend themselves."

There is no protocol or precedent for automatically including in a vice president-elect or, as the case might have been, the running mate of an administration vice president whose presidential bid failed. And, no one thought of it in September when the guest list was drawn up, according to a White House aide who reviews such lists with an eye toward politics.

"I think it all just was a mistake," said B.J. Cooper, a spokesman for Reagan.

By some estimates, the mistake was compounded when the Reagans failed either to extend Mr.

reporter and columnist in Washington who attended the Thatcher dinner Wednesday night as a guest, said of Quayle, "I can't imagine why they didn't include him. Normally, they are rearranging tables up to the last minute at these things."

"But I do agree that too much has been written about him," she added. "I saw him at a luncheon the the other day and I told him, 'Don't let it destroy your self-confidence.'"

But Quayle is not discouraged, according to Nesbit. He went to the State Department luncheon with Mrs. Thatcher where Ms. Beale saw him, and he attended

proudly.

"We just assume it's the East Coast media who are doing this," said Gordon Dervil, chairman of the Indiana Republican Party. "We know Dan Quayle, and we know how well he's going to do well as vice president."

The conservatives who consider him one of their chief allies in the Bush White House also say that they are convinced that George Bush, at least, is treating Quayle right.

"I'm satisfied that he will get a fair deal from George Bush," conservative leader Paul Weyrich said. "In fact, my information is, that Bush has really come to like him."

## Jury

justice in the manner each respective side views it.

The defense pointed to the case as "a classic mistaken identification," the prosecution pointed to an adamant eyewitness who could not be shaken from her story.

A composite sketch drawing of a suspect showed a distinct beard that the eyewitness later said was wrong. Police had no physical evidence, either fingerprints or blood samples, against Shiffer. But they pointed to discrepancies in his alibi story when questioned, although he always maintained innocence.

D.A. Naus' deliberate, concise recitation of his witnesses' accounts notably clashed with Costopoulos' forceful, dramatic persuasion, stilling a crowded courtroom during two hours of

final argument.

Holding aloft a bloodied jacket that police found later in Shiffer's closet, blood samples of which tested inconclusive for the victim's blood type, Naus told the jury, "How many people have 'Members Only' jackets? How many have blood on them? His does."

But Costopoulos pointed to "insufficiency of evidence" throughout the trial, saying "there is not enough here to convict anybody — let alone Kenny Shiffer."

"If it wasn't for Dianne Szklarz, this man wouldn't have been in jail for a year now," he said. "make no mistake about it," he said.

"She's got a stake in this thing," Costopoulos went on,

"because she knows the case against Ken Shiffer rests on her and the charge is murder.

"And," he added, "we sometimes get caught up in our own self-importance."

Naus, however, warned the jury not to be taken by "defense slight-of-hand" and "misdirection," comparing his counterpart's tactics to those employed along the midway at the Bloomsburg Fair.

"Come on in, come on in," he feigned, waving his hand in the air. "We're not here because of a composite. Maybe it was right and maybe it wasn't right.

"They're as sure as we are — one of them doing it is George Sheeler," he mentioned of a co-defendant whose fingerprint was found on a beer bottle at the crime scene. "And the question

for you is who is in the other one?"

Attorneys for both sides, along with family members of both the accused and the victim, appeared wearily tense as they awaited a decision, which must be unanimous.

Relatives and court officials spent the bulk of the evening chatting, strolling through the courthouse halls, drinking coffee and smoking innumerable cigarettes after the jury received the case at 4:30 p.m.

Police officials involved in the investigation, encompassing a special state police task force assigned to help Berwick solve three homicides last summer, huddled in private quarters in the district attorney's office.

Jury deliberations resume at 9 a.m.

## Murder

Derick will vacate at 34 E. Main.

Johnston said Rea and Derick will consider using both the main floor and basement of the former Penney store. An architect has already been asked to design several fronts to replace what is now a long, blank expanse of tile and

Please see **PENNEY** page 2

# Men tangled in two murder cases often drank together

By **LEON BOGDAN**
Press-Enterprise staff

BERWICK — Two Berwick men entangled today in separate murders often went out drinking together, at times getting so intoxicated each would have to help the other stand, according to court records of previous criminal proceedings.

The day after John K. Tyson was returned to Pennsylvania to face charges of strangling his ex-girlfriend, his former drinking buddy, Kenneth A. Shiffer, was convicted of murder in a beating at the Hayes Hotel.

Columbia County court records point to an unusual acquaintance between the two murder

Please see **MURDER** page 20

# Bringing up To

Press-Enterprise/Bill Hughes

Pilgrim WENDY VAN HORN
*. . . at Nescopeck elementary*

By the Press-Enterprise staff

BLOOMSBURG — Last Jun
and Delmar Zeisloft took a b
young turkeys under their win
decided to raise them right —
hormones, no chemicals, no a

This afternoon, one of the flock w
grace their family's table as the
centerpiece of an all-natural feast.

Does a turkey need the help of
modern chemistry to grow into a

# What will st

By **SUSAN BROOK**/ Press-Enterprise

First the turkey on the platter, th
the hunt for venison on the hoof. An
for those not out in search of
something good to eat, this weekend
will bring the first intensive crush o
Christmas shopping.

Today's Thanksgiving holiday sta
a five-day weekend that extends
through the opening of deer hunting
season Monday.

Public schools, some local

# Crib needed for child abandoned by dad

Two years ago, the Smith couple was looking forward to the birth of their first baby, the beginning of what should have been a happy life together.

But the child, a little girl, was born in a complicated cesarean-section operation that deprived the baby of oxygen to begin her life.

Soon, the infant developed a seizure disorder and was diagnosed as having cerebral palsy, mental retardation, severe allergies to food and autism. Many months of her young life have been spent in the hospital.

Mr. Smith, unable to cope with his daughter's physical impairments, abandoned his family. The couple has since divorced.

Today, Mrs. Smith gets by as best she can, but is unable to work because the child requires constant attention.

The apartment the mother rents is sparsely furnished: There is no living room furniture, the child sleeps in a borrowed crib, and the mother sleeps on a mattress on the floor.

Social workers who work with

Please see **FUND** page 20

This story is a true account of a case on file with a local social service agency.

To help make Christmas brighter for this family and others in our area, fill out the coupon found on page 28 and send it with your check to:

Brighter Christmas Fund
Press-Enterprise
3185 Lackawanna Ave.
Bloomsburg, PA 17815

Contributions, which are tax-deductible, can also be dropped off at any Press-Enterprise office. Please do not mail cash.

All money received is disbursed to those in need. There are no administrative costs; the work of those overseeing the appeal is voluntary.

If you need help from the fund, please make a request in writing and mail it to the Brighter Christmas Fund, in care of the Press-Enterprise. Make sure to include your phone number and list any current benefits received from service agencies.

Brighter Christmas Fund 1988

## GOOD DAY

**Weather**

Today/**Fair**
High temp/**46°**

**Index**

Classifieds/**31-38**
Nation/World/**16-17**

■ **RESIGNS:** Millville police ch

■ CHRISTMAS TREES: Local far

Enterprise, Oct. 10, 1987

# ...fter awaiting sentencing
# ...hen Radziak was beaten

By LEON BOGDAN
Enterprise staff

BERWICK — Kenneth Shiffer had ...e threatened to kill a man when ...ice arrived at a West Front ...reet home in January 1986 to ...vestigate a reported fight.

They found a middle-aged man, ...arge Petrishin of Berwick R.D.1, ...ten unconscious and bleeding ...dly from the head and face lying ... the sidewalk. Petrishin spent the ...xt three days in a hospital ...dergoing facial surgery.

Shiffer, 26, admitted to police he ...ad at and kicked the victim because ...trishin allegedly made an off- ...or remark to his girlfriend, ...ording to police and court ...ords.

He was convicted of aggravated ...sault in Columbia County Court ... Nov. 1, 1986, but was never ...ntenced. The charge carries a ...maximum term of up to 10 years.

A defense appeal, based in part on ...dge Jay W. Myers' refusal to ...ppress Shiffer's confession from ...ing brought up at trial, has since ...layed the court in imposing ...ntence.

Police now say that six months ...lowing Shiffer's court conviction, ...fickk) beat another middle-aged ...an, Leonard Radziak, at the ...yer Hotel on LaSalle Street.

"Yes, it does surprise me," said ...manthra Gnojek, public defender ...sterday in the Radziak's arrest ...grney had defended Shiffer on the ...rlier assault, and still has his ...peals pending.

...o, I really didn't think he could be

involved," Sumner said of his client.

When asked whether he might defend Shiffer in the murder case, Sumner noted that he already has Tracey Creasy and Robert Laczak as clients in Berwick's other two murder cases this year.

"To do another one wouldn't do a service to Ken or anyone else," Sumner said, saying another public defender may likely be assigned to represent Shiffer.

> I really didn't think he could be involved. Ken was very cooperative.
>
> — Hugh Sumner,
> Columbia County public defender

Shiffer apparently was known to police. In a police report on the 1986 assault on Petrishin, Berwick Police Sgt. Andrew Piwowarski noted of Shiffer, "This same individual who (the arresting officer) knows to have the first name of Ken, from a prior contact (I) personally investigated..."

Shiffer also had a prior arrest for an assault in Cumberland County but all charges were eventually dropped, according to police records entered in Columbia County Court.

Mechanicsburg police had arrested him on Feb. 9, 1982, for unlawful restraint, simple assault, making terroristic threats, reckless endangerment and criminal conspiracy, records show.

Three months later, all charges were dropped. The reason for the dismissal of prosecution is not indicated on those records.



COMPOSITE — Police Sgt. Robert McCormick holds sketch of a suspect sought several days after Leonard Radziak died in May

# Berwick chief says he wants to increase number of officers

By HUGH LESSIG
Enterprise staff

...assault, and still has his

Golla said.

The 11-man Berwick police force found itself with a ...workload of historical proportions in August three ...were dropped. The reason for the

Golla said he didn't think there ...
y requests are going to come ...

# Berwick chief says he wants to increase number of officers

Sgt. Robert McCormick holds sketch of a suspect several days after Leonard Radziak died in May

COMPOSITE — Sgt. Robert McCormick holds sketch of a suspect several days after Leonard Radziak died in May.

By HUGH LESSIG
Press-Enterprise Staff

BERWICK — A single Berwick police officer was manning the night Leonard Radziak was brutally beaten in the hallway of his residence.

Police Chief Eugene Golla said Friday he hopes to make sure that manpower shortage never happens again by lobbying borough council for more during the summer.

"My requests are going to be quite extensive this year, and at the top of the list will be manpower," Golla said.

The 11-man Berwick police force found itself as a result of blunt force injuries he suffered worldwide proportions as unsolved murders mounted. They also had a tight budget, especially for overtime, Golla said.

A state police task force was dispatched to Berwick to assist in the murder investigations, and results quickly followed. Police announce they have a possible motive in Creasy killing, but will not reveal what it is.

When Kenneth Shiffer was taken into custody on Friday, arrests had been made in all three cases.

Golla said the task force would remain only a few days after Leonard Radziak died in May.

## Chronology of three murders in Berwick

## Investigation events listed

By HUGH LESSIG
Press-Enterprise Staff

With the arrest of Kenneth Alan Shiffer yesterday in the Leonard Radziak murder, charges have been filed in the borough's three homicides of 1997.

Tracy Creasy and Myron Leighow face charges stemming from the Leonard Radziak murder. Lee Creasy, and Robert James Luczak, his son, have been charged with killing James Harman.

The following is a chronology of the three murders:

☐ May 11 — Radziak attacked with blunt instrument at 11:19 a.m. at the Hayes Hotel on LaSalle Street where he was a resident. Berwick Police Chief Eugene Golla said his "skull was split open." Assailant seen leaving the scene on foot by an officer at Monroe and Washington streets. Radziak interviewed by police, couldn't identify attacker.

☐ May 12 — Radziak dies from an

police to form a "murder task force" to look into a trio of killings in the borough this year.

☐ Sept. 11 — Police arrest Samuel Saxauran, Tracy Creasy approaches in-law, and charge him with hitting the triggerman. Police also issue a warrant for the arrest of Leighow, identified as the triggerman. Saxauran is then placed in "protective custody" at an undisclosed location because he has received death threats.

☐ Sept. 12 — Leighow surrenders to police and is charged with murder.

☐ Sept. 15 — Tracy Creasy is arrested and charged with the murder of her husband. Leighow is assigned on additional charges. Golla announced arrest imminent in the murder of Harman.

☐ Sept. 15 — Police arrest Luczak, and charge him with the murder of Harman.

☐ Sept. 17 — Police announce Luczak confessed to using table leg to kill Harman.

☐ Sept. 21 — Charges dropped against Saxauran. Police said he'd be to protect his sister.

☐ Sept. 29 — Police say they are optimistic about solving Radziak murder.

☐ Oct. 7 — Tracy Creasy waives her preliminary hearing in Leighow's preliminary hearing Creasy testified the

**PROTECT YOUR HEALTH WITH REGULAR CHIROPRACTIC CARE!**
See Your Chiropractor Today
**Dr. Drew R. Miller**
519 Park St.
Bloomsburg
784-0360
Hours By Appointment

**WE'LL BE CLOSED ON COLUMBUS DAY**

**YOUR CHOICE**
**Bedroom Suite**
Solid Oak
or
Solid Cherry
complete **$999.00**
Credit Terms
DOMESTIC
**SALES & SERVICE**
NESCOPECK
PHONE 752-7791

**WRONG PRICE!**
RCA Stereo Video
Cassette Recorder
RCA
Sale $319
Save $80
We Apologize For Any Inconvenience This Has Caused
**HOWELL'S TV & HOME FURNISHINGS**
New Bloomsburg-Danville Hwy.
784-3990

Golla said she didn't think there was room to cut the 1987 police budget in the first place.

"Show me the fat (in the budget)," he said. "Show me the fat (in the budget)."

When council was debating the budget, Mayor Lou Biacchi sounded what is now considered a prophetic warning. He told council the budget allowed for no more than basic police service, especially with cuts in overtime.

Hoping for a quiet year, the borough got just the opposite. Council already has hired three part-time officers because four Berwick policemen were involved in full-time arson investigations.

My requests are going to be quite extensive this year, and at the top of the list will be manpower.
**Police Chief Eugene Golla**

valuable manpower can be.

"I think this year we needed to break in the murder cases, but didn't have enough people to do the legwork," he said.

"I think this year's we needed to break in the legwork," he said.

# Chronology of three murders in Berwick

## Investigation events listed

With the arrest of Kenneth Alan Stüfler yesterday in the Leonard Radizick murder, charges have been filed in the borough's three homicides of 1987.

Tracey Creasy and Myron Leighow face charges stemming from the murder of Lee Creasy, and Robert James Luczak has been charged with killing James Herman.

The following is a chronology of the three murders:

□ May 11 — Radizick attacked with blunt instrument at 1:19 a.m. at the Hayes Hotel on LaSalle Street where he was a resident. Hotel owner and chef Eugene Gella said his "skull was split wide open." Assailant seen leaving the scene on foot. In the meantime, Radizick was taken to the direction of Monroe and Washington area streets. Radizick admitted to Geisinger Medical Center, Danville, in serious condition. As interviewed by police, couldn't identify attacker.

□ May 12 — Radizick dies from an apparent heart attack

□ May 14 — Forensic pathologist Isidore Mahalaitis said circular marks on Radizick's body indicate he may have been attacked with hammer. Police confirmed a bloodied hammer was found

in a stairwell of the hotel. In press conference Mahalaitis said Radizick died as a result of blunt force injuries he suffered in the assault.

□ July 14 — Lee Creasy is shot in the back shortly after 1 a.m. while driving his home, and dies less than an hour later at the Berwick Hospital Center. Police seek Leighow for questioning several hours after killing.

□ July 17 — Police announce they have a possible motive in Creasy killing, but will not reveal what it is.

□ July 20 — Police narrow search for the Creasy killer to one co-worker, reported to be Leighow, who agrees to submit to polygraph test.

□ July 31 — Leighow takes and passes a polygraph test. (Police would not confirm the name of the suspect who took the test. Nor would they reveal the result.)

□ Aug. 5 — Herman is found murdered behind a shed in his backyard. Police said his throat was slashed and his head brutally beaten.

□ Aug. 12 — Authorities announce an official news blackout on all information pertaining to the three murder investigations after the Press-Enterprise the WKP-FV is used in composite sketch of suspect in Herman murder.

□ Aug. 13 — Berwick police interrogate a hitchhiker about the Herman murder for more than three hours, but man is cleared. Police say they loved one another.

□ Aug. 16 — State police join Berwick

police in forming a "murder posse" to look into the trio of killings.

□ Sept. 11 — Police arrest Samuel Sassaman, Lee Creasy's brother-in-law, and charge him with killing the Berwick man. Police also make arrangements for the arrest of Leighow, identified as the triggerman. Sassaman is being placed in "protective custody" at an undisclosed location because he has received death threats.

□ Sept. 12 — Leighow surrenders to police and is charged with murder.

□ Sept. 15 — Tracey Creasy is arrested and charged with the murder of her husband. Leighow is arraigned on additional charges. Gella announced arrest is imminent in the murder of Herman.

□ Sept. 21 — Police arrest Luczak, and charge him with the murder of Herman.

□ Sept. 17 — Police announce Luczak confessed to using table leg to kill Herman.

□ Sept. 21 — Charges dropped against Sassaman. Police said he lied to protect his sister.

□ Sept. 29 — Police say they are optimistic about solving Radizick murder

□ Oct. 7 — Tracey Creasy waives her preliminary hearing. In Leighow's preliminary hearing Creasy testified the sole motive to planning her husband's killing was to be with Leighow, because they loved one another.

□ Oct. 8 — Stüfler arrested for the murder of Radizick. Preliminary hearing held for Luczak.

---



**WRONG PRICE!**
**RCA** Stereo Video Cassette Recorder

Sale $319
Save $80

We Apologize For Any Inconvenience This Has Caused

**HOWELL'S TV & HOME FURNISHINGS**
Now Bloomsburg-Berwick Hwy.
784-1399

**YOUR CHOICE**
Bedroom Suite
Solid Oak
or
Solid Cherry

complete $999.00
Credit Terms

**DOMESTIC SALES & SERVICE**
NESCOPECK
PHONE 752-7791

**PROTECT YOUR HEALTH WITH REGULAR CHIROPRACTIC CARE!**

See Your Chiropractor Today

**Dr. Drew R. Miller**
519 Park St.
Bloomsburg
784-0360
Hours By Appointment

## Are you a local history buff?

Every Monday you will read little known facts of local history written by Ted Fenstermacher, life-long resident, historian and writer, in his weekly column

**WE'LL BE CLOSED ON COLUMBUS DAY**

**OPEN SATURDAY**
9 A.M. to 12 Noon

Bloomsburg Office: Drive-in & Walk-up.
Benton Office: Lobby
Sweet Valley Office: Drive-in
And Remember

**MAC.**

WILL BE ON THE JOB 24 HOURS A DAY at our Bloomsburg

Join Our Group From Bloomsburg
**Shuman's World Travel, Inc.**
Holland America Line-Westours Presents...
YOUR VACATION!

**PANAMA – April 16, 1988**
11-day Panama Trans-canal cruise and 2 nights Acapulco or (extension optional) to West Coast — Holland America Line - S.S. Rotterdam

**ALASKA—Aug. 3, 1988**
Limited Space
14-day cruise • Air to Vancouver • S.S. Rotterdam to Juneau • Bus Skagway to Fairbanks • Luxury rail Fairbanks to Anchorage • includes Denali Nat'l.

**SOUTHERN CARIBBEAN –**
Jan. 17, 1988 Fly/Cruise
10-day cruise • S.S. Rotterdam
Ports of call: Curacao • Venezuela
Grenada • Martinique • St. Thomas
• Nassau

**CANADIAN ROCKIES –**
June 26, 1988
Air-Motor Coach
12-day escorted tour from Blooms-burg Including: Seattle, Banff, Lake Louise, Columbia Icefield, Jasper,



Press-Enterprise/Keith Haupt

...Suez, 13, sits on her porch doing some required ...urity Street in Berwick with mother Susan watching.

part to legislation aiding the Catastrophic Loss (CAT) Fund.

The General Assembly amended state law effective July 1 by adding a surcharge to the Act.

Please see **FINES** page 18

fine, plus $2 for every mile over the limit after a 5 mph grace period, plus $17.50 costs.

Add $30 for the CAT

Please see **GLANCE** page 18

# Murder suspect's descriptions vary

**By LEON BOGDAN**
Press-Enterprise staff

BLOOMSBURG — Prosecution witnesses differed Wednesday when describing a murder suspect named "George" seen drinking with his victim, one woman recalling light blonde "bangs" combed to the front.

"That's him over there. Wearing the yellow blazer," said Joan Beaver, pointing out defendant George Sheeler, who wears his black hair flattened to the sides and back.

"Are you saying this man, at the time, had blonde hair, and as you call them, bangs combed down in the front?" defense attorney Frank Kepner asked

incredulously.

"Definitely," replied Beaver.

The 28-year-old Berwick woman testified she had danced and drank with Leonard Radziak at a social club before he was brutally beaten and later died as a result of an apparent robbery on May 11, 1987.

Radziak, 51, who suffered from chronic alcoholism and a diseased liver, died at Geisinger Medical Center about 20 hours after the beating.

He might have survived the assault if in better health, said a pathologist, conceding it was "a tough one to call" in ruling on why he died.

Multiple blows delivered by what appeared to be a hammer

Please see **SUSPECT** page 8

# ...ry has region feeling lucky again

...MORGAN/ Press-Enterprise staff

...ver is again gripping the ...ie Super 7 jackpot reached at ...illion Wednesday, but local ...y the fever wasn't as hot as ...million bonanza.

...murder in here back then," ...ela, manager of the Food ...h Street in Berwick.

...business was brisk — he ...ets by mid-afternoon — but ...close to sales in the April ...he sold close to 3,000 a

...n lottery headquarters ...$37 million in tickets had ...late Wednesday ...er of 220 per second. ...s at most local ticket ...or non-existent around ...half hour before the

drawing.

Most retailers said that was the case most of the day, with business being heavy at times and dead at others.

Martha Hampton of Jill and Marty's Copy Shop in Berwick said they were selling about 1,000 to 2,000 tickets daily, down from the 4,000 in April.

"There's not as much excitement this time," Hampton said. "Maybe people spent all their money on the last one."

Those buying the tickets admitted there was little chance they would win, but held onto the slim hope, noting that "somebody has to."

"Don't ask me why I'm playing. It's just a donation to the government," said Stephen Kundrat of Berwick, to which the store clerk quickly replied "I'll take your donation."

Not all players were as pessimistic, however.

Please see **LOTTERY** page 18

## Unknown players to split $60M pot

HARRISBURG (AP) — A jackpot of at least $60 million dollars will be shared by two players who picked seven of the 11 winning numbers in Wednesday's Super 7 drawing, lottery executive director Jim Scroggins said.

Both winners used the computerized Quick Pick system to select their numbers. Each of the two winning players will receive at least $30 million dollars. The exact value of the jackpot will be announced Thursday afternoon, said a lottery official.

Scroggins said 222 players picked six winning numbers for $4,846.50; 7,774 picked five winning numbers for $277.50; and 127,029 players picked four winning numbers for $7.

THURSDAY/35¢

July 20, 1989



Press-Enterprise/Keith Haupt

...ks emptied. A new sewer system will eliminate the
...he work. It should be completed by fall.

# sewer system

will include the convenience store and
restaurant owned by the Hornes —
Slabtown Auto Sales, Mini Market and
Restaurant.

Also among the hookups are Our Lady of
Mercy Catholic Church, Andy R's Good
Times at the Lariat bar and about 20
residences.

Among the residents affected is Joseph
Slanina, who said he has been having
problems with his well water.

"It's going to solve the problem," said
Slanina, noting that he was the person who

# Suspect

Continued from page 1

and a pipe on the head, arms,
shoulder and buttocks were not
life-threatening in themselves but
led to death as a result of Rad-
ziak's poor overall health, said
Dr. Isidore Mihalakis.

"This man's die was cast the
minute he was injured," Miha-
lakis said, referring to the
victim's "extremely brittle"
health confirmed through
autopsy.

Radziak was also "very much
intoxicated" when beaten, he
added.

One defendant, 27-year-old Ken-
neth A. Shiffer, has already been
convicted in Columbia County
court of murder for participating
in the robbery beating.

Police believe George Sheeler,
a 41-year-old Mifflin Township
resident, plotted the robbery and
enlisted Shiffer's help in accost-
ing the victim. Although identi-
fied early on as a suspect, Shee-
ler was not arrested until 15
months later.

He is on trial this week for
murder, assault and conspiring to
rob Radziak of $400, although the
victim did not yield his money
during the severe beating.

Witness Beaver, who described
"George" as wearing jeans and a
solid blue polo shirt that night,
said the man tried talking her
out of giving Radziak a ride back
to his room at Hayes Hotel.

"I told him I couldn't. I don't
drive," she went on.

Sheeler, who frequented the
club in Berwick, was identified
by others, including a state
trooper who stopped him along
Route 11 that night, as wearing a
light blue checkered shirt.

Beaver also admitted being
unable to identify Sheeler at a
preliminary hearing last fall
because, she explained, of poor
eyesight irritated by allergies.
But she held fast to a similar
description of a blonde-haired
suspect at that hearing.

Gary Robbins, another patron

who saw Radziak at the Ameri-
can Ukrainian Club before the
attack, said "someone" told him
not to give "Lenny" a ride home
that night.

Radziak also laid four $100 bills
on the bar, Robbins recalled,
when the suspect and Beaver
were seated near him.

He was unable to offer any
description of that man. How-
ever, a couple who waited on
customers at the bar that eve-
ning, Donald and Anna Hellen-
thal, recalled Sheeler coming into
the club with Radziak, but
departing before him by about 15
or 20 minutes.

Sheeler, according to Donald
Hellenthal, made calls on a port-
able telephone kept behind the
bar up to five times that night,
including right before he left at
about 12:40 a.m. or 12:50 p.m.
The times vary in statements
given to police.

Radziak, he said, left with
Beaver and two men later identi-
fied as Tom McGran and Ernie
Knorr, who agreed to drive him
home.

Beaver said "Tom and Ernie"
appeared "very excited" on
returning to the car after both
had helped an intoxicated Rad-
ziak into the hotel.

"They said they had dropped
Lenny off in someone else's
room," Beaver said.

Radziak, however, was found
lying beaten and bloodied right
outside his room on the second
floor, where his assailants lay in
wait in a darkened hallway,
according to other boarders.

"I heard 'Ow! Ow! Ow!' And
'Bang, bang, bang.' Like someone
hitting the walls," recalled 73-
year-old Lawrence Laubach, a
hotel resident whom Radziak had
nicknamed, "Louie the Kraut."

"I called him Lenny the
Polock. And next to him was the
Puerto Rican," explained Lau-
bach of the friendly ethic refer-
ences by which hotel residents
came to know each other.

ph: Slanina
system will
problems

$194,000
an 'a
mmunity

# Salem woman injured in crash

Exhibit "K"



May 14, 198

# PRESS-ENTERPR

Serving the heart of the Susquehanna Valley

# suspect seen by wit

## Man spotted carrying pipe from hotel

**By ANDY ROSE**
Press-Enterprise staff

ntify
stioning



35
5-foot-8
: Slender
TION: White
air, pointed nose,
mustache.'
3: Dark, waist-
dark trousers and
rs.
EN: Walking
alle Street and
Street shortly after-
ying 26-28 inch
ject.'

BERWICK — Police are seeking a man seen carrying a "long pipe-type object" near the Hayes Hotel shortly after Leonard Radziak was brutally beaten there Monday morning.

Police said yesterday they have found no motive for the beating of Radziak, 51. He died Tuesday, and police termed the case a homicide.

The suspect is believed to be 25 to 35, and police have released a composite sketch, based on a witness's description.

The witness, whom police did not identify, saw the man walking between LaSalle and Washington streets shortly after Radziak was beaten Monday at 1:19 a.m., said Sgt. Robert "Chico" McCormick, a criminal investigator for police. The hotel is as 541 LaSalle St.

The man was carrying a "long pipe-type object," 26-28 inches long, police were told.

Meanwhile, a bloodied hammer that was found in the stairwell of the west Berwick hotel has raised suspicions that another person was involved, a source said.

Police would not comment on the hammer or the possibility of a second assailant.

Radziak, a hotel resident, suffered severe head trauma and lacerations in the attack, police said. He died at Geisinger Medical Center, Danville, on Tuesday night.

McCormick described the attack as "very violent," noting there were numerous marks on the wall and a large blood stain on the carpet in the narrow hallway outside the victim's room.

Police searched Radziak's hotel room and found "nothing out of the ordinary," McCormick noted.

At this point, theft has been ruled out as a motive because the victim had $400 in his possession, McCormick said.

"The fact remains they weren't after the money because they could have had it," said Tpr. Charles Confer of state police at Bloomsburg, who are assisting Berwick in the investigation.

It does not appear the assailant was scared off, Confer added.

Police can only speculate on the motive, said Berwick Police Chief Eugene Golla.

"Revenge? What else? I don't know. I'm stumped at this point," Golla said. "At this point, we're having trouble coming up with a logical motive."

Radziak, who was unemployed, was known to flash money and get into friendly arguments at the bar, "but I never remember anything that would get anybody after him" said American Ukrainian Citizens Club manager Robert Pollick.

Radziak was at the Ukrainian Club Monday from 12:45 a.m. to 1:15 a.m., when he asked a group of three to give him a ride back to the hotel, police said.

Two of those people, whose names are being kept confidential, volunteered to answer questions from police yesterday, McCormick said.

They said they noticed the hotel foyer was dark when they dropped Radziak off, said the investigator, who later discovered a light bulb had been unscrewed.

The beating took place just minutes after Radziak arrived home, police said. He was later discovered by one of five other hotel residents, who promptly called for an ambulance and police.

The victim was taken to Berwick Hospital Center, then by helicopter to Geisinger, where he was admitted in serious condition to the special care unit. He died Tuesday evening.

The man seen by the witness was described as a white male, around 5-foot-8

Please see SLAYING page 9



**Profile**
American Ukr
Don Hellentha
Radziak, who
hallway outside

# Video st
# Berwick

BERWICK — Lenny Radziak had his share of friendly arguments in the neighborhood bars here, but "nothing that wasn't forgotten the next day," an acquaintance said Wednesday.

Bobby Hayes spoke favorably of Radziak and, like others who knew him, said he didn't deserve the fate that met him in the dark hallway outside his room at the Hayes Hotel early Monday morning.

At 1:19 a.m., after arriving home from the American Ukrainian Citizens' Club, Radziak was brutally beaten with a blunt instrument by at least one man. He died Tuesday.

"They came to give him a beating," said Hayes, 20, whose family saw, it was very violent.

The assailant put dozens of deep marks into the wall in the narrow hallway outside Room 7 in what police described as a "very violent" act.

"I never remember the guy doing anything that would get anybody after him," said Ukrainian Club manager Robert Pollick. "He wasn't a fighting guy."

Radziak, unemployed and on welfare, spent a lot of time at the local bars, friends and acquaintances said yesterday.

For at least eight years, he was a member of the Ukrainian Club at the bar "quite often," sometimes three or four times a week, said Pollick.

served Radziak his last few drinks early Monday morning.

Radziak would spend $2 to $5, said Hellenthal. "If his girl was around, he'd give her a five or a 10 to play the machines," he added.

Occasionally, when he would drink a lot, he would provoke people, but not to the point of causing a violent reaction, most agreed.

And he never reached the point of fighting someone, added Hellenthal.

"He didn't get mad that he would threaten anybody," said the bartender. "He wasn't somebody to get off his stool to retaliate."

Ironically, Sunday night "was a peaceful night for him," said Hellenthal. "It was unusual that he

cashing in as ones, Hellent

"He did no least a half-d bar five or 10 a pay day," s

Police foun have ruled o the attack.

Hellenthal Lenny's natu to put his ar the bar."

But despite and misunder acquaintanc admirable qu

"He was as long," he sa than he took."

## Slaying

Continued from page 1

with a slender build, according to police. He has dark hair and a pointed nose, and wears a beard but no mustache, according to police.

He was wearing a dark, possibly black, waist-length coat, which the witness described as a "Members Only-type," police said. He wore dark trousers and a pair of white sneakers that also had another color.

The witness was shown a "couple hundred" mugshots, but was unable to match any with the man, McCor-

mick said.

An autopsy to determine the cause of Radziak's death will be completed this afternoon, said Montour County Coroner James C. Rodenhaver.

Rodenhaver said he has called in forensic pathologist Isadore Mihalakas of Bethlehem, who is trained in investigating exceptionally violent deaths.

Police said a relative told them Radziak died of an apparent heart attack, but Rodenhaver said the cause of death cannot be made

official until the autopsy is completed.

If the victim suffered a heart attack, Mihalakis would determine whether there was a link between the ultimate cause of death and injuries from the beating, Rodenhaver said.

Police have nevertheless ruled the death a homicide.

Anyone with information about the incident or suspect may call Berwick police at 752-3677. All information will be kept confidential.



Leonard Ra

Bill Hughes

een
the





# Willard's Of Danvill

# FREE GIFT GIVEAWAYS

Kelvinator

Kelvinator

Kelvinator

## BUY ANY APPLIANCE IN STOCK WITH A FREE GIFT TAG ON AND YOU GET ABSOLUTELY FREE THIS GIFT FROM US.

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


KENNETH ALAN SHIFFER,                    :

                    Petitioner    :    CIVIL No. 1:00-CV-1829

          v.                             :

BEN VARNER, et al.,                      :    (Judge Caldwell)

                    Respondents   :


## CERTIFICATION OF SERVICE

   I, Kenneth Alan Shiffer hereby certify that on July 16, 2001,
a copy of the foregoing document was served by placing same,
first-class postage prepaid, in the United States Mail, addressed
to:


                    John W. McDanel, Esquire
                Columbia County District Attorney
                    Court House, Main Street
                    Bloomsburg, Pa.  17815



                                        _____
                                        Kenneth Alan Shiffer
                                        #AT-1194
                                        1000 Follies Road
                                        Dallas, Pa.  18612-0286