# ORIGINAL

UNITED STATES DISTRICT
COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CIVIL NUMBER 1:00 – CV - 1829

KENNETH ALAN SHIFFER
Petitioner

**FILED**
HARRISBURG, PA

v.

MAY 1 3 2002

BEN VARNER, et al.
Respondents

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

---

## GOVERNMENT'S RESPONSE TO THE ORDER DATED APRIL 24, 2002

---

Government's response to United States District Judge William W. Caldwell's Order requesting the Petitioner's PCRA Petition, PCRA appellate briefs, and portions of the state record , by order entered April 24, 2002.

**Richard W. Knecht, Esquire**
Assistant District Attorney for Columbia County
Columbia County Courthouse
Bloomsburg PA 17815
ID# 41257

# **TABLE OF CONTENTS**

1.    Petitioner's PCRA Petition

2.    Post Conviction Hearing Act Hearing of June 26, 1997

3.    PCRA Appellate Brief

4.    Commonwealth Brief

5.    Notice of Appeal

6.    Post Conviction Hearing Act Hearing of October 15, 1997

*In The*
**COURT OF COMMON PLEAS OF THE**
**26TH JUDICIAL DISTRICT OF PENNSYLVANIA**
**COLUMBIA COUNTY BRANCH - CRIMINAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH OF** **PENNSYLVANIA** | : | |
| | : | |
| v . | : | **CRIMINAL** |
| **KENNETH ALAN SHIFFER** **Petitioner** | : | **NO. 294 of 1987** |

## MOTION FOR POST-CONVICTION COLLATERAL RELIEF

1.   Petitioner was found guilty by a jury of murder in the second degree on November 18, 1988.

2.   Petitioner is presently confined in the State Correctional Institution at Dallas serving a life sentence.

3.   Petitioner filed a direct appeal to the Superior Court of Pennsylvania. Judgment of the Lower Court was affirmed on October 18, 1990.

4.   Petitioner filed a Petition for Allowance of Appeal before the Supreme Court of Pennsylvania. On June 27, 1991, the Petition was denied per curiam.

5.   Petitioner has not filed any prior Petitions under the Post-Conviction Relief Act.

6.   Petitioner alleges violations of the Constitution of Pennsylvania and the Constitution of the United States which, in the circumstances of this case, so undermine the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

1

7.      Petitioner additionally alleges ineffective assistance of counsel which, in the circumstances of this case so undermines the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

8.      Petitioner seeks relief upon the following grounds:

#2      (a).    Counsel failed to pursue a motion for change of venue;

#4      (b).    Counsel failed to present evidence that Petitioner could have gained knowledge of the amount taken in the robbery from a newspaper article available to the public;

#3      (c).    Counsel failed to cross-examine the only eyewitness on the basis of her bias;

#5      (d).    Counsel failed to call as a defense witness an individual who had confessed to the commission of this offense.

#1      (e).    The Court improperly charged the jury regarding the basis of finding reasonable doubt.

#6  ADVICE concerning prior Ag ASSAULT Conviction

## DISCUSSION

### Change of Venue

9.      Petitioner was arrested and charged with this offense on October 9, 1987. The crime occurred on May 11, 1987. His trial began on November 14, 1988.

10.     This was one of a series of homicide cases in Berwick and neighboring Danville. Pre-trial publicity was intense. Trial counsel filed as a part of an Omnibus Pre-Trial Motion a Motion for a Change of Venue/Venire. He claimed extensive and highly prejudicial coverage of the events leading to this homicide and the subsequent arrests. He further claimed extensive and prejudicial television broadcasts and radio broadcasts and concluded that because of pervasive and prejudicial pre-trial publicity in this case, the Petitioner could not receive a fair and impartial trial in

2

Columbia County. For some undisclosed reason on June 1, 1988 at a suppression hearing, trial counsel withdrew the Petition for Change of Venue/Venire.

11. The Petitioner believed that the publicity was sensational, inflammatory, slanted toward conviction rather than factual and objective and revealed prior criminal activity on behalf of the Petitioner. In one instance, it even unfairly and inaccurately referred to an admission of Petitioner. For this reason, Petitioner believed then and believes now this publicity should have been deemed inherently prejudicial and that the withdrawal of Petition for Change of Venue/Venire before the Court ruled upon it was ineffective assistance of counsel. (**Commonwealth v. Gorby,** 588 A.2d 902 (Pa. 1991); **U. S. v. Beckner,** 69 F.3d 1290 (Fifth Circuit 1995); **U. S. v. De La Vega,** 913 F.2d 861 (11th Circuit 1990)).

## Failure to Cross re: Bias

12. Diane Sklarz was the only witness who identified the Petitioner as being near the scene of the incident on the night the homicide occurred. While it was dark and she was some distance away, the circumstances of this identification were hotly contested at trial. Inconsistencies were shown between her trial testimony and what she originally told the police regarding a beard.

13. Under the law of Pennsylvania, a defendant has every right to cross-examine this witness about pending charges. **Commonwealth v. Wilson,** 619 A.2d 1063 (Super. 1993). This right to cross-examine includes pending charges. **Commonwealth v. Correa,** 620 A.2d 497 (Super. 1993). It also includes conviction for summary offenses. **Commonwealth v. Young,** 638 A.2d 244 (Super. 1994). It includes the right to point out to the jury that the witness may have been on probation. **Commonwealth v. Buska,** 655 A.2d 576 (Super. 1995). It further includes the right to bring out any favorable treatment that the witness may have received from the Commonwealth. **Commonwealth v. Mullins,** 665 A.2d 1275 (Super. 1995).

14. Denying a defendant the right to cross-examine a prosecution witness about pending charges violates the Confrontation Clause of the United States Constitution. **U. S. v. Alexius,** 76 F.3d 642 (Fifth Circuit 1996). Failure to impeach a witness' credibility with evidence of charges pending against her at the

3

time of trial has been held by the Superior Court to be ineffective assistance of counsel. **Commonwealth v. Davis,** 652 A.2d 885 (Super. 1995). Furthermore, counsel has been held to be ineffective for failure to ascertain the true condition of a witness. **Commonwealth v. Baxter,** 640 A.2d 1271 (Pa. 1994).

15.    Petitioner has recently been aware that Diane Sklarz at the time of her testimony had been arrested on a charge of issuing worthless checks and that these charges were pending at some point in time through the Petitioner's trial. Petitioner alleges that counsel was ineffective in failing to discover this information and most ineffective in failing to cross-examine her regarding her bias.

### Failure to Present Evidence of Money Found on the Victim

16.    Evidence was introduced at trial that the Defendant had knowledge about an amount of money possessed by the victim that had not been made public. The argument of course was advanced that the only way the Defendant would know this was if he was present when the victim was killed. The Trial Court in its Opinion at p. 3 notes that authorities testified that such figures were not published in the newspaper and yet the Defendant claimed that's where he got the information. This goes even further and comments upon the Defendant's credibility.

17.    As a matter of fact, this figure was mentioned in the newspaper article of May 14, 1987. This article was never introduced in evidence and never brought to the attention of the Court and the jury. The Petitioner contends that failure to do so constituted ineffective assistance of counsel.

### Failure to Call Allen Shaw

18.    Petitioner is now informed that one Kenneth Allen Shaw was an individual who at one point in time confessed to the murder of the victim in this case. He did so without any implication of the Defendant. Mr. Shaw was never presented as a defense witness nor was the fact that he had confessed to this crime ever brought to the attention of the jury. Petitioner contends that failure to do so was ineffective assistance of counsel.

## Jury Charge

19.    The Court, in its charge to the jury (339 et. seq. ) defined reasonable doubt. The Court neglected to specifically instruct the jurors that a reasonable doubt may arise from the lack of evidence. Rather, the Court charged it is the kind of doubt that "arises from the evidence."

20.    In the context of this case, the evidence consists of a strongly contested identification of the defendant by an eyewitness and the introduction of a jacket containing blood which was not capable of being described as human. There was indeed a great lack of evidence. No objection was offered to this charge by defense counsel. (H367).

21.    Proper jury instruction on reasonable doubt is Constitutionally guaranteed. Any instruction which allows a finding of guilt based upon the degree of proof below that required by the due process clause is a violation of that guarantee. **Cage v. Louisiana,** 111 S.C.T. 328 (1990). Where a jury instruction of reasonable doubt is Constitutionally deficient, prejudice must be presumed and the deficiency must be viewed as plain error. **U.S. vs. Birbal**, 62 F.3d. 456 (2nd Cir. 1995). Constitutionally deficient reasonable doubt instructions is not amenable to harmless error analysis. **Sullivan v. Louisiana**, 113 S.C. 2078 (1993).

22.    What the court did in this instruction was to tell the jury that the vitally important and all pervasive reasonable doubt standard was limited to evidence in the case. Failure to instruct the jury that reasonable doubt could arise from the lack of evidence severely restricted the application of the reasonable doubt standard and denied the defendant due process of law guaranteed by the Constitution of the United States and the Constitution of Pennsylvania.

        In conclusion, the Petitioner contends that counsel was ineffective in withdrawing his Motion for a Change of Venue/Venire, in failing to present evidence that Petitioner read in the newspaper about the amount of money in the victim's possession, in failing to cross-examine the only eyewitness on the basis of her bias due to a pending criminal charge, in failing to call as a defense witness an individual who had confessed to this particular killing and in failing to object that the Court improperly limited the concept of reasonable doubt to the evidence introduced in the case.

WHEREFORE, Petitioner respectfully requests this Court to vacate the judgment and sentence and order him a new trial.

Respectfully submitted,

Date_____1-3-47_____

_____

IN THE COURT OF COMMON PLEAS OF THE 26th JUDICIAL
DISTRICT OF PENNSYLVANIA, COLUMBIA COUNTY BRANCH

CRIMINAL DIVISION

Commonwealth of Pennsylvania    :

     -vs-    :    No. 294 of 1987

Kenneth Alan Shiffer,    :    (President Judge Myers)
     Defendant.    :

MOTION FOR APPOINTMENT OF COUNSEL
_____

AND NOW COMES, the defendant Kenneth Alan Shiffer,
and respectfully avers the following:

1.  Defendant, having filed a post-conviction relief
act petition pursuant to 42 Pa.C.S.A. Section 9541, et seq.,
and a motion and affidavit attesting to his indigency, now
seeks appointment of counsel to represent his interests on
the post-conviction relief act petition.

2.  Pa.Rules of Court, 1994, Rule 1504(a) provides
the authority to appoint counsel since Defendant is
unrepresented, unable to afford or otherwise procure
counsel, and is proceeding on his first motion for post-
conviction collateral appeal.

WHEREFORE, Defendant Shiffer prays in relief that
counsel be appointed to represent his interests in advancing
his claims for relief via the post-conviction relief act.

Respectfully submitted,

Kenneth Alan Shiffer

IN THE COURT OF COMMON PLEAS OF THE 26th JUDICIAL
DISTRICT OF PENNSYLVANIA, COLUMBIA COUNTY BRANCH

CRIMINAL DIVISION

Commonwealth of Pennsylvania    :

         -vs-                :    No. 294 of 1987

Kenneth Alan Shiffer,            :    (President Judge Myers)
        Defendant.

## MOTION TO PROCEED IN FORMA PAUPERIS

AND NOW COMES, Kenneth Alan Shiffer, defendant in
the above captioned case and respectfully avers the
following:

1.  THAT Defendant seeks permission to proceed in
forma pauperis for the purposes of litigating a Post-
Conviction Relief Act Petition. Purdons, Title 42 Section
9541, et seq.

2.  THAT Defendant believes in good faith that he is
entitled to judicial relief from his conviction and sentence.

3.  THAT Defendant is without the means nor money to pay
the costs of the proceedings and appeal if it becomes
necessary.  Defendant's Affidavit is attached hereto.

WHEREFORE, Defendant Shiffer prays in relief that the
Court grant him permission to proceed on post-conviction
collateral attack and on appeal therefrom if necessary in
forma pauperis status.

Respectfully submitted,

Kenneth Alan Shiffer

IN THE COURT OF COMMON PLEAS OF THE 26th JUDICIAL
DISTRICT OF PENNSYLVANIA, COLUMBIA COUNTY BRANCH

CRIMINAL DIVISION

Commonwealth of Pennsylvania    :

          -vs-    :    No. 294 of 1987

Kenneth Alan Shiffer,    :    (President Judge Myers)
        Defendant.

AFFIDAVIT IN SUPPORT OF PETITIONER'S REQUEST
TO PROCEED IN FORMA PAUPERIS

1.  I am the defendant in the above matter and because of my
financial condition am unable to pay the fees and costs of
prosecuting or defending the action or proceeding.

2.  I am unable to obtain funds from anyone, including my
family and associates, to pay the costs of litigation.

3.  I represent that the information below relating to my
ability to pay the fees and costs is true and correct:

(a) Name:  Kenneth Alan Shiffer

Address:  State Correctional Institution at Dallas

Drawer K, Dallas, Pa. 18612-0286

Social Security Number:  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

(b) Employment

    If you are presently employed, state

Employer:  State Correctional Institution at Dallas

Address:  Drawer K, Dallas, Pa. 18612-0286

Salary or wages per month: __.28¢ per hour, 8hours a day__

Type of work: __Property Room Clerk_____

  If you are presently unemployed, state

Date of last employment: ____N/A_____

Salary or wages per month: __N/A_____

Type of work: _____N/A_____

(c) Other income within the past twelve months

Business or profession: _____N/A_____

Other self-employment: _____N/A_____

Interest: _____N/A_____

Dividends: _____N/A_____

Pension and annuities: ____N/A_____

Social Security benefits: __N/A_____

Support payments: _____N/A_____

Disability payments: _____N/A_____

Unemployment compensation and supplemental benefits:____N/A____

Workman's Compensation: ____N/A_____

Public assistance: _____N/A_____

Other: _____N/A_____

(d) Other contributions to household support

(wife)(husband) Name:_____N/A_____

  If your (wife)(husband) is employed, state

Employer: _____N/A_____

Salary or wages per month: __N/A_____

Type of work: _____N/A_____

Contributions from children: N/A_____

-2-

Contributions from parents: _____ $40.00 per month _____

Other contributions: _____ None _____

(e) Property owned

Cash: _____ $85.00 _____

Checking account: _____ N/A _____

Savings account: _____ N/A. _____

Prison account: _____ $85.00 _____

Certificates of deposit: _ N/A _____

Real estate (including home): _ N/A __

Motor vehicle: Make _ N/A _____ Year _ N/A _

              Cost _ N/A _ Amount Owed $ _ N/A _

Stocks; bonds: _____ N/A _____

Other: _____ N/A _____

(f) Debts and obligations

Mortgage: _____ N/A _____

Rent: _____ N/A _____

Loans: _____ N/A _____

Other: _____ N/A _____

(g) Persons dependent upon you for support

   (Wife)(Husband) Name: _____ N/A _____

Children, if any:

     Name: _____ N/A _____ Age: _ N/A _

         _____    _____

         _____    _____

Other persons:

Name: _____ N/A _____

Relationship: _ N/A _____

4.   I understand that I habe a continuing obligation to inform the court of improvement in my financial circumstances which would permit me to pay the costs incurred herein.

5.   I verify that the statements made in this affidavit are true and correct.   I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.


Date: _____*DEC 24, 1996*_____


_____
Petitioner

Sworn and subscribed before me this
..........day of .........*pcc*........*1976*
_____

-4-

1  COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

2             VS.           : OF THE 26TH JUDICIAL DISTRICT

3     KENNETH ALAN SHIFFER    :       OF PENNSYLVANIA

4                            :    COLUMBIA COUNTY BRANCH

5                            :      CRIMINAL DIVISION

6                            : NO. 294 of 1987

7                            :

8                            :

9

10

11              POST CONVICTION HEARING ACT HEARING

12              BEFORE HONORABLE GAILEY C. KELLER, PRESIDENT

13  JUDGE, in the Courtroom, Columbia County Courthouse,

14  Bloomsburg, Pennsylvania, on Thursday, June 26, 1997.

15

16

17

18  APPEARANCES:

19  RICHARD KNECHT, ESQUIRE, Assistant District Attorney for the

20  Commonwealth of Pennsylvania.

21  HUGH SUMNER, ESQUIRE, Attorney for the Defendant.

22

23

24                                COPY

25

1    MR. KNECHT:  This is the time set for the

2    P.C.R.A. hearing on Kenneth Shiffer.  Mr. Sumner represents

3    Mr. Shiffer and we are ready to proceed.

4              THE COURT:   It is your motion, Mr. Sumner?

5              MR. SUMNER:  That's correct, your Honor.

6              THE COURT:   Perhaps, for the record, you

7    ought to indicate exactly what the issues are.

8              MR. SUMNER:  Okay, your Honor.  The issues

9    for consideration today on the P.C.R.A. Petition are in the

10   nature of ineffective assistance of counsel in the following

11   respects, your Honor.

12             The first issue would be failure to object to

13   what we felt was an insufficient charge by Judge Myers on

14   the issue of reasonable doubt.

15             The second issue would be ineffective

16   assistance in failing to pursue a motion for change of venue

17   or veneer that was filed by trial counsel.

18             The third issue presented was a failure by

19   trial counsel to cross examine the eye witness to the crime

20   on the basis of her bias in having pending criminal charges

21   against her at the time of her testimony, which were not

22   cross examined with that witness.

23             Ineffective assistance in failure to present

24   evidence that there was a newspaper article in this case,

25   your Honor, that provided that information concerning the

1    amount of money the victim had on him, specifically $400.00.

2    The police officers in the case testified that there was no

3    public disclosure of that amount, and for that reason there

4    was guilty knowledge on behalf of my client.  We feel it was

5    ineffective for trial counsel not to cross examine and use

6    that article or call someone from the <u>Press Enterprise</u> to

7    indicate that that had in fact occurred in the paper and

8    that could have been the source of knowledge of my client.

9    So, that is another issue of ineffective assistance, your

10   Honor.

11            The other remaining issue, your Honor,

12   ineffective assistance of trial counsel in indicating to my

13   client that his testimony as a witness could be impeached by

14   use of a prior conviction he had for aggravated assault.  We

15   do not feel it is in the nature of crimen falsi and that

16   advice was erroneous.  Those are the issues we have today,

17   your Honor.

18            <u>THE COURT</u>:  Is there a transcript in this

19   case?

20            <u>MR. SUMNER</u>:  Yes, your Honor.

21            <u>THE COURT</u>:  It does not appear to be in the

22   file that I have.

23            <u>MR. KNECHT</u>:  If I can, I think the last

24   indication that the Defendant was seeking grounds for relief

25   upon which had to do with the advise concerning his prior

4

1   charge and conviction of aggravated assault was not raised

2   in the petition.  Therefore, we had no notice of it.  So, we

3   would object to that particular matter.

4               MR. SUMNER:  The petition was filed pro se,

5   your Honor.  I think we have an opportunity to amend it.  We

6   are asking the Court to amend the petition to include that

7   count.

8               THE COURT:  We will grant the motion. What

9   issues are we going to have to take testimony on?  I assume

10   that at least with the exception of the possible allegation

11   that he was not advised as far as taking the stand the rest

12   appears of record, I would assume.

13               MR. SUMNER:  The only other testimony I

14   anticipated your Honor was that he was going to indicate

15   that the article that I talked about, he brought that to the

16   attention of counsel.

17               THE COURT:  Okay.  Let's put him on then.

18               KENNETH ALAN SHIFFER, Called, sworn

19   according to law, and examined by Mr. Sumner.

20                       DIRECT EXAMINATION

21   BY MR. SUMNER:

22        Q       Do you want to state your name, please for

23   the record?

24        A       Kenneth Alan Shiffer.

25        Q       Mr. Shiffer, you were, of course, charged

CHERI BRENNAN, RPR     BLOOMSBURG, PA     (717)389-5668

5

1    with criminal homicide and related offenses for a crime

2    occurring on May 11, 1987, is that correct?

3            A       Yes, Sir.

4            Q       The trial of this matter began November 14

5    and continued through November 18, 1988, is that also

6    correct?

7            A       Yes, Sir.

8            Q       After you were charged your family, on your

9    behalf, retained private counsel, is that correct?

10           A       Yes, Sir.

11           Q       Who did you retain as private counsel?

12           A       William Costopolous.

13           Q       Mr. Costopolous in fact represented you in

14    connection with the preliminary hearing held in the matter,

15    is that right?

16           A       Yes, Sir.

17           Q       He represented you in connection with the

18    filing of any pre-trial motions that might have been filed

19    also, correct?

20           A       Yes, Sir.

21           Q       He also did, in fact, represent you

22    throughout the trial process in this matter?

23           A       Yes, Sir.

24           Q       He also represented you in connection with

25    and direct appeal to the Superior Court, is that right?

6

1          A       Yes, Sir.

2          Q       I think also on your behalf did file a

3     petition for allowance of appeal with the Supreme Court

4     which was denied, correct?

5          A       Yes, Sir.

6          Q       Throughout all those proceedings Mr.

7     Costopolous was your counsel, is that right?

8          A       Yes, he was.

9          Q       With regard to the one issue I have raised,

10    the change of venue issue, at any point in time, Mr.

11    Shiffer, were you advised of the fact that your motion for

12    change of venue was being withdrawn by Mr. Costopolous?

13         A       No, Sir, I wasn't.

14         Q       At no point did he discuss with you the

15    reason that was being done?

16         A       No, Sir.

17         Q       Do you know when you became aware of the fact

18    that that petition had in fact been withdrawn?

19         A       The day of the suppression hearing he--the

20    day that he actually withdrew it in Court is the day of the

21    suppression hearing.

22         Q       Did you question him at that point or did he

23    give you any reason why he was doing that?

24         A       No, Sir.

25         Q       I have discussed an issue regarding a

1    newspaper article.  You have heard that discussion?

2        A    Yes, Sir.

3        Q    Did you, in fact, have discussions about an

4    article in the Press Enterprise with Mr. Costopolous?

5        A    Yes, I did.

6        Q    Do you know the dates of the article you are

7    referring to?

8        A    May 11, 1987.

9        Q    What did you discuss with him regarding that

10   article?

11       A    I knew the amount of money that the victim

12   had in his possession from that article.  And, when I was

13   being questioned by the local and state police they had

14   informed me that it was never in the newspaper.  And, I had

15   told Bill that yes it was.  That, you know, this is where I

16   got the information from.

17            THE COURT:  By Bill you mean?

18            THE WITNESS:   Mr. Costopolous.

19   BY MR. SUMNER:

20       Q    So you did point out to him the fact that

21   there was in existence this article in the newspaper that

22   would have given you knowledge of the amount involved?

23       A    Yes, Sir.

24       Q    In the trial of the matter you heard

25   testimony I think from the arresting officer that indicated

CHERI BRENNAN, RPR    BLOOMSBURG, PA    (717)389-5668

1  that the fact that you knew that amount indicated guilty

2  knowledge on your part?  You heard that testimony, didn't

3  you?

4        A      Yes, Sir.

5        Q      As a matter of fact, Judge Myers, in his

6  opinion in support of a motion denying your request for new

7  trial, picked up on that and used that as indication of your

8  guilty knowledge, is that correct?

9        A      Yes, Sir.

10       Q      I have indicated an issue regarding the fact

11 that you had discussions regarding whether or not you were

12 going to take the stand with Attorney Costopolous, is that

13 correct?

14       A      Yes, Sir, I did.

15       Q      Would you indicate to the Court what those

16 discussions were about?

17       A      I had asked Mr. Costopolous if I would be

18 taking the stand at all during my trial in my own behalf.

19 And, he informed me that he didn't want to put me on the

20 stand because of a prior aggravated assault conviction I

21 had.

22       Q      Do you recall the time frame of that?  When,

23 in fact, that conversation would have occurred?

24       A      It was during our trial.  I think I may have

25 mentioned it to him once or twice.

1          Q        Again your indication was that your feeling,

2     as a client, was that you did wish to take the stand, is

3     that right?

4          A        Yes, Sir, I felt the Jury had to hear from me

5     that I wasn't involved in that crime.

6          Q        As a result of the advice concerning the

7     impeachment by use of the aggravated assault you decided not

8     to pursue testifying?

9          A        Yes, Sir.

10              MR. SUMNER:  I have nothing further.

11                   CROSS EXAMINATION

12    BY MR. KNECHT:

13         Q        Mr. Shiffer, with respect to the change of

14    venue, you testified that you became aware that Mr.

15    Costopolous withdrew the request for a change of venue at

16    the time of the suppression hearing, is that correct?

17         A        Yes, Sir.

18         Q        Isn't it true that you continued to retain

19    him after the suppression hearing?

20         A        Yes, Sir.

21         Q        Did you acquiesce or agree to that trial

22    strategy?

23         A        It was never--my opinion was never asked on.

24    It was between him and his co-counsel Charlie Rector.

25         Q        Did you volunteer that you wanted a change of

10

1   venue?

2        A      Yes.

3        Q      When did you volunteer that to him?

4        A      (No response.)

5        Q      Right around the time he withdrew the

6   request?

7        A      No, this was prior to him filing for the

8   motion of change of venue.

9        Q      When you found out that Mr. Costopolous

10  withdrew that request, did you again raise your concern or

11  your position that you wanted a change of venue?

12       A      Yes, Sir.  I asked him why he was doing it

13  and he said, "Because, there is not a Jury in the world that

14  can convict you."

15       Q      As I understand you asked him why.  Did you

16  tell him you still wanted a change of venue?

17       A      No, Sir.  I went on trial with counsel's

18  advice.

19       Q      With respect to the article on the amount of

20  money taken from the victim would it be correct you did not

21  testify at the trial?

22       A      Right.

23       Q      Testimony regarding any statements you made

24  came primarily from the investigating troopers, is that

25  true?

11

1    A    Yes, Sir.

2    Q    In fact, isn't it true that one of the

3    investigating troopers said that you had stated that you had

4    learned about the amount from Shiffer and also from the

5    newspaper?

6    A    No, Sir.

7    THE COURT:    From Shiffer?

8    BY MR. KNECHT:

9    Q    I'm sorry.  From Sheeler, and from the

10   newspaper, from George Sheeler?

11   A    Yes, Sir.

12   Q    You acknowledge that at some point the

13   trooper testified that you had told him you had learned

14   about the amount taken from the victim based on a

15   conversation with Sheeler and also from the newspaper?

16   A    When I was being interviewed in the State

17   Police Barracks I had asked the state troopers what possible

18   motive what would I have.  They in turn said robbery.  And,

19   I said to them, "Well the man wasn't robbed.  He had $400.00

20   in his possession."  At that time the state troopers asked

21   me how I knew that.  I informed that I read it in the

22   newspaper.  And, at that time is when they told me that it

23   was never released to the newspaper and that I had to have

24   been involved in the crime.

25   Q    You acknowledge that the trooper that

12

1    testified said that you told him you had learned it from a

2    conversation with Sheeler and also the newspaper?  That is

3    what the trooper said.  Is that a fair statement?

4         A    No, Sir.

5              THE COURT:  I guess the record will speak

6    for itself.

7              MR. KNECHT:  Rather than approach with the

8    record we will refer the Court to page 211 of the

9    transcript.  No further questions.

              RE-DIRECT EXAMINATION

11   BY MR. SUMNER:

12        Q    Mr. Shiffer, then you testified that Mr.

13   Costopolous indicated not a Jury in the world could convict

14   you when you asked about why the change of venue was being

15   withdrawn?

16        A    Yes, Sir.

17             MR. SUMNER:  I have nothing further of him,

18   your Honor.

19             MR. KNECHT:  No followup, your Honor.

20             THE COURT:  You may step down.

21             MR. SUMNER:  I have nothing further, your

22   Honor, in support of our case other than to move for

23   admission.  We do have copies of all the newspaper articles

24   associated with the case and we would like to have those

25   part of the record and also would like--

1    THE COURT:    For what purpose?

2    MR. SUMNER:    For the purpose of the change

3    of venue, whether or not there was a reasonable basis for

4    not pursuing the change of venue and whether or not it

5    merited that type of thing.

6    THE COURT:    Those articles were never

7    introduced as part of the petition.

8    MR. SUMNER:    The petition was never followed

9    through with, your Honor.

10    THE COURT:    I understand there was a

11    petition filed requesting, as I understand it, requesting a

12    change of venue.  Were those newspaper articles attached to

13    that petition?

14    MR. SUMNER:    The petition I got down at the

15    Prothonotary's Office had allegations in numbered form, not

16    articles attached to it.  We would move for their admission.

17    THE COURT:    Does the Commonwealth have any

18    objection?

19    MR. KNECHT:    No.  We would like to see the

20    May 11 before we, I guess, agree to that.  It was testified

21    to on the stand.

22    THE COURT:    Was that part of the request

23    for a change of venue?

24    MR. SUMNER:    No, that is on the second

25    issue.

14

1              MR. KNECHT:  Are you asking to introduce

2     that also?

3              MR. SUMNER:  It is actually May 14th, 1987.

4              MR. KNECHT:  I don't object to that, your

5     Honor.

6              THE COURT:  Just for the record, as I

7     understand it you are offering a number of newspaper

8     articles in support of the motion for change of venue, is

9     that correct?

10             MR. SUMNER:  That's correct.

11             THE COURT:  Have any been marked?

12             MR. SUMNER:  They have not been at this

13    point, your Honor.

14             THE COURT:  I think we should mark them then

15    either as Petitioner or Defendant's 1.  Petitioner's 1 then.

16    It is your position that the newspaper articles should have

17    been submitted on this motion for change of venue?

18             MR. SUMNER:  That is correct.

19             THE COURT:  Do you have any objection to

20    Petitioner's 1?

21             MR. KNECHT: I do not, your Honor.

22             THE COURT:  They are received, then.

23             MR. SUMNER:  Petitioner's 2 would be the

24    article of Press Enterprise dated May 14, 1987.

25             THE COURT:  That is the one that--

1    MR. SUMNER:  Refers to the money, at the

2    bottom of the first paragraph at the bottom of the page.

3         THE COURT:   Is there any objection to

4    Petitioner's 2?

5         MR. KNECHT:  No, your Honor.

6         THE COURT:   It is received.

7         MR. SUMNER:  We have nothing further.

8         THE COURT:   Do I understand, then, the

9    balance of the issues raised in this petition are to be

10   resolved based on the record and the law?

11        MR. SUMNER:  Your Honor, the other issue is

12   on the fact that the witness had a pending bad check charge

13   at District Justice Cashman's office, on the failure to

14   cross examine on that.  I have a verbal indication from Mr.

15   Cashman's office that that is in fact the case.  I don't

16   have documentation.  As I understand Mr. Knecht's position I

17   would be, if I provided my affidavit or by something

18   certified from there, that is the case, I could supplement

19   the record with that.

20        MR. KNECHT:  I don't object to that.  I

21   don't remember, your Honor, whether there was or whether

22   there was not.  If he offers proof, I will not object to

23   that.

24        THE COURT:   Proof?

25        MR. KNECHT:  Proof that a bad check charge

16

1    was pending at the Magistrate level.

2              MR. SUMNER:  At the time of trial.

3              MR. KNECHT:  It rings a bell but--

4              THE COURT:  Proof would be acceptable to

5    you if it was an affidavit from the Magistrate?

6              MR. KNECHT:  Yes, including the time and

7    circumstances I think it is accurate.  I just don't remember

8    enough about it.

9              MR. SUMNER:  Nothing further then, your

10   Honor.

11             THE COURT:  Mr. Knecht?

12             MR. KNECHT:  We call Attorney Costopolous to

13   the stand.

14             WILLIAM C. COSTOPOLOUS, ESQUIRE, Called,

15   sworn according to law, and examined by Mr. Knecht.

16                   DIRECT EXAMINATION

17   BY MR. KNECHT:

18        Q      State your name and your professional

19   affiliation?

20        A      My name is William C. Costopolous, your

21   Honor.  I am an attorney and licensed to practice law in the

22   Commonwealth of Pennsylvania since 1972.

23        Q      Mr. Shiffer has indicated that you

24   represented him during the pending criminal matters filed to

25   number 294 of 1987, Columbia County.  Was his recitation

CHERI BRENNAN, RPR    BLOOMSBURG, PA    (717)389-5668

1    accurate?

2         A        That is correct.  I represented him at the

3    preliminary hearing, the pre-trial stage, at the trial

4    stage, before the Superior Court of Pennsylvania.  And, I

5    petitioned the Supreme Court of Pennsylvania for a review.

6         Q        Mr. Shiffer has testified with respect to the

7    issue concerning a change of venue, and you were present for

8    his testimony.  Do you recollect filing a petition for

9    change of venue?

10        A        I recollect filing an omnibus pre-trial

11   motion, a motion for a bill of particulars, and that we had

12   filed a motion for a change of venue from this county

13   because of the newspaper articles which apepared.

14               My recollection is that one point in time in a

15   discussion with the D.A. handling the case at the time and

16   the Honorable Judge Myers, who was the presiding Judge, I

17   brought to the attention of the Court that if the Court

18   would give me individual voir dire and liberal voir dire,

19   pretty much to ask whatever I wanted, that I would withdraw

20   the motion for change of venue and we would not have to have

21   a hearing on that particular motion.

22               The Court had indicated that it was willing to

23   give me individual voir dire and liberal questioning of the

24   prospective jurors.  And, it was for that reason that I

25   decided to withdraw the motion for a change of venue.  It

18

1    was my judgment at the time that individual voir dire and

2    liberal questioning of the prospective jurors was much more

3    beneficial to me than pursuing the motion for a change of

4    venue.

5              In 1988, when this case was being tried, the

6    Commonwealth was not seeking the death penalty. I did not

7    have a right to individual voir dire. But, when that

8    opportunity came up to grab it I did. And it was for that

9    reason I withdrew my motion for a change of venue. That I

10   discussed that decision with Mr. Shiffer, I don't recall.

11             THE COURT:   Your answer was what?

12             THE WITNESS:   I don't recall I sought his

13   approval on that. I can tell you, your Honor, that Ken

14   Shiffer pretty much throughout the entire of the proceedings

15   deferred to my judgment. And, if he would have asked me I

16   would have recommended that we do it this way.

17   BY MR. KNECHT:

18        Q      Did the individual voir dire actually occur

19   then?

20        A      Yes we had individual voir dire and there was

21   very liberal opportunity for me to question the prospective

22   jurors, which is very, very beneficial to a defense in any

23   kind of case.

24        Q      There is reference to a news articles May 11.

25   And, I think, maybe corrected to May 14. Do you recollect

1    reviewing any articles that spoke specifically to the amount

2    of money taken from the victim?

3         A        This case was tried nine years ago, and I

4    don't know what I recollect.  And, I don't know what the

5    transcript has refreshed my memory on.  I can tell you that

6    during the Commonwealth's case in chief, your Honor, a state

7    trooper took the witness stand by the name of Trooper

8    Charles Confer and testified that the co-defendant who was

9    waiting to be tried--Mr. Shiffer was tried first and the

10   co-defendant Mr. Sheeler was tried second.

11             And, when they interviewed my client, Ken

12   Shiffer, Trooper Charles Confer testified that my client

13   said that on the night in question before the robbery and

14   murder took place my client testified that he got a call

15   from the co-defendant.  And the co-defendant asked my client

16   if he wanted to rob an old man that had $400.00 on his

17   person.  That is what my client--according to Trooper

18   Confer--told Trooper Confer.  My client further went on to

19   say that, "I not only got that call I said no and hung up."

20             A second trooper took the witness stand by the

21   name of Trooper Carlson, and he testified that he

22   interviewed my client, after advising my client of his

23   rights in the presence of another trooper by the name of

24   Grovera.  That trooper testified, in interviewing Mr.

25   Shiffer, testified that he got this call from the

1    co-defendant on the night in question and the co-defendant

2    asked him if he wanted to rob an old man that had $450.00 on

3    his person, and my client said no and hung up.

4              That testimony of the interviewing trooper is

5    found on page 298 of the trial transcript.  According to the

6    trial transcript, the trooper then asked him again where he

7    got the figures $450.00, or the extra fifty.  Because this

8    was the first time this extra fifty came up in the trial.

9    And, I am quoting, at which time he paused and he said I got

10   it from the newspaper.  I said, that wasn't in the

11   newspaper.  He said he got the $400.00 from Sheeler, that is

12   the co-defendant, and he reiterated that he heard that from

13   Sheeler.

14             And, according to the record, three troopers

15   testified that my client got this information from the

16   co-defendant on the night in question, and he refused to go

17   along with the co-defendant said no and hung up.

18        Q        Did you personally conduct cross examination

19   of Diane Sklarz?

20        A        At great length.  I mean, Diane Sklarz was

21   the chief Commonwealth witness.  She was the only eye

22   witness that placed Ken Shiffer at the crime scene.  It was

23   very damaging testimony.  And, quite honestly, a significant

24   part to the Commonwealth's case rose and fell with her

25   credibility.  And, she was grist of cross examination.  She

21

1   couldn't pick him out of two photo arrays.  Picked him out

2   of the third one.

3              And, we spent a lot of time cross examining

4   her to the point where we kept the Jury out for almost two

5   days in their deliberations.  And the decision at that time

6   was to cross examine her as a woman that in the middle of

7   the night that had failed to identify Ken Shiffer from two

8   prior photographic arrays, was just flat out mistaken.  She

9   was wrong.

10             My recollection now is that there was an

11  outstanding bad check charge at a magistrate's office in a

12  small amount, an insignificant amount.  And, my recollection

13  is that we did not take the tact that she was lying and that

14  she was intentionally telling a falsehood to send a man away

15  for life because of a small check charge at the magistrate's

16  office.  We intentionally left that out.

17             THE COURT:  You were aware of the existence

18  of this charge?

19             THE WITNESS:  I believe so, your Honor.  My

20  recollection is we were aware that there was a bad check

21  charge against her in a small amount.

22  BY MR. KNECHT:

23      Q      You elected not to cross examine on that

24  issue for what reason?

25      A      The reason was we just wanted to make

1  emphasis to the Jury that this woman was mistaken she was

2  making an honest mistake in her identifying our client

3  versus going after this citizen this woman with no history

4  of having an adjenda to commit perjury versus can go after

5  her to portray her as having an agenda for giving false

6  testimony.

7        Q        Did you advise Ken Shiffer not to take the

8  stand in his own defense?

9        A        Yes, I did.

10       Q        What was your basis for that?

11       A        My basis for that is Ken Shiffer had a prior

12  criminal conviction of aggravated assault and battery.  And,

13  Judge Myers--I believe the Commonwealth had made an efforts

14  to get that prior conviction into the record.  And, we were

15  successful in keeping it out of the record.  I didn't want

16  this Jury to know that Ken Shiffer had this assault of past.

17            This particular murder on the night in

18  question was done with an instrumentality, whether it was a

19  ballpeen hammer or a pipe, this particular victim was beaten

20  to death.  And, this prior conviction of assaultive behavior

21  by Ken Shiffer was just not in our favor.  And I didn't want

22  the Jury knowing about this young man having this criminal

23  history.

24            I knew that if I called him to the witness

25  stand I was opening the door for what I had kept out, which

23

1    was for this criminal conviction to come in.  Or, at least I

2    believed at the time this criminal conviction was coming in,

3    if Ken Shiffer took the witness stand.  And, we were

4    concerned about that.  And, I discussed that with Mr.

5    Shiffer.

6                I can tell you, that unlike my deciding to

7    withdraw the motion for change of venue to go with the

8    individual voir dire, which I made that decision myself.

9    And, I told him why.  When it comes to a Defendant

10   testifying you don't tell them that they are or aren't going

11   to testify.  That is their judgment call.  That is their

12   right.  That is their decision.  And, that is not only an

13   ethical obligation of a lawyer that is our legal

14   responsibility to the client.  And that decision always

15   comes from the client.

16               So I did not tell him not to testify.  I told

17   him that, in my opinion, if he testified this assault, this

18   aggravated assault and battery, was coming in.  And, if he

19   was asking me what I thought, I thought it was in his best

20   interests not to take the witness stand.  But, that decision

21   was his.  And, he voiced that decision based upon my advice

22   not to take the witness stand.

23        Q       What led you to conclude that aggravated

24   assault would be admissible?

25        A       I don't recall now if we had any kind of a

24

1   ruling from Judge Myers that he was going to let it in.  I

2   don't recall now if there was any kind of a signal from the

3   Court that he was going to let it in.  I do recall that the

4   Commonwealth was very aggressive about wanting that

5   conviction in, even without him testifying.

6           And I do recall the Commonwealth made it clear

7   to the Court, once the Court ruled to keep it out, that if

8   the defense called the Defendant to the witness stand they

9   were going to seek to bring it in for impeachment purposes.

10   And, if the Court didn't rule or if the Court didn't send

11   that signal I wasn't going to take the chance with that

12   criminal conviction coming in.

13           In addition to all of that, whatever he had to

14   say was pretty much brought out by the troopers on the

15   witness stand who testified as to the statement he had given

16   that was favorable to us.  He did tell the troopers "Look, I

17   did not do it.  I was home with my wife on the night in

18   question.  I wasn't there."  And we called his wife as our

19   alibi witness.

20      Q     Other than those items and the potential for

21   the entry of the aggravated assault were there any other

22   factors that you weighed in advising him whether or not to

23   take the stand?

24      A     Yes, I spent a lot of time with Ken Shiffer.

25   I spent a lot of time with him.  I had an associate spent a

25

1    lot of time with him.  I had a private investigator retained

2    to investigate this case on his behalf.  And, I liked Ken

3    Shiffer.  I liked him a lot, but I just didn't think that

4    his persona, if you will, his testimony on the witness stand

5    was going to be well received by the Jury, and that was a

6    factor in assessing how he would come off as a witness.

7                And, indeed if my recollection is, if he was

8    going to be asked about that prior conviction, my concern

9    was he was going to jump out and try to get into the merits

10   of it.  And, that doesn't even come in anyhow.  I had a lot

11   of concerns with what his substantive testimony was going to

12   be regarding a particular article of clothing they found in

13   his closet.  I was concerned about a lot of the substantive

14   answers he was going to give under cross examination that

15   were not going to be helpful.

16                So, it wasn't just the prior criminal

17   conviction, it was his persona, and it was the answers we

18   knew he was going to give to a lot of the cross examination

19   questions.  I wasn't concerned about what his answer was

20   going to be if he was asked if did you do it, but everything

21   else.

22                MR. KNECHT:  That's all.

23                CROSS EXAMINATION

24   BY MR. SUMNER:

25                Q      Mr. Costopolous, did you make a professional

CHERI BRENNAN, RPR      BLOOMSBURG, PA      (717)389-5668

1    judgment that aggravated assault was crimen falsi?

2          A          Back in 1987 I made the professional judgment

3    that that conviction might be left in by the Court for cross

4    examination purposes.  I can tell you I have had felony

5    convictions brought in in many trials that withstood

6    appellate review.  So, when I made a determination that it

7    was crimen falsi, I don't think it is crimen falsi at all.

8    But, I think it could have come in.

9          Q          On what basis could it have come in if it

10   wasn't crimen falsi?

11         A          You are asking me to second guess now what

12   the Court would do.  As it comes in, you know, we object to

13   it coming in.  The Court says it comes in.  It comes in.

14   Now, you have an appellate issue, but keep in mind this was

15   a triable case, and I just didn't want to make it less

16   triable.  I didn't want to put my eggs in the Superior

17   Court's basket.

18         Q          You had the option of filing a motion in

19   limini in this case which you didn't do in this case, is

20   that correct?

21         A          We did not file a written motion in limini.

22         Q          That would have allowed the Court to review

23   that question outside the presence of the Jury and make a

24   determination, isn't that also correct?

25         A          Yes, that is correct.

27

1    Q        Did you communicate to Ken at any point that

2    you felt he wouldn't be a good witness in terms of his

3    testimony?

4    A        I don't remember that.  I don't remember

5    telling Ken Shiffer.  I don't know that I told him that, if

6    I believed it.

7    Q        Your indication is that you did, in fact,

8    through your investigation, have knowledge of the pending

9    bad check charge in regard to Diane Sklarz

10   A        It's just something about that that I recall,

11   Counselor.  And I am willing for this record to concede to

12   the fact I had knowledge of it.

13   Q        Who had knowledge?

14   A        I just recall knowing something about her

15   having a small bad check charge pending at the magistrate's

16   office.

17   Q        You understood very well, as you have

18   indicated, the importance of her testimony in terms of this

19   case?

20   A        Absolutely.  Yeah.  She was a big witness for

21   the Commonwealth.

22   Q        You felt by simply asking her about that,

23   that would set the Jury off as you were attacking her by

24   asking her whether she had a pending bad check charge?

25   A        I didn't know if it was going to set them

CHERI BRENNAN, RPR    BLOOMSBURG, PA    (717)389-5668

28

1    off.  I just didn't think it amounted to anything.  And, I

2    still don't.  If I had to do it over again I would do it the

3    same way, if she had a small bad check charge pending at the

4    magistrate's office, keeping in mind the grist we had to

5    cross examine her with it, looked like we were reaching.  I

6    didn't think we had to reach.  I think we had the Jury

7    thinking hard about her eye witness testimony.  If it wasn't

8    for that coat they found in his closet I think we would

9    every won the case.

10          Q       You have indicated, and went through quite a

11   bit of details, all the testimony of the troopers that

12   indicated that Mr. Shiffer had gotten the amount of money

13   through Sheeler or other sources.  Do you recall going

14   through all that with the different troopers, Carlson and

15   Confer, and all of them?

16          A       Yeah, it is on two pages, page 211 and 298.

17   That is where it's at.

18          Q       The decision that you had made that Mr.

19   Shiffer, in consultation, was not going to testify, was that

20   made at a time that these police officers testified?

21          A       (No response.)

22          Q       Had you made the decision at that point?

23          A       I don't recall whether we made that decision.

24   My guess is it is consistent with the way I practice.  That

25   decision isn't made until the Commonwealth rests.  That

CHERI BRENNAN, RPR     BLOOMSBURG, PA     (717)389-5668

1    decision might not be made until you call all your defense

2    witnesses.  I can tell you that decision was not made before

3    the Commonwealth.  That is a big decision.

4        Q       But given the testimony that you talked about

5    the troopers about the fact that the knowledge of that money

6    came from Sheeler, you didn't feel it was essential for you

7    to take this newspaper article up and say, "Hey, you are

8    saying this guy had to get this information from Sheeler?

9    It was in the paper.  Everybody in Columbia County saw it."

10   You didn't think that would be effective to go up and do

11   that with him?

12       A       The way that came in the trooper that was

13   going through the interrogation, Trooper Carlson, on page

14   298 of the transcript said that when Ken Shiffer mentioned

15   that he also got it from the paper, according to Carlson,

16   Carlson said to Shiffer "It wasn't in the paper."  I don't

17   know if it was a trick question by Carlson.  My guess is

18   that it was.  And, immediately when Carlson told Ken Shiffer

19   that it wasn't in the paper, according to Carlson, whose

20   credibility for the Jury--I don't know if I believe

21   Carlson--but, according to Carlson as soon as he confronted

22   Shiffer it wasn't in the paper Shiffer backed off.

23             And I just looked at the paper again today for

24   the first time in nine years.  And, there is nothing in that

25   newspaper at all about $50.00, which became kind of touchy

30

1    for me on Ken's behalf, because we were talking about

2    $400.00 the whole time.  And ,the only thing in the paper is

3    about $400.00.  And according to Carlson Mr. Shiffer said,

4    "Well, why would you only take $50.00 and leave $400.00 on

5    his person.  That is stupid."  And, I didn't want to touch

6    that.

7         Q        You had an investigator working up here and

8    you were familiar with the other murders that had occurred

9    in close proximity in Columbia County, is that a fair

10   statement?

11        A        At that time I would have been familiar with

12   what was going on around here, yes.

13        Q        Again, you did, as part of your omnibus

14   pre-trial motion, you did file a motion for change of venue

15   and because of a number of different television, radio

16   newspaper sources in, I think, Luzerne and also Columbia

17   County correct?

18        A        It speaks for itself.  Yes, Sir.

19        Q        You felt that type of a climate where there

20   was considerable effort to get convictions of these murders

21   that were going on up here, that it was in Ken's best

22   interests to go ahead and do an individual voir dire rather

23   than vigorously pursue the change of venue that you had?

24        A        Every time--these high profile murder cases,

25   Counselor, are in every county in this Commonwealth as we

1    speak today, and we have a tendency to get caught up in our

2    own publicity.  I will take individual voir dire with

3    liberal questioning over a hearing on a change of venue any

4    time.

5             As a matter of fact, I would even take it over

6    a change of venue.  I would take it over a change of venire,

7    see California versus O.J. Simpson, where time and time

8    again if the defense has individual voir dire and free reign

9    with this questioning you can get a lot more done than you

10   can with a motion for a change of venue.

11            MR. SUMNER:  We have nothing further of him,

12   your Honor.

13            MR. KNECHT:  No redirect, your Honor.  And

14   we have no further testimony.

15   BY THE COURT:

16       Q       When you discussed with your client whether

17   or not he should testify, did he, after you explained your

18   reasoning, did he ever persist in being permitted to

19   testify?

20       A       He did not, your Honor.  My recollection is

21   that when I told him I didn't think he should testify and

22   the reasons I didn't think he should testify he went along

23   with what my advice was to him.  And did not only not

24   persist, but elected not to testify.

25       Q       You left it to his decision?

1          A          Absolutely.

2          Q          After you advised him of your opinion?

3          A          That's correct.  That is absolutely correct.

4     And, the only other thing I wanted to clear up for myself,

5     and for the record, was that pretty much a lot of things Ken

6     Shiffer said up here was the truth.  I never told Ken

7     Shiffer or told a client in twenty-five years of doing this

8     almost full-time that there is no Jury in the land that is

9     going to convict you and we are going to win this case

10    because it's a slam dunk.  This was a tryable case.  We

11    couldn't plead it out.  But, I never represented that to my

12    client that there is no way you can lose a jury trial.

13                    THE COURT:  Any rebuttal, Mr. Sumner?

14                    MR. SUMNER:  We call Ken Shiffer.

15                    THE COURT: You remain under oath?

16                    KENNETH ALAN SHIFFER, Called, sworn

17    according to law, and examined by Mr. Sumner.

18                    DIRECT EXAMINATION

19    BY MR. SUMNER:

20         Q          Mr. Shiffer, on that last point that was

21    being discussed, will you indicate to the Court what

22    conversations you had with Attorney Costopolous regarding

23    that?

24         A          I can't remember exactly what day it was but

25    within around the middle of that trial I was under the

33

1    impression that Bill Costopolous had a discussion with the

2    District Attorney's office where they had offered a five to

3    ten for me if I would plea guilty.  And, Bill did, from what

4    I can recall, Bill did discuss it with me, but he advised me

5    that it wouldn't have been a good thing to do.

6                MR. SUMNER:  I have nothing further of him

7    then.

8    BY THE COURT:

9         Q      He did leave the final decision to you?

10        A      Well, actually I was under the impression

11   that the decision had already been made.  That, no I would

12   not take any kind of a kind of plea seeing we were already

13   here in trial.

14        Q      Did you indicate to him you were interested

15   in doing that?

16        A      No, Sir I didn't.

17               MR. SUMNER:  Nothing further.

18               MR. KNECHT:  No cross.

19               THE COURT:  You may step down.

20               MR. SUMNER:  We have nothing further.  We

21   would like an opportunity to brief, your Honor, on those

22   issues.

23               THE COURT:  I am about to tell you about

24   that.  No surrebuttal?  ***

25               MR. KNECHT:  No, your Honor.

34

1       THE COURT:   The record is closed then?

2       MR. SUMNER:   Yes, your Honor.

3       MR. KNECHT:   Yes, Sir .

4       THE COURT:   I will give counsel thirty days

5   to brief the issues and would ask that the briefs make

6   specific reference to those pages in the record that are

7   material to the issues raised.

8       MR. SUMNER:   Thank you, your Honor.

9       (Whereupon the hearing was concluded.)

10

11

12

13

14       I HEREBY CERTIFY that the proceedings and

15   evidence are contained fully and accurately in the notes

16   taken by me on the above cause, and that this copy is a

17   correct transcript of the same.

18

19                        _____

20                        CHERI BRENNAN, RPR

21

22

23

24

25

*Rich — our Brief Due Aug 27, 1997.*

COMMONWEALTH OF PENNSYLVANIA  : IN THE COURT OF COMMON PLEAS
                             : COLUMBIA COUNTY, PENNSYLVANIA
         VS.                 :
                             :
   KENNETH ALAN SHIFFER      : NO.  294  1987
                             : CHARGE: CRIMINAL HOMICIDE


### *BRIEF OF DEFENDANT, KENNETH*

### *ALAN SHIFFER IN SUPPORT*

### *OF HIS MOTION UNDER*

### *POST CONVICTION RELIEF ACT*

## *TABLE OF CONTENTS*

Page

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

I.  STATEMENT OF THE CASE/PROCEDURAL HISTORY. . . . . . . . . . . . . . . . .    1

II. QUESTIONS PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO PERMIT DEFENDANT TO TESTIFY IN HIS OWN BEHALF AT TRIAL.

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO OBJECT TO A JURY INSTRUCTION WHICH DID NOT ADEQUATELY DEFINE REASONABLE DOUBT.

TRIAL COUNSEL WAS INEFFECTIVE FOR WITHDRAWING A PRETRIAL MOTION FOR CHANGE OF VENUE OR VENIRE.

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO IMPEACH POLICE OFFICER WITNESSES ABOUT THE FACT THAT THE AMOUNT OF MONEY IN POSSESSION OF THE VICTIM WAS DISCLOSED IN A NEWSPAPER ARTICLE WHEN SAID FACT WAS USED TO SHOW GUILTY KNOWLEDGE BY DEFENDANT IN THE CASE.

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

i

## *TABLE OF CITATIONS*

Page

Cage vs. Louisiana, 111 S. Ct. 328 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

Commonwealth vs. Bighum, Pa., 307 A.2d 255 (1973). . . . . . . . . . . . . . . . . . .    5

U.S. vs. Birbal, 62 F. 3d 456 (2nd circuit 1995). . . . . . . . . . . . . . . . . . . . . . . . . .    8

Commonwealth vs. Evancho, Pa Supra, 103 A.2d 289 (1954) . . . . . . . . . . . . . .    7

Commonwealth vs. Fowler, Pa. Super., 523 A.2d 784 (1987). . . . . . . . . . . . . . .    5

Commonwealth vs. Grimm, Pa. Super, 378 A.2d 377 (1977). . . . . . . . . . . . . . .    6

Commonwealth vs. Randall, Pa., 528 A.2d 1326 (1987). . . . . . . . . . . . . . . . . . .    6

Commonwealth vs. Rowles, Pa. 462 A.2d 619 (1983). . . . . . . . . . . . . . . . . . . . .    5

Commonwealth vs. Rucci, Pa. 670 A.2d 1129 (1996). . . . . . . . . . . . . . . . . . . . .    9

ii

# I. STATEMENT OF THE CASE/PROCEDURAL HISTORY

Leonard Radziak was an old man who lived in Room No. 7 of the Hayes Hotel, an establishment mostly for single men located on LaSalle Street, Berwick, Columbia County, Pennsylvania. Shortly before 1:00 a.m. on Monday, May 11, 1987, Lawrence Laubach, a fellow hotel guest known to Mr. Radziak as "Louie the Kraut," heard someone crying "ou, ou, ou" and a banging sound down a second floor hallway of the Hotel. (NT 14-15). He got out of bed to investigate and found Mr. Radziak lying outside his room, bleeding from a head wound. (NT 16).

The police were summoned. Assistant Chief Thomas James, Berwick Police Department, arrived a little after 1:00 a.m., and called an ambulance. (NT 55-57). When Chief James went outside the Hotel, he saw a male with dark pants and a light blue shirt near the corner of Sycamore and LaSalle Streets looking directly at him. The man started walking quickly away as Officer James approached. He later learned it was none other than George Sheeler, a sometime drinking buddy of Mr. Radziak, who would later be stopped by the State Police walking along a highway. (NT 61-62, 67).

Mr. Radziak was transported by ambulance to Berwick Hospital. When asked by Chief James, the beating victim said that "Louie the Kraut" did it. (NT 66). Marge Sorber, Lenny's lady friend, was told by Mr. Radziak: "George -- I had a bad argument with George." (NT 293). Mr. Radziak was then flown to Geisinger Medical Center, Danville, where he died at 9:04 p.m. on May 12, 1987. An autopsy was conducted on May 14, 1987, by the esteemed forensic pathologist Isidore Mihalikis, M.D., who expertly attributed the cause of death to a lack of oxygen to the brain and bacteria in the bloodstream from multiple blunt injuries to the head. (NT 282-283).

By July 1987, Diane Szklarz was looking "through her third array of photos" with Trooper Charles Confer. (NT 155).

1

Both Trooper Confer and Officer McCormick had interviewed her the day after Mr. Radziak's demise, for Ms.Szlarz, who lived one block from the Hotel, had seen a man about 1:00a.m. on May11th with a pipe in his right hand; the man had stopped and looked at her under a street light for a full 6 or 7 seconds. (NT134, 138). Trooper Confer's report of the interview noted that the man had "a beard with no mustache" and "hair combed over the ears" (NT 159). Officer McCormick's notes reflect the same description. (NT 162). On July 13th Ms. Szklarz selected Defendant's photo-- sans facial hair-- from the array, which carried the mug shot caption of "AGGRAVATED ASSAULT, SIMPLE ASSAULT."

Defendant was arrested and charged with criminal homicide on October 09, 1987 in connection with the death of Lenny Radziak. Defendant was represented at preliminary hearing, trial and direct appeal of the matter by William C. Costopoulos, Esquire. Following a preliminary hearing before District Justice Richard Cashman on November 04, 1987, Defendant was held for trial without bail. On December 23, 1987 counsel for the Defendant filed an Omnibus Pretrial Motion including a motion for change of venue/venire. On June 1, 1988, counsel for Defendant prior to scheduled suppression hearing abruptly withdrew motion for change of venue /venire.

Trial commenced with jury selection on November 14, 1988, presided over by Judge Myers. Defense counsel made no objection or exception to the jury charge given by the Court at conclusion of the trial. On November 18, 1988, Defendant was convicted of second-degree murder. Counsel for Defendant timely filed a post-trial motion in arrest of judgment and for a new trial which was ultimately denied by Opinion and Order

2

dated January 09, 1990. A direct appeal to the Pennsylvania Superior Court on sufficiency of evidence and denial of suppression motions grounds was made on March 06,1990 with said judgment of lower court affirmed on October 18, 1990. Defendant's Petition for allowance of appeal before the Pennsylvania Supreme Court was denied per curcam, June 27, 1991.

On January 06, 1997, Defendant filed a Motion for Post-Conviction Collateral relief. On June 26, 1997 prior to hearing on the Motion Post-Conviction counsel was permitted to amend the motion to include an issue of failure of trial counsel to permit Defendant to testify in his own behalf at trial. Post-Conviction counsel at time of hearing raised issue of failure of trial counsel to impeach Commonwealth witness, Diane Szklarz, on basis of pending bad check charges or summary conviction of bad checks. However, Post-Conviction counsel on investigation of the matter at the respective district justice offices has determined that the bad check cases at issue had been settled without conviction prior to trial or had not yet been filed at time of trial. Accordingly, there were no pending bad check cases against the Commonwealth witness at time of trial nor did any of the cases resulting summary conviction.

WHEREFORE, Post-Conviction counsel withdraws this issue for consideration. This brief is in support of the Motion for Post-Conviction collateral relief as amended prior to hearing.

3

## II. QUESTIONS PRESENTED FOR REVIEW

A.      TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO PERMIT DEFENDANT TO TESTIFY IN HIS OWN BEHALF AT TRIAL.

B.      TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO OBJECT TO A JURY INSTRUCTION WHICH DID NOT ADEQUATELY DEFINE REASONABLE DOUBT.

C.      TRIAL COUNSEL WAS INEFFECTIVE FOR WITHDRAWING A PRETRIAL MOTION FOR CHANGE OF VENUE OR VENIRE.

D.      TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO IMPEACH POLICE OFFICER WITNESSES ABOUT THE FACT THAT THE AMOUNT OF MONEY IN POSSESSION OF THE VICTIM WAS DISCLOSED IN A NEWSPAPER ARTICLE WHEN SAID FACT WAS USED TO SHOW GUILTY KNOWLEDGE BY DEFENDANT IN THE CASE.

4

III. ARGUMENT

    A.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO
        PERMIT DEFENDANT TO TESTIFY IN HIS OWN BEHALF
        AT TRIAL.

The decision whether to testify in one's own behalf is ultimately to be made by the accused after full consultation with counsel. Commonwealth vs. Rowles, Pa. 462 A.2d 619 (1983).

In order to support a claim that counsel was ineffective for failing to put the Defendant on the witness stand, the Defendant must show that counsel interfered with the Defendant's freedom to testify or that counsel gave specific advise so unreasonable as to vitiate a knowing and intelligent decision by the Defendant not to testify. (Emphasis supplied) Commonwealth vs. Fowler, Pa. Super., 523 A.2d 784 (1987).

The testimony presented at hearing in this matter does not evidence interference by trial counsel with Defendant's freedom to testify as Defendant did not persist after being advised by trial counsel. The testimony does, however, indicate advise by trial counsel so unreasonable as to vitiate a knowing and intelligent decision by the Defendant not to testify.

Trial counsel testified that his major concern in permitting Defendant to testify was that the Defendant was subject to impeachment as a result of a prior conviction the Defendant had for the crime of aggravated assault.

Traditionally, Pennsylvania Court have permitted impeachment of witnesses by proof of any felony or misdemeanor conviction if it was in the nature of crime falsi; (emphasis supplied) that is involved dishonesty or false statement. Commonwealth vs. Bighum., Pa., 307 A.2d 255 (1973). If a witness is also the Defendant in a criminal trial, additional protectors attach when evidence of prior convictions is offered to impeach. The Courts have recognized the "tendency of a normal juror to accept testimony of prior convictions as a basis for finding a predisposition to commit the crime

5.

charged. Pennsylvania Evidence, Packel and Poulin Section 609.1 at page 449. In this instance the current charge was for an assault that led to murder whereas the prior conviction was for assaultive behavior. Aggravated assault has been held not to constitute a crime of false statement or dishonesty. Commonwealth vs. Grimm., Pa. Super, 378 A.2d 377 (1977).

In Commonwealth vs. Randall, Pa., 528 A.2d 1326 (1987), the Pennsylvania Supreme Court continued the longstanding requirement that only crimes of dishonesty and false statement were subject to impeachment.

Given the state of the law trial counsel's advise not to testify because of the possibility of prior conviction impeachment was totally unreasonable and did in fact vitiatethe decision by Defendant not to testify. Trial counsel also had another avenue to pre-test the impeachment question which he chose not to pursue. Trial counsel testified he was aware that a Motion in Limine could be filed to get a ruling on the issue outside the presence of the jury but could not explain his failure to file a Motion in Limine in this case. Defendant testified that he wanted to and felt it was important that he testify in his trial and would have done so absent the advise concerning impeachment. Defendant was obviously prejudiced by the erroneous advise in such a way that the truth determining process was undermined.

B.    **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO OBJECT TO A JURY INSTRUCTION WHICH DID NOT ADEQUATELY DEFINE REASONABLE DOUBT.**

The Court in charge to the jury defined reasonable doubt as follows:

"As part of that concept is included the phrase or expression reasonable doubt. Again we have a duty to explain the legal ramification or legal significance of that phrase as it applies to that particular concept. When we say that the Commonwealth must prove the guilty of the Defendant beyond a reasonable doubt, reasonable doubt does not mean beyond the shadow of a doubt, nor beyond the possibility of a doubt, nor is it a doubt that a juror might conjure up

in his or her own mind to avoid the performance of an unpleasant duty. But, reasonable doubt simply defined is such a doubt that would cause a person of ordinary firmness and prudence to hesitate to act in important affairs of his or her own life. Obviously a doubt to be reasonable <u>arises from the evidence</u> and must be such a doubt that would fairly strike a conscientious mind and cloud your judgment and cause you to hesitate to conclude that this Defendant is guilty" (emphasis supplied, Notes of testimony, Jury trial dated November 14, 15, 16, 17 and 18, 1988 at page 339.)

No exception was made by trial counsel to this instruction, Notes of testimony **Jury trial dated** November 14, 15, 16, 17 and 18, 1988 at page 367.

The Pennsylvania Criminal Suggested Standard Jury Instructions prepared by the Criminal Instructions Subcommittee of the Pennsylvania Supreme Court in effect at <u>the time of the trial</u> recommended the following instruction on reasonable doubt:

(3) "Although the Commonwealth has the burden of proving that the Defendant is guilty this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or <u>out of the lack of evidence presented with respect to some element of the crime</u>. A reasonable doubt must be a real doubt, it may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty." PA. SSJI (CRIM) Instructions 7.01 attached hereto and made a part hereof.

This instruction was recommended as being in line with the charge adopted in other jurisdictions. See cases cited in <u>Commonwealth vs. Evancho</u>, Pa. Supra, 103 A.2d 289 (1954), affirmed 379 Pa. 273, 108 A.2d 719. Proper jury instructions on reasonable doubt is constitutionally guaranteed. Any instruction which allows a finding of guilt based upon the degree of proof that is less than required by the due process clause is a violation of that guarantee. <u>Cage vs. Louisiana</u>, 111 S. Ct. 328 (1990). Where a jury instruction of reasonable doubt is constitutionally deficient, prejudice

7

must be presumed and the deficiency must be viewed as plain error. U.S. vs. Birbal, 62 F. 3d 456 (2nd circuit 1995).

In the context of this case the evidence consisted of a strongly contested identification of the Defendant by an eyewitness and the introduction of a jacket containing blood which was not capable of being described as human.  The point of the charge was to tell the jury that the vitally important and all pervasive reasonable doubt standard was limited to the evidence in the case.  Failure to instruct the jury that reasonable doubt could arise from the lack of evidence prejudiced the Defendant in such a way that the truth determining process was undermined.

C.    TRIAL COUNSEL WAS INEFFECTIVE FOR WITHDRAWING A
       PRE-TRIAL MOTION FOR CHANGE OF VENUE OR VENIRE.

The Post-Conviction Hearing testimony revealed that trial counsel withdrew a Motion for Change of Venue or Venire on the basis that the trial judge would permit him individual voir dire of potential jurors.

The record in this case reveals that trial counsel in support of his Motion for Change of Venue/Venire cited the extensive prejudicial coverage afforded the case in the print, radio and television medias.  This case was also one of a series of homicide cases in Berwick for which a special state police task force had been formulated.

In order for pre-trial publicity to be presumptively prejudicial a defendant must prove two (2) points: first either that (a) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual or objective; (b) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; or (c) the publicity is derived from police and prosecuting officer reports; and secondly, that the publicity must be so extensive, sustained, and persuasive without sufficient time between the publication and trial

for the prejudice to dissipate, that the community must be deemed to have been satured. <u>Commonwealth vs. Rucca</u> Pa. 670 A.2d 1129 (1996).

The newspaper articles submitted as Defendant's Exhibit #1 evidence that Defendant had a prior conviction for aggravated assault, Press-Enterprise article dated October 10, 1987, Press Enterprise article dated November 17, 1988; In one instance, it was unfairly and inaccurately reported that Defendant had admitted to the killing. The Times Leader articles dated August 26, 1988 and September 02, 1988 report that Defendant told police he acted along in the murder. Police and prosecuting officer reports were consistently quoted as sources of information by the media. Press Enterprise May 14, 1987, October 10, 1987, November 04, 1987, November 05, 1987, November 21, 1987, June 02, 1988, June 09, 1988, October 9, 1988. The Defendant was depicted in a number of photographs handcuffed and in the custody of law enforcement authorities. Press Enterprise articles dated October 10, 1987, November 05, 1987, June 02, 1988 and November 17, 1988.

In view of the extensive pre-trial publicity as evidenced by the newspaper articles introduced as Defendant's Exhibit #1, the introduction of Defendant's prior criminal record into articles, the use of police reports in articles and the photographs depicting Defendant in custody and in company of law enforcement authorities, the conclusion of the Court should be that the publicity was so extensive, substantial and persuasive that the community was indeed saturated. The publicity should be ruled to have been presumptively prejudicial and the failure of trial counsel to pursue his change of venue motion prejudiced the Defendant in such a way as to undermined the truth determining process.

> D. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO IMPEACH POLICE OFFICER WITNESSES ABOUT THE FACT THAT THE AMOUNT OF MONEY IN POSSESSION OF THE VICTIM WAS DISCLOSED IN A NEWSPAPER ARTICLE WHEN SAID FACT WAS USED TO SHOW GUILTY

## KNOWLEDGE BY DEFENDANT IN THE CASE.

Defendants statement to the police indicated that he had read that the victim was found with $400.00 on his person. Defendant testified at post-conviction hearing that he informed trial counsel about a Press Enterprise Newspaper article dated May 14, 1987 introduced as exhibit at post-conviction hearing and attached hereto. The article reports that "at this point, theft has been ruled out as a motive because the victim had $400.00 in his possession, McCormick said." Despite being proffered this information by Defendant, trial counsel did not cross-examine police officer witnesses about this obvious source of information as to money on the victim.

The importance of the testimony about Defendant's guilty knowledge cannot be overemphasized. Judge Myers' opinion in support of denial of post-trial motions noted that authorities testified that such figures were not published in the newspaper and yet the Defendant claims to have gathered the information from that source. Opinion and Order of Judge Myers dated January 09, 1990 at page 3. Trial counsel by utilizing the article would have been able to establish that the Commonwealth had publicly maintained the position that $400.00 was in fact found on the victim and expose the $450.00 for the rouse that it was. Because trial counsel did not confront Trooper Carlson with the inconsistency, he was unable to get to the cross-examination and argument that the $50.00 additional dollars never in fact existed. Raymond Fenstermacher testified that he saw the victim flash four (4) one hundred dollar bills. Notes of testimony at page 54. However, the failure to vigorously pursue this issue left the jury with the belief that the police had information about an additional $50.00 that had never been released to the press.

Given the circumstantial nature of the case against Defendant, it was incumbent upon trial counsel to have reviewed the article and used it in vigorous cross examination of its police witness. His failure to do so has prejudiced the Defendant in such a way that the truth determining process was undermined.

10

## IV. CONCLUSION

WHEREFORE, Defendant, Kenneth Alan Shiffer, based upon the foregoing, respectfully requests that your Honorable Court grant him relief under the Post-Conviction Relief Act and arrest his conviction and order his discharge or in the alternative grant him a new trial.

Respectfully submitted,

Hugh L. Sumner, Esquire
116 West Second Street
Berwick, PA 18603
(717) 752-5924

## 7.01 (Crim) PRESUMPTION OF INNOCENCE: BURDEN OF PROOF; REASONABLE DOUBT

(1) A fundamental principle of our system of criminal law is that the defendant is presumed to be innocent. The mere fact that he was arrested and is accused of a crime is not any evidence against him. Furthermore the defendant is presumed innocent throughout the trial and unless and until you conclude, based on careful and impartial consideration of the evidence, that the Commonwealth has proven him guilty beyond a reasonable doubt.

(2) It is not the defendant's burden to prove that he is not guilty. Instead it is the Commonwealth that always has the burden of proving each and every element of the crime charged and that the defendant is guilty of that crime beyond a reasonable doubt. The person accused of a crime is not required to present evidence or prove anything in his own defense (except with respect to the defense of _____, which I will discuss later). If the Commonwealth's evidence fails to meet its burden, then your verdict must be not guilty. On the other hand, if the Commonwealth's evidence does prove beyond a reasonable doubt that the defendant is guilty, then your verdict should be guilty.

(3) Although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime. A reasonable doubt must be a real doubt; it may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

(4) So, to summarize, you may not find the defendant guilty based on a mere suspicion of guilt. The Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt. If it meets that burden, then the defendant is no longer presumed innocent and you should find him guilty. On the other hand, if the Commonwealth does not meet its burden, then you must find him not guilty.

### SUBCOMMITTEE NOTE

The instructions on presumption of innocence, reasonable doubt and burden of proof have been combined and woven together because the subject matter of these instructions does not permit separate treatment without undue complexity. This arrangement predominates elsewhere. See, for example, Vol. 1, Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 11.01 (2nd Ed. 1970).

Copyright © 1979 The Pennsylvania Bar Institute

1 of 3

Date of Last Revision
June 1975

SPORTS

INSIDE



May 14, 1987

# PRESS-ENTERPR

Serving the heart of the Susquehanna Valley

# Slaying suspect seen by wit

## Man spotted carrying pipe from hotel a

### Victim couldn't identify attacker during questioning



■ AGE: 25-35
■ HEIGHT: 5-foot-8
■ WEIGHT: Slender
■ DESCRIPTION: White male, dark hair, parted, not beard but no mustache.
■ WEARING: Dark, waist-length coat over trousers and light shirt.

By Andy Ross
Press-Enterprise Staff

BERWICK — Police are seeking a man seen carrying a metal pipe-type object near the Hayes Hotel shortly after Leonard Radziak was brutally beaten there Monday morning.

Police said yesterday they have found no motive for the beating of Radziak, 51. He died Tuesday, and police termed the case a homicide.

The suspect is believed to be 25 to 35, and police have released a composite sketch based on a witness's description.

The witness, whom police did not identify, saw the man walking between LaSalle and Washington streets shortly after Radziak was beaten Monday at 1:19 a.m., said Sgt. Robert McCormick, a criminal investigator for police. The hotel is on LaSalle St.

The man was carrying a "long pipe-type object," 20-25 inches long, police were told.

Meanwhile, a bloodied hammer that was found in the stairwell of the west Berwick hotel has raised suspicions that another person was involved, a source said.

Police would not comment on the hammer or the possibility of a second assailant.

Radziak, a hotel resident, suffered severe head trauma and lacerations in the attack, police said. He died at Geisinger Medical Center, Danville, on Tuesday night.

McCormick described the attack as "very violent," noting there were numerous marks on the wall and a large blood stain on the carpet in the narrow hallway outside the victim's room.

Police searched Radziak's hotel room and found "nothing out of the ordinary," McCormick said.

At this point, theft has been ruled out as a motive because the victim had $400 in his possession, McCormick said.

"The fact remains they weren't after the money because they could have had it," said Tpr. Charles Confer of state police at Bloomsburg, who are assisting Berwick in the investigation.

It does not appear the assailant was scared off, Confer added.

Police can only speculate on the motive, said Berwick Police Chief Eugene Golla.

"Revenge? What else? I don't know. I'm stumped at this point," Golla said. "At this point, we're having trouble coming up with a logical motive."

Radziak, who was unemployed, was known to flash money and get into friendly arguments at the bar, "but I never remember anything that would get anybody after him," said American Ukrainian Citizens Club manager Robert Pollick.

Radziak was at the Ukrainian Club Monday from 12:45 a.m. to 1:15 a.m., when he asked a group of three to give him a ride back to the hotel, police said.

Two of those people, whose names are being kept confidential, volunteered to answer questions from police yesterday, McCormick said.

They said they noticed the hotel foyer was dark when they dropped Radziak off, said the investigator, who later discovered a light bulb had been unscrewed.

The beating took place just minutes after Radziak arrived home, police said. He was later discovered by one of five other hotel residents, who promptly called for an ambulance and police.

The victim was taken to Berwick Hospital Center, then by helicopter to Geisinger, where he was admitted in serious condition to the special care unit. He died Tuesday evening.

The man seen by the witness is described as a white male, around 5-foot-8
Please see SLAYING page 9

### Profile
American Ukrai
Don Hellenthal a
Radziak, who d
hallway outside

Please see SLAYING page 9

Teacher says Ierton was hool trip

# Video sto
# Berwick :
# approval

COMMONWEALTH OF PENNSYLVANIA   :    IN THE COURT OF COMMON PLEAS

                                 :    OF THE 26TH JUDICIAL DISTRICT

         VS.               :    COLUMBIA COUNTY BRANCH, PENNA

                                 :    CRIMINAL DIVISION

KENNETH ALAN SHIFFER          : 

              Defendant     :    NO:     294 OF 1987

                               :    CHARGE: Criminal Homicide

# MEMORANDUM OF COMMONWEALTH

# IN OPPOSITION TO DEFENDANT'S MOTION

# UNDER POST CONVICTION RELIEF ACT

FILED
PROTHONOTARY
CLERK OF COURTS OFFICE
Oct 23  3 02 PM '97

# *TABLE OF CONTENTS*

**Page**

Table of Citations................................................................... ii

I.   STATEMENT OF THE CASE/PROCEDURAL HISTORY.................. 1

II.  SUMMARY OF ISSUES PRESENTED................................................. 2

III. LAW AND ARGUMENT.................................................................. 3

         WHETHER TRIAL COUNSEL PREVENTED THE
         DEFENDANT FROM TESTIFYING ON HIS OWN
         BEHALF AT THE TIME OF TRIAL

         WHETHER THE TRIAL COUNSEL WAS INEFFECTIVE
         FOR FAILING TO OBJECT TO A JURY INSTRUCTION
         REGARDING REASONABLE DOUBT

         WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR
         WITHDRAWING A PRE-TRIAL MOTION FOR CHANGE
         OF VENUE/VENIRE

         WHETHER TRIAL COUNSEL EFFECTIVELY AND
         APPROPRIATELY CROSS EXAMINED CERTAIN
         POLICE OFFICERS ON BEHALF OF THE DEFENDANT

IV.  SUMMARY......................................................................................... 10

         Certificate of Service........................................................... 11

# *TABLE OF CITATIONS*

*Page*

Commonwealth vs. Rawles, Pa. 462 A.2d 619 (1983)...................................   3

# I.  *STATEMENT OF CASE/PROCEDURAL HISTORY*

The Defendant was convicted of second degree murder on November 19, 1988. Defendant's counsel, at the time, filed a Post-Trial Motion in Arrest of Judgement coupled with a Motion for a New Trial.  On January 9, 1990, these motions were *DENIED* and a direct appeal was perfected to the Pennsylvania Superior Court.

On October 18, 1990, the Superior Court *AFFIRMED* the Lower Court's Opinion.  The Defendant subsequently petitioned for Allowance of Appeal before the Pennsylvania Supreme Court, which was *DENIED* on June 27, 1991.

With respect to the facts giving rise to the charges and the testimony in support of the charges, the Court is referred to the transcript of the trial testimony, which is available for review.

The Defendant has now filed, pursuant to the PCRA Act, a petition raising several issues which are now ripe for determination by this Honorable Court.

## II.   *SUMMARY OF ISSUES PRESENTED*

A summary of the issues presented by the Defendant for review are as follows:

A.   **WHETHER TRIAL COUNSEL PREVENTED THE DEFENDANT FROM TESTIFYING ON HIS OWN BEHALF AT THE TIME OF TRIAL?**

B.   **WHETHER THE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO A JURY INSTRUCTION REGARDING REASONABLE DOUBT?**

C.   **WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR WITHDRAWING A PRE-TRIAL MOTION FOR CHANGE OF VENUE/VENIRE?**

D.   **WHETHER TRIAL COUNSEL EFFECTIVELY AND APPROPRIATELY CROSS EXAMINED CERTAIN POLICE OFFICERS ON BEHALF OF THE DEFENDANT?**

## III.  *LAW AND ARGUMENT*

### A.  WHETHER TRIAL COUNSEL PREVENTED THE DEFENDANT FROM TESTIFYING ON HIS OWN BEHALF AT THE TIME OF TRIAL?

The primary issue raised by the Defendant is his claim that he desired to testify on his own behalf and was prevented from doing so based upon the advice of his trial counsel.

The Defendant has cited two cases which the Commonwealth agrees accurately set forth the law with respect to ineffectiveness concerning the trial counsel with regard to a defendant's decision whether or not to take the stand in his own offense.

The case of *Commonwealth v. Rawles, Pa. 462 A.2d 619 (1983)* sets forth the proposition that matters such as these will not be considered if the actions of trial counsel are within the realm of sound trial strategy.

Furthermore, there is an inability to determine ineffectiveness in cases where there was no indication on the record of any disagreement between the defendant and his counsel as to the course taken.

It is obvious in this case that the following two things have occurred; first, the record contains no evidence of any dispute or discussion between the defendant and his counsel with respect to the defendant's desire to take the stand.

Secondly, trial counsel has accurately described the many factors involved in his determination to advise the defendant that trial counsel did not believe that it would be in the defendant's best interest to take the stand in his own defense.

Although trial counsel may have inaccurately recalled the applicable law with respect to

-3-

the defendant's existing aggravated assault conviction at the time of his trial for murder, he does clearly state that he was concerned that this might become a matter of consideration for the jury.

Subsequent to his apprehension on the charge of murder, a search warrant was executed at the defendant's residence. A jacket was turned over to the police at that time, however, the police were looking for a "Member's Only" style jacket, and found just such a jacket placed in the rear of a closet. This jacket was not voluntarily turned over by the occupant of the residence, but rather, was found pursuant to the execution of the search warrant.

The jacket became the center of much controversy. An eye witness had testified that she believed that she had seen Ken Shiffer shortly after the murder standing under a street light in the vicinity of the murder holding a long cylindrical object. Not only did she identify Ken Shiffer, subsequently, as the person she saw, but also she indicated at the time that the individual appeared to be wearing a "Members Only" style jacket.

When the "Members Only" style jacket was obtained pursuant to the search warrant, it was tested by both the Commonwealth and the Defendant. The test results revealed that the jacket contained blood which could not be determined to be either animal or human.

The Defendant's prior aggravated assault conviction involved a case where he brutally battered and pummeled another man with his fists causing bruises, marks and bleeding. Defendant's trial counsel testified that he was concerned that if the Defendant took the stand, he would be confronted with the jacket and asked to identify it, and further explain where the blood came from. The trial counsel's concern was that the Defendant might acknowledge the blood from the prior assault, thus giving rise to an adverse inference that could be drawn by the jury with respect to the Defendant's propensity for violence.

-4-

The trial counsel also testified that he knew the defendant, liked the defendant, and believed the defendant; however, he did not believe that the Defendant's demeanor on the stand would convey his innocence. Trial counsel was also concerned that the Defendant's demeanor might cause some jurors to draw a conclusion of guilt simply from his appearance on the witness stand.

It is contended that trial counsel's strategy was well thought out in that he obtained, correctly, a ruling from the trial court prior to the trial that the aggravated assault charge of the defendant would not be part of the Commonwealth's case in chief. Additionally, any ruling as to its admissibility during any defense presentation was deferred as it was unknown what the circumstances would be, and at that time it was not "ripe" for a decision. This was also appropriate as it was unknown whether the Defendant would testify and further, in the event that he did testify, whether the Commonwealth would be permitted to confront the Defendant with the "Members Only" jacket. This, coupled with the demeanor of the Defendant as viewed by the trial counsel, gave legitimate reasons for trial counsel to advise the Defendant that it would not be in his best interest to testify.

Notwithstanding this advice, trial counsel was adamant that he is experienced with respect to jury trials of criminal defendants and that the decision is ultimately left up to the defendant. In this case, the Defendant choose to accept the trial strategy recommendation of the trial counsel and now is bound by his decision not to testify.

**B.** **WHETHER THE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO A JURY INSTRUCTION REGARDING REASONABLE DOUBT?**

The Defendant believes that his trial counsel should have objected to a jury instruction given at the time of the trial.

The Defendant has accurately set forth the jury instruction that was read with respect to reasonable doubt.

It is not disputed that there are certain standard jury instructions that are suggested. However, it is also well recognized that any jury instruction is proper where it accurately states the law and creates no likelihood of confusion. (See Rawles)

In this case, the jury instruction with respect to reasonable doubt is neither incorrect nor unclear and therefore, does not present the likelihood of confusion. The charge as given by the trial court is very clear with respect to the Commonwealth's burden of proving the Defendant guilty beyond a reasonable doubt.

**C.** **WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR WITHDRAWING A PRE-TRIAL MOTION FOR CHANGE OF VENUE/VENIRE?**

The Defendant has also challenged the trial counsel's not to seek a change of venue/venire.

As referenced previously, this issue rests upon the trial strategy exercised by the trial counsel in this matter. Trial counsel testified that he was aware of the pre-trial publicity and had considered the potential for seeking a change of venue or venire. However, trial counsel testified that in his experience, it has always been preferable to conduct individual voir dire as it is his

-6-

best chance to individually question potential jurors to determine whether they have any bias. The trial counsel indicated that it has always been his preference to conduct individual voir dire as opposed to changing the venue or venire.

In the context of this case, it is obvious that trial counsel had a sound strategy in that he exercised the opportunity to individually question each and every potential juror to examine them for any preconceived ideas and/or bias. This ability obviates any concern the Defendant would have had with respect to pre-trial publicity and/or potential biased jurors.

**D.    WHETHER TRIAL COUNSEL EFFECTIVELY AND APPROPRIATELY CROSS EXAMINED CERTAIN POLICE OFFICERS ON BEHALF OF THE DEFENDANT?**

The Defendant maintains trial counsel was ineffective with respect to a failure to cross examine one of the investigating officers with concerning the sum of money which was found on the victim at the time of his death. The Defendant points to a newspaper article that referenced comments by the police that this matter did not have to do with a robbery as the victim had a large sum of money, ($400.00), on his person at the time of his death.

Obviously, these comments were made by the police at the initial point of their investigation. A review of the transcript in this matter reveals that the crux of the Defendant's argument is undermined by the reference to pages 297-299.

Trooper Walter P. Carlson testified that the Defendant was arrested and brought to the State Police Barracks in Bloomsburg, Pennsylvania for an interview. The Trooper mirandized the Defendant and then began to question the Defendant concerning the night in question.

Trooper Carlson stated that the Defendant acknowledged having been called by his co-defendant (George Sheeler) who asked the Defendant if he wanted to rob a man of "$400.00".

The Defendant then went on to indicate that he learned about the $400.00 both from George Sheeler and also from the newspaper account. The Defendant then <u>volunteered</u> that it would "be stupid for somebody to take $50.00 out of a man's pocket and leave $400.00". (See page 298 of transcript)

The Defendant was then questioned as to where he got the sums of $400.00 and $50.00 or "the extra $50.00". The Defendant paused and indicated that he had gotten it from the newspaper. The trooper pressed the Defendant for a clarification by telling the Defendant that "that wasn't in the newspaper". The Defendant reiterated that he had heard about the $400.00 from George Sheeler. When asked again about the $50.00 discrepancy, the Defendant choose not to answer. (See page 298 of transcript) The Defendant misses the obvious implication of the Commonwealth testimony. While it is true that Ray Fenstermaker testified that he had seen the victim flashing hundred dollar bills earlier in the evening, it is also true that Ray Fenstermaker saw the victim pay for a drink for another individual at the bar with a dollar bill. (See page 51 of transcript)

The Commonwealth maintains that the victim had not only the four one hundred dollar bills, but additionally, other cash with which to pay for his drinks and the drink of at least one other bar patron. It is obvious that the parties agree that the sum of $400.00 was recovered from the victim and therefore, that it appeared initially not to be an assault motivated by robbery.

However, when the Defendant volunteered that it would be stupid for somebody to take $50.00 out of a man's pocket and leave $400, it gave rise to the implication that the Defendant

participated in the assault and robbery and apparently had removed only $50.00 and missed removing the $400.00.

The Commonwealth maintained that the evidence that any amount was taken, apparently, an amount approximating $50.00, was information that was not released in any news article and, in fact, was information that was known only to the Defendant as a result of his participation in the robbery and subsequent murder.

Obviously, the Defendant cannot point to any ruse on behalf of the Commonwealth when he is the individual who first raised the issue of $50.00 having been taken from the victim. In fact, the Defendant was given an opportunity to clarify why he said this and he choose not to answer.

It is, therefore, maintained by the Commonwealth that the Defendant's argument is inaccurate and without merit with respect to trial counsel's failure to explore this point further. In fact, further exploration on cross examination may have solidified the inference in the jurors' minds that this defendant did participate as a result of his knowledge that was not available to the general public.

## IV.  **SUMMARY**

The Commonwealth maintains that the issues raised by the Defendant are without merit and, therefore, his trial counsel was not ineffective in his representation of the Defendant.

Respectfully submitted,

RICHARD W. KNECHT
Assistant District Attorney for Columbia County
Columbia County Courthouse
Bloomsburg PA 17815

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
                            : OF THE 26TH JUDICIAL DISTRICT
          VS.               : COLUMBIA COUNTY BRANCH, PENNA
                            : CRIMINAL DIVISION
KENNETH ALAN SHIFFER        :
              Defendant     : NO:    294  OF  1987
                            : CHARGE: Criminal Homicide

## *CERTIFICATE OF SERVICE*

*I, BETTE KRUM,* Sr. Legal Assistant, to *RICHARD W. KNECHT,* Assistant District

Attorney for Columbia County, hereby certify that I served a true and correct copy of the

foregoing Memorandum of Commonwealth in Opposition to Defendant's Motion Under Post

Conviction Relief Act in the case of *KENNETH ALAN SHIFFER which is DOCKETED TO*

*NUMBER: 294 OF 1987,* this *23rd day of OCTOBER, 1997,* by placing the foregoing

memorandum in the Columbia County mailboxes located in the Prothonotary's Office in the

Columbia County Courthouse, Bloomsburg, Pennsylvania, to the following individuals at the

following addresses:

HONORABLE GAILEY C. KELLER
President Judge of Columbia County
Columbia County Courthouse
Bloomsburg PA 17815

HUGH SUMNER, ESQUIRE
116 West Second Street
Berwick PA 18603

OFFICE OF THE DISTRICT ATTORNEY
FOR COLUMBIA COUNTY

Dated: _CH-23 1997_

BY: _Bette Krum_
Bette Krum, Sr. Legal Assistant for
RICHARD W. KNECHT, Esquire
Assistant District Attorney for Columbia County
Columbia County Courthouse
Bloomsburg PA 17815
(717) 389-5656



| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE COURT OF COMMON PLEAS |
| | : OF THE 26TH JUDICIAL DISTRICT |
| vs. | : COLUMBIA COUNTY BRANCH |
| | : CRIMINAL DIVISION |
| KENNETH ALAN SHIFFER | : |
| | : |
| Defendant | : NO. 294 OF 1987 |

### <u>*NOTICE OF APPEAL*</u>

Notice is hereby given that the Defendant, Kenneth Alan Shiffer, hereby appeals to the

Superior Court of Pennsylvania the Order entered in this matter on the 28th day of October, 1997.

This Order dismissed the Defendant's Petition under the Post Conviction Relief Act. This Order has

been entered in the docket as evidenced by the attached copy of the docket entry.

Respectfully Submitted,

Hugh L. Sumner, Esquire
Attorney for Defendant, Kenneth Alan Shiffer
Attorney I.D. #37193
116 West Second Street
Berwick, PA 18603
(717) 752-5924

FILED
PROTHONOTARY
CLERK OF COURTS OFFICE

Nov 20  12 12 PM '97

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE COURT OF COMMON PLEAS<br>: OF THE 26TH JUDICIAL DISTRICT<br>: COLUMBIA COUNTY BRANCH<br>vs.                 : CRIMINAL DIVISION<br>: |
| KENNETH ALAN SHIFFER | : |
| Defendant | : NO. 294 OF 1987 |

## ORDER FOR TRANSCRIPT

A Notice of Appeal having been filed in this matter, the official Court Reporter is hereby ORDERED to produce, certify and file the transcript in this matter in conformity with Rule 1922 of Pennsylvania Rules of Appellate Procedure.

Respectfully submitted,

Hugh L. Sumner, Esquire
Attorney for Defendant, Kenneth Alan Shiffer
Attorney I.D. #37193
116 West Second Street
Berwick, PA 18603
(717) 752-5924

COMMONWEALTH OF PENNSYLVANIA    : IN THE COURT OF COMMON PLEAS
                                : OF THE 26TH JUDICIAL DISTRICT
          vs.                   : COLUMBIA COUNTY BRANCH
                                : CRIMINAL DIVISION
KENNETH ALAN SHIFFER            :
                                :
                  Defendant     : NO. 294 OF 1987

## VERIFICATION OF INDIGENCE FOR APPELLATE
## IN FORMA PAUPERIS PROCEDURE

Appellate, Kenneth Alan Shiffer, has been indigent since assignment of counsel by the Public

Defender's Office of Columbia County and will continue to be indigent and unable to obtain funds

for representation by private legal counsel. Appellant must therefore proceed in forma pauperis in

all eppellate proceedings.

_____
Anthony J. McDonald, Esquire, for Hugh L.
Sumner, Esquire

COMMONWEALTH OF PENNSYLVANIA

vs

KENNETH ALAN SHIFFER

           Defendant

IN THE COURT OF COMMON PLEAS
FOR THE 26TH JUDICIAL DISTRICT
COLUMBIA COUNTY BRANCH,
PENNSYLVANIA
CRIMINAL DIVISION

CASE NO:   294 OF 1987
CHARGE:   CRIMINAL HOMICIDE

WILLIAM S. KREISHER, ESQUIRE, Attorney for the Commonwealth
Pennsylvania
HUGH SUMNER, ESQUIRE, Attorney for the Defendant

OPINION

October 28 , 1997, Keller, P.J.

     This matter is before the Court for consideration of
Defendant's Petition for Relief under the Post Conviction
Relief Act, 42 Pa. C.S.A. § 9541 et seq.  We held an
evidentiary hearing at which time the Defendant was represented
by counsel other than prior counsel.[1]  After a careful
consideration of the entire record and the applicable law, we
are convinced that the Defendant's Petition must be denied.

---

[1]
    At the conclusion of the initial hearing and before our decision, the
Commonwealth moved to reopen the record for additional testimony by trial
counsel on the sole issue of why the Defendant did not testify on his own
behalf.  The Defendant opposed the motion, and after hearing argument, we
will grant the same.  The motion is granted in the interest of justice to
make certain that <u>all</u> parties have every opportunity to pursue, as well as
oppose, the Defendant's claims fully.  By granting the motion, we will
consider the additional testimony in our discussion on the merits to
follow.  <u>Commonwealth v. Tharp</u>, 575 A.2d 557,558 (Pa. 1990).

1

We make the following findings of fact:

1.  The Defendant was arrested on or about October 9,
    1987, and charged with Criminal Homicide; 18
    Pa.C.S.A. § 2501 (a) (b).

2.  Following a Preliminary Hearing, the Defendant
    was held for Court, and on December 1, 1987, an
    Information was filed on this charge.

3.  Defendant's case came on for jury trial before
    the Honorable Jay W. Myers on November 15, 1988,
    and Defendant was found guilty by the jury of
    Murder in the Second Degree.

4.  Motions for a New Trial and in Arrest of Judgment
    were filed.  After consideration thereof, these
    Motions were denied.

5.  On February 12, 1990, the Defendant was sentenced
    to a period of life imprisonment.

6.  The Judgment of sentence was appealed to the
    Pennsylvania Superior Court who, by its
    Memorandum Opinion, affirmed the sentence on
    October 18, 1990.

7.  From the affirmance by the Superior Court,
    Defendant petitioned for Allowance of Appeal to
    the Pennsylvania Supreme Court, which was denied,
    June 27, 1991.

2

## DISCUSSION

In the instant petition, Defendant contends that he is entitled to relief on the basis that trial counsel, William C. Costopoulos, was ineffective as follows:

1. For failing to permit the Defendant to testify in his own behalf.

2. For failing to object to the trial Court's charge defining reasonable doubt.

3. For withdrawing Defendant's Motion for a Change of Venue or Venire.

4. For failing to impeach the police officer concerning the amount of money on the victim's person after knowledge that the amount appeared in the newspaper when Defendant's admitted knowledge of the amount was used to show his guilty knowledge.

The contention that trial counsel failed to render effective assistance is the most frequent claim of post conviction defendants. In considering this claim several clear standards exist. At the outset, counsel is presumed to have acted effectively. Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987). The burden is always on the Defendant to prove counsel ineffective; the burden never shifts to the Commonwealth to

prove counsel competent. <u>Commonwealth v. Hudson</u>, 485 A.2d 487 (Pa. Super. 1984).

To rebut the presumption of competency of counsel and to carry his burden, the defendant must prove: (1) that he had some claim of arguable merit which was not raised and (2) that there was no reasonable basis for counsel's actions or inaction. <u>Commonwealth ex rel Washington v. Maroney</u>, 427 Pa. 599 (1967). Once the Defendant has satisfied these two tests, he must show that he was so prejudiced by counsel's actions that the verdict has become unreliable. <u>Commonwealth v. Pierce, supra</u>.

I

Initially, the Defendant submits that trial counsel was ineffective for refusing to permit him to testify on his own behalf. If this were true, Defendant's assertion would have merit, since the ultimate decision in this regard must be made by the client himself. <u>Commonwealth v. Rowles</u>, 462 A.2d 619 (Pa. 1983). However, we are satisfied that counsel did not prevent the Defendant from testifying but, after advising him of the consequences, left the Defendant to make the ultimate decision.

The issue then is whether counsel's advise not to take the stand was so unreasonable as to vitiate a knowing and

4

intelligent decision by the Defendant.  <u>Commonwealth v. Fowler</u>, 523 A.2d 784 (Pa. Super. 1987).

Counsel's advise not to testify, so as to be permitted to assert his innocence, was based upon his concern that to do so would open the door and permit the Commonwealth to examine him concerning the blood found on the Defendant's jacket.  Although the Commonwealth was unable to tie the blood to the crime charged, its presence on Defendant's jacket would have admittedly required him to testify that it had gotten there during an aggravated assault for which he had previously been convicted.

This was the only way that Defendant's prior conviction would have become known to the jury.  This prior conviction for aggravated assault was not admissible otherwise to impeach, since it did not constitute a crime of dishonesty or false statement.  <u>Commonwealth v. Grimm</u>, 249 Pa. Superior Ct. 441 (1977).

Counsel's concern about opening the door and permitting Defendant's prior conviction for assaultive conduct to be introduced, when coupled with his opinion that the Commonwealth was unable to sustain its burden to convict, and his concern about the Defendant's demeanor on the witness stand, reasonably justified his advise that the Defendant not take the stand.

We are satisfied beyond all doubt that the Defendant, a man of prior criminal experience, knowingly and intelligently made the decision not to testify. We will not second-guess both the advice given by counsel nor Defendant's ultimate decision to follow this advice. The Defendant must bear the burden of his decision not to testify and cannot shift the blame after having received competent advice concerning the matter. Commonwealth v. Harper, 614 A.2d 1180 (Pa. Super. 1992).

II

The Defendant next contends that trial counsel, by failing to object to the Court's charge on reasonable doubt, was ineffective. It is Defendant's contention that the Court's charge was defective because it failed to instruct the jury that reasonable doubt could arise from the lack of evidence. In all other respects, Defendant concedes that the charge properly defined reasonable doubt.

It is true that the Suggested Standard Jury Instructions, as well as a number of other jurisdictions, require that the jury should be instructed that "a reasonable doubt may arise not only from the evidence introduced, but from the lack of evidence presented." Pennsylvania has never required that this form of instruction be included. Commonwealth v. Evancho, 175 Pa. Superior Ct. 225 (1954).

Since the trial Court's charge was correct, trial counsel cannot be faulted for failing to object.

### III

The Defendant's third assertion is that trial counsel was ineffective by withdrawing his motion for a change of venue or venire.  Counsel justified this decision by explaining that he felt it was the better strategy to withdraw the motion in exchange for the Court's grant of individual voir dire.

Since Pa.R.Crim.P. 1106 (E) does not mandate individual voir dire, except in capital cases, we will not engage in hindsight second-guessing of counsel's strategy in this regard.  Commonwealth v. Thomas, 526 A.2d 380 (Pa. Super. 1987).

Nor has the Defendant met his burden of demonstrating that he was prejudiced by counsel's withdrawal of the motion. The murder occurred on May 11, 1987, and the Defendant did not come to trial until November 15, 1988, (seventeen months later).  As demonstrated by the relative ease with which the jury was selected, in a matter of about nine hours of individual voir dire, any prejudice which might have been generated by pre-trial publicity had long before trial been dissipated.

IV

Finally, the Defendant contends that counsel was ineffective because he failed to "impeach" the police officer who testified to a statement made to him by the Defendant during which the Defendant told him of the amount of money, which had been in the possession of the victim.  This fact as argued by the Commonwealth, demonstrated Defendant's guilty knowledge.  On the other hand, the Defendant contended that he became aware of this fact because it was contained in a newspaper account of the murder.

From our review of the trial record, there does not appear to have been any real confusion about how the Defendant obtained knowledge of the money in the victim's possession. The police officer who testified to these facts readily admitted that the Defendant told him, when questioned how he obtained knowledge of the amount, that he had read the newspaper reports and it was for this reason that he had this knowledge.

Once again, we find no quarrel with trial counsel's failure to further pursue this matter.  There was no need, as the Defendant suggests, to beat a dead horse.  Defendant's mere suggestion falls far short of carrying his burden to overcome the presumption of counsel's competency.

8

We, therefore, draw the following conclusions of law:

1.  The Defendant was not deprived of his right to be
    represented by competent and effective prior
    counsel.

2.  The Defendant's prior counsel at all times
    relevant competently and effectively represented
    him.

Thus, it is clear that the Defendant has established
no grounds upon which relief can be granted.  Accordingly, and
for the foregoing reasons, we enter the following:

ORDER

AND NOW, this 28th day of October, 1997,
Defendant's Petition under the Post Conviction Relief Act is
hereby denied.

BY THE COURT

HONORABLE GAILEY C. KELLER, P.J.

1  COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

2          VS.            : OF THE 26TH JUDICIAL DISTRICT

3  KENNETH ALAN SHIFFER    :        OF PENNSYLVANIA

4                          :     COLUMBIA COUNTY BRANCH

5                          :       CRIMINAL DIVISION

6                          : NO. 294 of 1987

7                          :

8                          :

9

10

11          POST CONVICTION HEARING ACT HEARING

12          BEFORE HONORABLE GAILEY C. KELLER, PRESIDENT

13  JUDGE, in the Judge's Chambers, Columbia County Courthouse,

14  Bloomsburg, Pennsylvania, on Wednesday, October 15, 1997.

15

16

17

18

19  APPEARANCES:

20  RICHARD KNECHT, ESQUIRE, Assistant District Attorney for the

21  Commonwealth of Pennsylvania.

22  HUGH SUMNER, ESQUIRE, Attorney for the Defendant.

23

24                                      COPY

25

CHERI BRENNAN, RPR    BLOOMSBURG, PA    (717) 389-5668

2

1          THE COURT:   Mr. Sumner, I understand that

2    you are opposing the Commonwealth's request for permission

3    to take additional testimony.  Is that correct?

4          MR. SUMNER:   That's correct, your Honor.

5          THE COURT:   Your opposition to that motion

6    by the Commonwealth is what?

7          MR. SUMNER:   Our opposition, your Honor, is

8    based on a close reading of the motion for additional

9    testimony.  On paragraph five of the motion it indicates

10   that "in reviewing the testimony the Commonwealth has

11   determined that the Commonwealth's witness was not

12   sufficiently clear with respect to certain aspects of his

13   trial strategy, and therefore request an additional hearing

14   to complete the testimony of the Commonwealth."  And,***

15   further, it affirm in the briefing schedule.

16          Our opposition to this motion is that we

17   understand that the Court has the ability to grant reopening

18   of a case when the interest of justice require that.  We do

19   not feel the fact that the Commonwealth feels that its

20   witness, in reading its testimony, feels its witness was not

21   clear is a sufficient reason in the interest of justice to

22   reopen the case.  We feel that the clarity of the witness is

23   something for you, as a fact finder, to determine.  Not

24   something that, because the Commonwealth feels his witness

25   is not clear, therefore we should reopen the case.

3

1        We think that the interest of justice is a

2   high standard, and we do not feel that the mere testimony

3   may have been unclear in the opinion of the Commonwealth

4   Attorney, obviously, the opinion of the Commonwealth

5   Attorney and the Defense Attorney, that testimony may be

6   unclear is not a sufficient reason to grant a new hearing.

7   It is a sufficient reason for the Judge to look at the

8   testimony and determine in his own mind if it is clear.

9        We also object to the fact that the motion was

10  filed after the time period when the briefing schedule was

11  set.  The record was closed, the briefing schedule was set,

12  and the motion was filed.  The hearing was on the 26th of

13  June.  The briefs were due on the 25th of July of 1997.  The

14  brief was filed on August 5, 1997.  We feel that it is not

15  timely in terms of asking us now to reopen the record and

16  asking for a deferment of the briefing schedule.  We feel

17  that the best serving of justice is a high standard.

18       We do not feel that because the testimony may

19  have been unclear to the Commonwealth Attorney is not

20  sufficient reason to reopen the record.  We have a case to

21  provide--I do not have it with me--Commonwealth versus

22  Sanders.  In that case I think that the of Court dealt with

23  the question of the witness had been on direct examination,

24  cross examination, re-crossed and the Court would not, in

25  that case, allow the defense attorney to recross on the

4

1    basis that all the questions had been asked and answered,

2    and that there was no reason to continue to present

3    additional testimony.  So, we will provide that to the Court

4    Commonwealth versus Sanders on that issue.  Those are the

5    reasons we feel, your Honor, that the Court should exercise

6    its discretion in not allowing additional testimony in this

7    case.

8          MR. KNECHT:  Your Honor, I would surmise

9    that the case Mr. Sumner refers to will ultimately say it is

10   in the discretion of the Court as to whether additional

11   testimony should be permitted or not.  I think a guiding

12   standard is, in the interest of justice, we have to remember

13   this case is a 1987 case.  Obviously, the trial was sometime

14   after that.  We are dealing with the memory of the defense

15   attorney.

16          Mr. Sumner mentioned reading--I do not think

17   there was a transcript of the P.C.R.A. hearing.  I did

18   review notes and did make a determination that there was

19   information that would enhance the record, and I think in

20   the interest of justice, whether it benefits the Defendant

21   or the Commonwealth, should be permitted, and should be made

22   part of the record by testimony of Mr. Costopolous.

23          THE COURT:  Are you asking that the entire

24   record be opened or--

25          MR. KNECHT:  Simply the P.C.R.A. hearing I

CHERI BRENNAN, RPR     BLOOMSBURG, PA     (717) 389-5668

5

1    want to supplement.

2         THE COURT:  You wish to supplement his

3    testimony on what issue?

4         MR. KNECHT:  Well, on the issue of--I am not

5    sure how it is framed in Mr. Sumner's brief.  It would be

6    the issue pertaining to his advice to Ken Shiffer with

7    respect to whether or not Ken Shiffer should take the stand

8    and waive his 5th Amendment right, and additionally, his

9    rationale and/or reasoning for the advice that he gave Ken

10   in permitting Ken to make a decision as to whether or not to

11   testify.

12        THE COURT:  The testimony that you intend to

13   submit at this time is solely on the issue of whether or not

14   he was ineffective in advising or not permitting the

15   Defendant to testify?

16        MR. KNECHT:  That's correct, your Honor.

17   Although, again, my recollection is that Mr. Costopolous, I

18   believe, testified that he did not prevent Ken Shiffer,

19   simply advised him, and let him make the ultimate choice.

20   That is the area that I would wish to probe.  I would not

21   expect it would take long.

22        THE COURT:  What we are going to do then?

23   We are going to take the testimony solely on that issue, and

24   then I will rule on Mr. Sumner's motion as to whether or not

25   it will be considered as part of the record in deciding the

6

1    merits of the P.C.R.A. petition.

2              MR. KNECHT:  If I can add one thing with

3    respect to Mr. Sumner.  I cannot read the date it was filed.

4    Mr. Sumner made a reference to--

5              MR. SUMNER:  August 5th.

6              THE COURT:   Your motion?

7              MR. KNECHT:  My motion.  And, it is my

8    understanding my motion was filed on or about August 5th,

9    which was prior to the date that my brief was due.

10             MR. SUMNER:  Briefs were due in 30 days.

11             MR. KNECHT:  I think I had time to respond.

12   Our office had it.  I could respond August 27th.

13             MR. SUMNER:  Notice was thirty days and we

14   were directly to supplement it to references to the trial

15   transcript.

16             THE COURT:  Mr. Knecht?

17             WILLIAM COSTOPOLOUS, ESQUIRE, Called, sworn

18   according to law, and examined by Mr. Knecht.

19                     DIRECT EXAMINATION

20   BY MR. KNECHT:

21       Q      Attorney Costopolous, I am Rich Knecht from

22   the D.A.'s office.  I think you recollect we met before?

23       A      Yes.

24       Q      I had indicated to you that we would be

25   having a telephone conference and I would be asking you

7

1    questions with respect to your representation of Kenneth

2    Alan Shiffer.   I want to indicate beforehand that, and

3    Attorney Sumner and/or the Judge will correct me if I am

4    wrong, but the scope today will be limited to the area

5    pertaining to your advice and counsel with Ken Shiffer

6    regarding his decision as to whether or not to waive his 5th

7    Amendment right and take the stand and testify at the time

8    of his trial.

9         A        Correct.

10        Q        Just so you understand that.   I am not

11   attempting to elicit anything beyond that.   And there may be

12   interruptions by way of objections from Attorney Sumner?

13        A        I understand.

14        Q        Can you hear me clearly?

15        A        I can hear you.

16        Q        Would you for the record state your name and

17   your profession, please?

18        A        My name is William C. Costopolous.   I am an

19   Attorney in the Commonwealth of Pennsylvania and have been

20   since 1972.

21        Q        Would it be correct that you represented

22   Kenneth Shiffer regarding number 294 of 1987, Columbia

23   County Criminal Division?

24        A        Yes.

25        Q        Would it also be correct that you were the

8

1    chief trial counsel at the time the case of Commonwealth

2    versus Shiffer went to trial in Columbia County?

3          A      That is correct.

4          Q      At during that trial, or during the

5    preparation prior to that trial, did you meet with Ken

6    Shiffer?

7          A      I did.

8          Q      Did you have any discussions with him

9    regarding his desire to take the stand and testify in his

10   own behalf?

11         A      Yes.

12         Q      Do you recollect what your advice to Ken was?

13                MR. SUMNER:  Objection, your Honor.  We

14   object on the basis that this was asked and answered, this

15   question, at the June 26th hearing.

16                THE COURT:  Overruled.  Go ahead.

17                THE WITNESS:  Yes, your Honor.

18   BY MR. KNECHT:

19         Q      You may answer.

20         A      My advice to Ken Shiffer was that he not take

21   the witness stand during that trial.  And, I had several

22   reasons for them, many of which I have already testified to.

23   But, in addition to the reasons I have already given, there

24   was still another reason that I advised him not to take the

25   witness stand.  And that reason was that the police seized

9

1    from Ken Shiffer's home a black jacket with material they

2    believed and represented to the Jury was blood.

3            The Commonwealth could not prove, and

4    acknowledged that they could not prove, what type of blood

5    it was, nor could they even confirm that it was human blood

6    versus animal blood.  When I asked Ken Shiffer about that

7    substance on the jacket he indicated that it was in fact

8    human blood, but it came from a previous assault up in that

9    county for which he had been convicted.

10            At that point in the trial the Court had

11    already indicated it was not going to let that prior

12    conviction for assault into evidence during the

13    Commonwealth's case in chief.  But, kept the judicial option

14    open as to whether it would come in during the defense,

15    should we, quote, open the door.

16            And, I believe that if Ken Shiffer took the

17    witness stand to testify on his own behalf to his innocence

18    of the murder, which he had always maintained to me, that

19    the prosecutor would properly be allowed to present him with

20    the jacket, ask him if it was his jacket, and ask him if the

21    substance on the jacket was blood.  And, if so where it came

22    from.  And, Ken's truthful testimony would have been, if it

23    was consistent with what he told me, that it was human blood

24    that came from a previous assault and battery which the Jury

25    was not aware of.

1        And, in my opinion that would have opened the

2    door for that previous assault and battery to come in, which

3    I didn't think was in Ken Shiffer's best interests to come

4    in.  And that was another reason why I didn't want him

5    taking the witness stand, because I didn't want that

6    previous assault to come in, not only in the form of a prior

7    criminal record for that conviction, but also, I think, the

8    door would have been opened by his own testimony to get into

9    the fact how that assault on that other person took place

10    which produced blood flying onto the jacket which the

11    prosecution had possession of.

12        Q        Mr. Costopolous, you indicated that the

13    jacket was retrieved pursuant to the discussion of a search

14    warrant.  Do you recollect whether the jacket was turned

15    over voluntarily during the search the discussion of the

16    search warrant?

17        A        Well, the record will of course speak for

18    itself as to how it was retrieved by the authorities, but my

19    recollection based on the police testimony was that they

20    went there and another jacket was given to them and then

21    they executed the search warrant and found this jacket in a

22    closet.  And, therefore, was not voluntarily turned over to

23    them being searched for and seized.

24        Q        Your recollection with respect to those facts

25    were they also considered at the time that you advised Ken,

1    or had any discussions with him, as to whether he would

2    testify?

3         A      Well, of course, because that jacket that was

4    searched for and seized by the prosecution was incriminating

5    to the defense, was damaging to the defense, because the

6    prosecution's eye witness, which we vigorously cross

7    examined, and I believe compromised, made it clear in her

8    testimony that the assailant was wearing a jacket identical

9    or substantially identical to the one that was taken from

10   the closet on the night in question.

11        Q      When you say--I'm sorry?

12        A      That is it.

13        Q      Identical or substantially identical, was

14   there any particular brand name mentioned?  Style?

15        A      Yes, she was very specific about the brand

16   name.  I just don't recall it at the time.  If you refresh

17   my recollection I could tell you.  But the record answers

18   your question.  I just don't remember the brand name that

19   she gave.  But the one that they found was the brand name

20   she gave.

21        Q      Mr. Costopolous, ultimately who made the

22   decision whether or not Ken Shiffer would testify?

23        A      That decision was left to Ken Shiffer.  And,

24   that decision isn't mine as a matter of law.  Ken Shiffer

25   was ultimately given that decision, and it was made very

12

1    clear to him that that decision was his.  Though, I did

2    advise him that that is my opinion he should not take the

3    witness stand, it was his decision not to take the witness

4    stand.

5                    MR. KNECHT:  Cross examine.

6                    CROSS EXAMINATION

7    BY MR. SUMNER:

8         Q      Attorney Costopolous, I am Attorney Sumner on

9    behalf of Ken Shiffer.  Can you hear me?

10        A      I can, Mr. Sumner.

11        Q      On June 26 you testified, and you did not

12   mention anything about the blood on the jacket as being a

13   reason, is that correct?

14        A      The record will speak for itself as to what I

15   testified to.  And, I did not answer the question actually

16   as I am now trying to do.

17        Q      Don't you always try to answer your questions

18   fully, or are we doing it now?

19        A      I am now supplementing my answer that I gave

20   at that hearing.  And, the truth of the matter is on my way

21   home from the Courthouse, on that very day, that I

22   remembered another reason why I didn't call Ken.  And, just

23   flat out forgot to include it in my testimony when I was up

24   there on that day.  And that is how it happened, and thus

25   this supplemental record.

1    Q        Then you called Mr. Knecht and told him that

2    you had remembered that?  Is that the way it worked?  Did

3    you call him and give him that information, that you had

4    forgotten that, and that he should reopen the hearing?  Did

5    you call him?

6    A        I did not ask him to reopen the hearing.

7    That is none of my business.  I do remember bringing it to

8    his attention.  I don't recall if I called him and told him

9    of my recollection, or if he called me, having read the

10   transcript, and asked me about that jacket again.

11   Q        After June 26 do you remember receiving a

12   phone call from Mr. Knecht about this P.C.R.A. hearing?

13   A        I got at least one phone call from Mr. Knecht

14   about this P.C.R.A. hearing, who arranged this conference

15   call to accomodate me so I wouldn't have to come up there.

16   Q        Did Mr. Knecht discuss with you the issue

17   that you mentioned today regarding the jacket and the blood

18   and that type of thing?

19   A        I told him what my recollection was regarding

20   that jacket, yes.

21   Q        Was there more than one phone conference or

22   just the one?

23   A        I believe that on the substantive testimony

24   there was one phone conversation that dealt with my

25   recollection.  And then after that I made one or two calls

1    to try to get it on the record without having to get me back

2    up there.

3           Q       On June 26th you testified at the P.C.R.A.

4    hearing that one of the reasons that you did not put Ken on

5    the stand was because you were not sure whether or not the

6    Judge was going to allow in the prior conviction or not.

7    Today your testimony is that you knew that the Judge was not

8    going to leave that in?

9           A       No, I don't believe that was my recollection

10   that I knew the Judge wasn't going to leave it in.

11          Q       You don't recall testifying to that today?

12          MR. KNECHT:   I object.  That is not what I

13   recollect him saying today.

14          THE COURT:   You may answer.

15          THE WITNESS:  My recollection is that the

16   Court issued a ruling.  And, again, this is all a matter of

17   record--issued a ruling that it was not admissible during

18   the Commonwealth's case in chief.  And then I believe the

19   Court kept its judicial option open as to whether it would

20   come in during the defense case should we open the door to

21   it coming in.

22          Q       You do not recall testifying or any of our

23   conversation on the 26th about the fact that you did not

24   file a motion in limini that could have determined whether

25   or not it be brought in?  You do not recall that?

1    A        That I do recall, Mr. Sumner.  And I recall

2    that we did not file a motion in limini to get a ruling on

3    whether it would come in.

4    Q        Are you saying then that the Judge on his own

5    motion ruled that it would not come in?

6    A        No.  The defense either objected to it at

7    sidebar or on the record to it coming in.  I didn't even

8    want it coming in during the opening.  I just don't recall

9    when we did it on the record to keep it from coming in, even

10   during the opening.  But it was not in the form of a written

11   motion in limini.  It was either in sidebar or in chambers

12   on the record.

13   Q        Isn't it true, Attorney Costopolous, that a

14   motion in limini could have also covered the situation that

15   you are talking about now?  In other words you could have

16   filed a motion in limini that would not allow the

17   Commonwealth to ask a question about the origin of that

18   blood because it could lead to the fact he had a prior

19   conviction.  You could have filed a motion in limini on that

20   ground also, could you not have?

21   A        Could we have filed such a motion?

22   Q        Yes.

23   A        Yes, we could have filed such a motion.  But,

24   in my judgment, I think such a motion would have been

25   baseless.  Preclude the prosecution from asking the

16

1   Defendant, who opted to testify, about a jacket that was

2   taken from his closet.

3          Q       I am talking about the origin of the blood on

4   that jacket.  You already knew on the record that the blood

5   could not even be identified as human.  You do not feel the

6   Court would have ruled that the Commonwealth could not ask

7   about the origin of that blood given the fact it was not

8   human?

9          A       I don't think the Commonwealth could be

10   precluded about asking that.  But I could tell you for me to

11   have called the Defendant in this case to testify to his

12   innocence, which is why I would have called him, and which

13   he always maintained, and then not addressed on direct

14   examination what was out there for the Jury to consider,

15   this jacket, or the substance on the jacket, isn't the way I

16   would have done it.

17          Q       Well, the jacket--

18          A       I would have called him and then dealt with

19   it up front with the Jury as to, "is this your jacket."  And

20   we have heard testimony about blood on the jacket.  "Do you

21   know anything about it?"  And, I would have had to ask that

22   question.

23          Q       But the jacket was already out there before

24   the Jury anyway because it was brought into the trial,

25   wasn't it?

1    A      What was the question again?

2    Q      The jacket was already before the Jury

3  because Trooper Confer testified about the jacket and the

4  way it was obtained, did he not?

5    A      Correct.

6    Q      With respect to that jacket, you did delay

7  the trial so that testing could be done to determine the

8  origin on that jacket?  D.N.A.?

9    A      Right, as I recall.  And, we were very much

10 interested in what was on that jacket.

11     MR. SUMNER:  I have nothing further of him

12 then, your Honor.

13             RE-DIRECT EXAMINATION

14 BY MR. KNECHT:

15    Q      Mr. Costopolous, Attorney Sumner

16 characterized the blood on that jacket as not human.  Do you

17 think that is a fair characterization?

18    A      Well, that was a fair argument for the Jury

19 in light of the Prosecution's case.  But, it would not have

20 been a fair characterization based on what Ken Shiffer told

21 me.

22    Q      Well, were the results of the testing

23 actually better?  It characterized as blood but that they

24 could not determine whether it was animal or human?

25    A      Right.

18

1    Q    Well then that doesn't mean that it is not

2    human, does it?

3    A    No.

4    MR. KNECHT:  Nothing further.

5    MR. SUMNER:  Nothing further, your Honor.

6    THE COURT:  I guess that will conclude your

7    testimony.  Thank you.

8    THE WITNESS:  Thank you, Judge Keller.

9    Thank you, gentleman.

10   THE COURT: I am going to hang up.

11   MR. COSTOPOLOUS:  Yes, your Honor.

12   THE COURT:  Do you have anything further,

13   Mr. Knecht?

14   MR. KNECHT:  I do not, your Honor.

15   THE COURT:  Mr. Sumner, do you wish to

16   introduce any testimony in response?

17   MR. SUMNER:  We call Ken Shiffer.

18   KENNETH ALAN SHIFFER, Called, sworn

19   according to law, and examined by Mr. Sumner.

20   DIRECT EXAMINATION

21   BY MR. SUMNER:

22   Q    Mr. Shiffer, do you want to the state your

23   name, please?

24   A    Ken Shiffer.

25   Q    Ken, you heard the testimony, additional

19

1    testimony, presented by Attorney Costopolous, did you not?

2         A        Yes, Sir.

3         Q        You heard him mention that there was a

4    discussion about a jacket, and that that was part of the

5    reason why he didn't want you to testiy?

6         A        I heard that is what he said today, Sir, yes.

7         Q        Did he ever say that to you on or about the

8    time, or in preparation for the trial you had in this

9    matter?

10        A        No, Sir, he didn't.

11             MR. SUMNER:  I have nothing further then of

12   him.

13                    CROSS EXAMINATION

14   BY MR. KNECHT:

15        Q        Ken, were you present when the jacket was

16   retrieved?

17        A        No, Sir, I wasn't.

18        Q        Were you incarcerated at that point?

19        A        I was.

20             MR. SUMNER:  I object to the relevance of

21   this, your Honor.

22             MR. KNECHT:  We are talking about the jacket

23   and the circumstances surrounding it.

24             THE COURT:  Overruled.

25   BY MR. KNECHT:

CHERI BRENNAN, RPR    BLOOMSBURG, PA    (717) 389-5668

20

1      Q        Did you become aware that a jacket had been

2   retrieved from your residence that had some type of blood on

3   it?

4      A        Yes, Sir.

5      Q        How did you become aware of that?

6      A        If I'm not mistaken I think it was Trooper

7   Confer informed me while I was at Columbia County Prison.

8      Q        There was a question from Attorney Sumner

9   that had to do with the trial being delayed so that the

10  blood on that jacket could be further tested.  Do you

11  recollect that happening?

12     A        Yes, Sir.

13     Q        Were you aware at the time that the trial was

14  being delayed to have an additional D.N.A. tests at your

15  request?

16     A        Yes, Sir.

17     Q        Is it your contention that Mr. Costopolous

18  did not discuss with you at all the possibility of that

19  jacket being questioned if you were to take the stand?

20     A        Could you repeat that please?

21     Q        Let me try that again.  Did Mr. Costopolous

22  discuss with you at all the possibility of the Commonwealth

23  asking questions about that jacket if you took the stand?

24     A        No, Sir, he never did.

25         MR. KNECHT:  I have nothing further.

21

1      <u>MR. SUMNER</u>:  Nothing further of him.

2      <u>THE COURT</u>:  We will close the record, then.

3  BY THE COURT:

4      Q      Mr. Shiffer, I assume you are aware that Mr.

5  Sumner, on your behalf, had filed a motion in response, or

6  an answer in response to the Commonwealth's motion to the

7  reopen the testimony in this case?

8      A      Yes, Sir I became aware of that today.

9      Q      He indicated prior to your coming in here

10  this afternoon that the reason that he was opposing the

11  reopening of the record was that, and you may correct me if

12  I misquote you Mr. Sumner, that in the interest of justice

13  it would not be fair to permit the Commonwealth to

14  supplement the testimony of Mr. Costopolous.  Do you

15  understand that?

16      A      Yes, Sir.

17      Q      Do you have any other reason for opposing the

18  Commonwealth's request that the record be opened and

19  permitting additional testimony?

20      A      Well, Sir, I am, you know, correct me if I am

21  wrong, or I am misspeaking here, but when we had that

22  hearing in June and you had ordered briefs within thirty

23  days.  Am I right?

24      Q      Yes.

25      A      It was August 5th, I think, if I am not

1   mistaken, when this was filed.  I am, you know--I don't

2   agree with the fact that the D.A. has been able to go

3   through this again after he did not file the brief that you

4   had ordered within thirty days, or ask for a continuance

5   past the thirty days.  And, without asking for a

6   continuance, this is, you know, this is what he had filed

7   and received, for some reason.  And I am very unclear as to

8   why that went on.

9           Q       I want you to understand that what I intend

10  to do is, before I consider this testimony from this

11  afternoon, I will rule on your motion to have it excluded.

12  And if, in fact, I grant your motion then I will not

13  consider this testimony in reaching the merits of your

14  petition.  However, if I deny your motion then, of course, I

15  will consider it.

16          A       All right.

17                  THE COURT:   Anything further then,

18  Gentlemen?

19                  MR. SUMNER:  Nothing further.

20                  MR. KNECHT:  Just that if they were saying

21  thirty days, I will say I was instructed by my office to

22  file the brief by August 27, 1997.

23                  THE COURT: I think the record will speak for

24  itself?

25                  MR. KNECHT:  I agree.

CHERI BRENNAN, RPR     BLOOMSBURG, PA     (717) 389-5668

23

1    THE COURT:    I am going to give you an

2    additional ten days, Mr. Sumner.  If you wish to supplement

3    your brief you are free to do so, and, if you wish to brief

4    your question of whether or not the record should have been

5    reopened.  At the pre-hearing conference I understood you to

6    state that there was a case you were going to make the Court

7    aware of?

8              MR. SUMNER:  Yes.

9              THE COURT:    Okay.

10             MR. SUMNER:  Your Honor, the 10 days that he

11   has he is going to file his brief?

12             THE COURT:  He is going to file a brief on

13   everything.

14             MR. SUMNER:  On the new testimony, too?

15             THE COURT:  I assume he will.

16             MR. SUMNER:  Do I wait until you rule and

17   tell me to file?  In other words my brief stands as it is?

18   You are going to rule on the question of whether or not he

19   is allowed to use additional testimony?

20             THE COURT:    You are going to give me a

21   brief on that within ten days.

22             MR. SUMNER:  On whether or not additional

23   testimony should be allowed?

24             THE COURT:    That's correct.

25             MR. SUMNER:  Then I will have a chance to

CHERI BRENNAN, RPR    BLOOMSBURG, PA    (717) 389-5668

24

1    file a brief if the supplemental is allowed on that?

2              THE COURT:    You will have an additional 10

3    days then.    We will close the record once and for all.

4              (Whereupon the hearing was concluded.)

5

6

7

8

9              I HEREBY CERTIFY that the proceedings and

10   evidence are contained fully and accurately in the notes

11   taken by me on the above cause, and that this copy is a

12   correct transcript of the same.

13

14   _____

15                        CHERI BRENNAN, RPR

16

17

18

19

20

21

22

23

24

25

KENNETH A. SHIFFER,            :     IN THE COURT OF COMMON PLEAS
           Petitioner          :     OF THE 26TH JUDICIAL DISTRICT
                       :     COLUMBIA COUNTY BRANCH
                       :
          VS.                 :
                       :
BEN VARNER, et al.,            :     NO. 1:00 – CV - 1829
           Respondents         :

## CERTIFICATE OF SERVICE

    I, **RICHARD W. KNECHT, ASSISTANT DISTRICT ATTORNEY** FOR COLUMBIA
COUNTY, hereby certify that I served a true and correct copy of the documents requested by Order of Judge
William W. Caldwell on April 24, 2002, by first class mail, postage prepaid, to the following individuals at
the following addresses:

**Kenneth A. Shiffer
SCI Dallas
Drawer K, Follies Road
Dallas, PA 18612-0286**

                               **OFFICE OF DISTRICT ATTORNEY FOR
COLUMBIA COUNTY**

DATED:                                    BY:
                                 **RICHARD W. KNECHT, ESQUIRE
Columbia County Assistant District Attorney
Columbia County Courthouse
Post Office Box 380
Bloomsburg, PA  17815
(570) 389-5656
I.D # 41257**